FILED

2017 JAN -9  AM 10: 02

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PRIMO BROODSTOCK, INC., a Texas
Corporation,

     Plaintiff,

vs.

AMERICAN MARICULTURE, INC., a
Florida Corporation, AMERICAN PENAEID,
INC., a Florida Corporation, ADVANCED
HATCHERY TECHNOLOGY, INC., ROBIN
PEARL, and CHARLES T. TUAN,

     Defendants.                  /

CASE NO.:

2:17-CV-9-Ftm-29CM

## PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER and MEMORANDUM IN SUPPORT

NOW COMES Plaintiff, PRIMO BROODSTOCK, INC. (hereinafter referred to as "Primo"), by and through its undersigned attorneys having filed a Complaint for Injunctive Relief pursuant to Rule 65, Fed. R. Civ. P. (the "Complaint"), in the above-captioned matter hereby moves for a temporary restraining order against AMERICAN MARICULTURE, INC. ("AMI"), AMERICAN PENAEID, INC. ("API"), ADVANCED HATCHERY TECHNOLOGY, INC. ("AHT"), ROBIN PEARL ("Pearl"), and CHARLES T. TUAN ("Tuan"),(collectively hereinafter referred to as the "Defendants"), and in support thereof alleges as follows:

1

## PRELIMINARY STATEMENT

1.   Plaintiff seeks to enjoin the Defendants, acting individually and in concert, from misappropriating and converting Primo's proprietary shrimp broodstock to their own purpose and use, and passing off Primo's broodstock as API's, thereby irreparably damaging Primo's reputation in the marketplace and otherwise harming Primo in ways that cannot be compensated solely by money damages. The harm is imminent as each of the Defendants were in China in early November falsely representing to Chinese buyers that Primo had "abandoned over 650,000 animals and all of its genetic material." Sales to entities at these meetings in China are imminent. Defendants control massive quantities of Primo's broodstock and associated intellectual property rights. Defendants themselves project they will be "[a]ble to produce 500,000 breeder pairs per year."

2.   A temporary injunction is necessary because once the genie is let out of the bottle and the Primo broodstock genetics are released into markets outside of this Court's jurisdiction, such as China, the status quo will never be capable of being returned. Absent imposition of an immediate and complete injunction over all of Defendants' efforts to market and sell Primo's stolen broodstock, decades of

2

painstaking selection, testing, cross-breeding, and trial and error to finally achieve what is recognized as the heartiest and most disease-resistant shrimp ever created will be destroyed in one fell swoop.

3.  By signing below the undersigned counsel hereby certifies that she has made a good faith effort to obtain cooperation from the Defendants AMI, API and Robin Pearl but failed to reach an agreement.

4.  Specifically, the undersigned counsel has spoken to counsel for AMI, API and Robin Pearl twice and requested an agreement between the parties that none of Primo's live broodstock shrimp will be sold, relocated or otherwise removed from AMI and API's facilities in St. James City until such time as a hearing can be held on the matter.

5.  Counsel for Ami, API and Robin Pearl indicated that his clients would not agree to the request as of January 5, 2017 and requested Primo file in Federal Court.

## FACTUAL BACKGROUND

6.  Primo produces *Litopeneaus vannamei* (shrimp) broodstock in a specific pathogen free environment.

7.  Primo's goal is to produce families of shrimp broodstock that combine genetic traits found in different domesticated stocks with highly desirable production traits

3

from different geographical areas, thereby resulting in broodstock animals that have a higher tolerance to White Spot Syndrome Virus ("WSSV") in cold temperatures and superior growth in warmer temperatures.

8. Primo's founders developed their first generation of WSSV-tolerant shrimp in Ecuador in 2000. They formally incorporated Primo in 2011.

9. In 2011, Primo began importing WSSV-tolerant animals from the lines developed by the founders' arduous work in Ecuador and quarantining the imported WSSV-tolerant shrimp at the University of Arizona.

10. After further research and development, including painstaking cross breeding of the WSSV-tolerant lines with other disease tolerant lines, Primo received approval from the United States Department of Agriculture ("USDA") as an approved export facility.

11. In December 2013, Primo's client in Mexico conducted a field study comparing the survival rates of Primo's broodstock to those of a local Mexican broodstock.

12. The results of this study were startling. The local Mexican broodstock produced approximately 200 pounds of shrimp per hectare with a 20% survival rate; this was an unsustainable business model. By comparison, the Primo

4

broodstock produced over 800 pounds of shrimp per hectare with a survival rate in excess of 80%; this is a sustainable business model.

13. All of Primo's efforts have been conducted with the utmost care to preserve the confidentiality and proprietary nature of the animals and genetic codes associated with Primo's premium broodstock.

14. Needing additional space to increase its production capacity beyond its headquarters in Texas, Primo and AMI entered into an agreement on January 1, 2015 (the "AMI Agreement"), under which Primo would use a defined portion of AMI's "grow-out" capacity at AMI's facility in St. James City, Florida (the "AMI Facility") to "grow-out" Primo larvae broodstock for ultimate sale to third parties. The AMI Agreement also provided that Primo would be able to use the AMI Facility to continue its work of selecting genetically superior, disease-tolerant shrimp in hyper-intensive grow-out systems like the one at the AMI Facility. A copy of the AMI Agreement is attached as **Exhibit A** to the Complaint.

15. Under the terms of the AMI Agreement, Primo agreed to supply AMI post-larvae shrimp and immature shrimp broodstock so that AMI could grow-out that broodstock to at

5

least 20 grams. (AMI Agreement, Ex. A, ¶ 9). Under Paragraph 9 of the AMI Agreement, AMI was obligated to grow Primo's shrimp to a weight of at least 20 grams.

16. Most significantly for purposes of this lawsuit, the AMI Agreement made clear in Paragraphs 8 and 9 that (i) "Primo considers its live shrimp stocks to be grown at AMI intellectual property and any unauthorized sale, use or transfer to a secondary facility of live Primo shrimp from AMI stock will be libel [sic] for financial damages done to P[rimo]" (¶ 8), and (ii) "[a]ll live broodstock grown out [at the AMI Facility would] remain the property of Primo at all times" (¶ 9).

17. The AMI Agreement also provided that Primo would compensate AMI for its grow-out services by paying AMI a premium price for the live shrimp produced at AMI's facilities. Specifically, Primo would pay AMI $5.00 for each shrimp weighing between 20 and 30 grams and $7.50 for each shrimp weighing over 30 grams. (¶ 1).

18. Equally significant, in order to protect Primo's trade secrets and intellectual property rights to the genetically superior broodstock that has taken nearly two decades to develop, Paragraphs 3 and 7 of the AMI Agreement strictly limited what AMI could do with shrimp that failed

6

to meet the size or weight requirements or that could not be timely sold. Specifically, these paragraphs provided that (i) "[i]n the event an animal cannot be sold in an agreed upon time or size[,] the animal will be killed and sold as dead[,] fresh or frozen shrimp product into the market" (¶ 3), and (ii) "NO Primo shrimp of any size [shall] be used, transferred or sold by AMI without written authorization of Primo. . . ." (¶ 7, emphasis in original).

19.   The purpose of Paragraphs 3 and 7 of the AMI Agreement was to allow AMI to sell shrimp and recoup costs for shrimp that failed to grow-out to Primo's exacting minimum specifications, but only if such shrimp were first killed so that they could not be bred by a competitor and sold in direct competition to Primo's prized broodstock.

20.   Primo further worked to protect its intellectual property rights and the trade secrets represented by its broodstock by providing in the AMI Agreement that "Primo is permitted to have 1 employee on site at the expense of Primo." (¶ 21). The purpose of having an employee on site round-the-clock was to insure that not a single one of Primo's genetically robust and disease-resistant shrimp would be taken by anyone else looking to quickly get rich at Primo's expense.

7

21.   About one year into the AMI Agreement, relations soured, and on January 21, 2016, Primo filed suit against AMI in Lee County, Case No. 16-CA-181-A, seeking temporary and permanent injunctive relief to prevent AMI from breaching the AMI Agreement by harvesting Primo's shrimp prematurely in order to leverage a $100,000 pre-payment from Primo. A copy of that Complaint is attached as **Exhibit B** to the Complaint.

22.   On January 28, 2016, Primo and AMI signed a one page handwritten list of terms by which they would settle their differences and disengage from one another (the "Term Sheet"). Pearl signed the Term Sheet on behalf of AMI and Randall Lloyd Aungst ("Aungst"), a Vice President and manager with Primo, signed on behalf of Ken Gervais ("Ken Gervais"), Primo's President. A copy of the Term Sheet is attached as **Exhibit C** to the Complaint.

23.   While not a model of clarity, the Term Sheet is fairly interpreted as providing that the parties would wind down operations and terminate their business relationship on April 30, 2016.

24.   To that end, Primo would remove the shrimp it desired to purchase and retain as of that date and AMI would

8

not destroy any animals in the interim (as it had threatened to do before injunction relief was sought by Primo).

25. Though the Term Sheet was silent on what would happen to shrimp that didn't meet Primo's exacting standards, Pearl assured Aungst at the time that AMI understood its obligation to not sell any of Primo's live broodstock, but rather kill all shrimp left behind by Primo and sell it as profit to AMI.

26. Pearl's representation to Aungst was entirely consistent with the Paragraphs 3 and 7 of the AMI, which authorized AMI to sell shrimp that Primo refused to pay $5.00 to $7.50 per animal for, but only if those animals were first killed so that they could not be bred by a competitor and thereby sold in direct competition to Primo. (*See* ¶ 25, *supra*).

27. On January 26, 2016, Neil Gervais (Primo co-founder) filed a separate suit against Kenneth Gervais in the District Court of Waller County, Texas, seeking various forms of relief in a case captioned *Neil Gervais, Individually and Derivatively on Behalf of Primo Broodstock, Inc. v. Kenneth Gervais*, Cause No. 16-01-23560.

28. On July 19, 2016, the parties to that suit entered into a "Settlement and Mutual Release Agreement" (the

9

"Gervais Settlement"), which resolved the litigation and resulted in dismissal of the lawsuit. A copy of Gervais Settlement is attached as **Exhibit K** to the Complaint.

29. In addition to receiving $600,000 for all his equity interests in Primo, Neil Gervais agreed in Paragraph 3 of the Settlement to not compete with Kenneth Gervais or Primo from May 1, 2016 until April 30, 2017 "in the countries of China and Japan for the sale, ownership or distribution of broodstock shrimp."

30. In a separate agreement between Neil Gervais and Kenneth Gervais and Primo executed in April 2016, Neil Gervais agreed to not "either individually or as an employee of, or by contract with, any entity, provide or sell broodstock to, or breed shrimp for, any entity within [China and Japan]." A copy of this separate noncompete agreement is attached as **Exhibit L** to the Complaint.

31. Instead of killing the broodstock intentionally left behind by Primo under the assumption that AMI would kill the shrimp before selling them into the market, AMI, Pearl, and the other Defendants harvested Primo's live broodstock, created their own competing premium product from that broodstock, and used their substantial combined

resources to market the genetically superior, disease-resistant shrimp painstakingly developed by Primo.

32.   In July 2016, Ken Gervais learned that Pearl had posted a lengthy message on a Yahoo! Groups message board frequented by people in the shrimp industry. In that post, he false claimed that API "[o]ver the past 18 months . . . has been the primary multiplication center for Primo."   He further falsely stated that "we terminated our relationship with Primo Broodstock due to various defaults by Primo's owner, Ken Gervais."

33.   He then added that the shrimp left behind by Primo at the termination of the AMI Agreement "are now owned by API . . . and have been renamed API High Vigor Animals." Further, he boasted, "API has about 50,000 fully mature breeders in the 30 to 45 gram range available for immediate shipment" and "API's genetic program is already hard at work selecting future generations and we will be able to supply next generation animals starting in 2 months, and hopefully for many years thereafter. These animals will now be called API High Vigor. These Animals have shown SPR against Whitespot and EMAS."

34.   He concluded: "We want to work with the industry to bring these highly sought after APR SPR animals to the

world market. If you have any interest in obtaining these breeders for your hatchery . . . please contact me right away." A copy of Pearl's post is attached as **Exhibit D** to the Complaint.

35. When Primo learned that AMI and Pearl had blatantly lied about their intentions with respect to how AMI would dispose of the shrimp left behind by Primo at the conclusion of the AMI Agreement, Primo's attorneys sent Pearl and AMI a "cease and desist" letter (the "<u>Cease and Desist Letter</u>"), dated August 30, 2016. A copy of the Cease and Desist Letter is attached as **Exhibit E** to the Complaint.

36. In it, Primo's attorneys expressed their shock at AMI's justification for the retention of Primo's intellectual property. They wrote:

> Now, AMI is claiming that due to Primo's failure to pick up the shrimp, AMI owns the shrimp in question. This is undeniably false. AMI has even gone as far as to remarket the shrimp and sell them under their own name. The actions constitute a clear breach of both the Mutual Non-Disclosure Agreement[1] and "[the AMI] Agreement" signed by the parties. AMI is breaching the Mutual Non-Disclosure Agreement by disseminating Primo's intellectual property. The genetic makeup of these shrimp is clearly unique and is a product of Primo's efforts. Dissemination of this information will cause irreparable harm to Primo's business.

---

[1] A copy of the Mutual Non-Disclosure Agreement, dated December 10, 2014, is attached hereto as **Exhibit F** to the Complaint (the "<u>Mutual NDA</u>").

Furthermore, these acts by AMI constitute conversion. It is clear that AMI is exercising wrongful dominion or control over the property of Primo by selling and marketing the shrimp.

These shrimp are the property of Primo and do not belong to AMI. Therefore, this letter constitutes a demand to CEASE AND DESIST all sales and marketing of any shrimp that have ever belonged to Primo or the offspring of such shrimp.

37. In response, AMI and Pearl doubled down, giving Primo the runaround, arguing that his clients were not bound by the Mutual NDA and that since "[Primo] made no effort to take delivery of any of the animals in my client's tanks . . . by April 30, 2016, those animals became my client's to sell." A copy of this response is attached as **Exhibit G** to the Complaint.

38. Subsequently, Defendants worked in concert to market Primo's broodstock to China. In one notable instance, on November 3, 2016, Defendants hosted, participated in, or lent their name or facility to a sales presentation in China of broodstock that they identified as having originated with Primo but had been converted by them and renamed "High Vigor Breeder Shrimp."

39. At this November 3, 2016 presentation, a bilingual sales brochure was distributed falsely claiming that "Primo abandoned over 650,000 animals and all its genetic material

13

[to API in 2016]." The brochure identifies, Neil Gervais and Robin Pearl further verifying that Defendants were exercising dominion and control over Primo's live broodstock and intellectual property rights by boasting that "API continued the genetic breeding program and created API High Vigor Shrimp." The brochure further claimed that Defendants were "able to produce 500,000 breeder pairs per year." A copy of the brochure is attached as **Exhibit H** to the Complaint.

40. Primo learned about the November 3 meeting indirectly from a customer who later cancelled an order.

41. From the time of this meeting Primo worked to confirm these allegations independently.

42. Until recently, Primo could not commence litigation without requisite proof which included copies of the video and brochures.

43. Further, Primo was prevented from taking legal action to try and enjoin these activities since it was lacked sufficient funds to engage in protracted legal battles with the Defendants. In addition, at the time, Primo was deep in negotiations with Ningbo Tech Bank ("NTB"), a Chinese company that publicly trades on the Shenzhen Stock

Exchange, regarding a potential acquisition by NTB of Primo's assets.

44.   This acquisition became necessary for Primo as it was experiencing lower sales and was suffering financial losses, in part as a result of the business disruptions, litigation, and confusion in the marketplace engendered by the Defendants' activities (as described generally in this Complaint).

45.   NTB and Primo executed an Asset Purchase Agreement on November 23, 2016 calling for NTB at closing to purchase substantially all of Primo's assets. The acquisition, however, has not yet closed because all conditions to closing have not yet been satisfied.

46.   The acquisition agreement with between Primo and NTB also called for the parties to enter into a Management Services Agreement that would grant NTB the authority to provide management services to Primo in its day-to-day operations.

47.   Primo commenced its request for a TRO as soon as practicable following its having recently learned that Defendants were planning to deliver a shipment of live Primo broodstock to one or more customers in China via cargo plane sometime between the middle and end of December, 2016. This

information regarding the imminent shipment of Primo broodstock to China was obtained from Mr. Zhao Lei, a copy of whose Affidavit is attached as **Exhibit I** to the Complaint(the "<u>Zhao Affidavit</u>").

48. The Zhao Affidavit details how Primo and NTB came to be aware of Defendants' recent activities in China in respect of the offer to sell Primo's broodstock that was AMI and/or API wrongfully converted, including his learning that Defendants AMI and/or API would be shipping live Primo broodstock to one or more customers in China before the end of December, 2016.

49. Since inception of operations in this area, Primo and its president, Ken Gervais, have instituted tight controls over the living broodstock so that unscrupulous parties like the Defendants could not capitalize upon their hard work by stealing the fruits of their labor. A copy of the Affidavit of Ken Gervais is attached as **Exhibit J** to the Complaint.

50. Primo and its president, Ken Gervais, have since inception instituted tight controls over the living broodstock so that unscrupulous parties like the Defendants could not capitalize upon their hard work by stealing the fruits of their labor.

16

51. As a result of Defendants' misrepresentations regarding how they came to control massive quantities of Primo broodstock, Defendants are on the verge of flooding the world market with potentially millions of Primo's proprietary broodstock animals. A copy of the Affidavit of Zhao Lei is attached as **Exhibit I** of the Complaint.

52. Primo seeks injunctive relief here because it has no adequate remedy at law in that because (i) the actual value of the shrimp being bred, marketed, and sold by Defendants cannot be readily ascertained or reasonably quantified as money damages, and (ii) those sales will flood the market and destroy everything Primo and its President, Ken Gervais, have scrupulously worked to protect over the past 16 years. A copy of the Affidavit of Kenneth Gervais is attached as **Exhibit J** to the Complaint.

53. The potential harm to Defendants from this Court's entering a temporary and permanent injunction against them is virtually zero since everything they've gained to date is a result of their own conversion of Primo's live broodstock and associated intellectual property rights under the false pretext that Primo "abandoned" its broodstock.

54. Primo has a substantial likelihood of success on the merits. Defendants' admit that they possess and control

17

substantial numbers of Primo's live broodstock and associated intellectual property rights. Yet, they cannot point to a single agreement or acknowledgement by Primo or Ken Gervais evidencing their intent to abandon their interests in Primo's live broodstock and associated intellectual property rights.

55. Injunctive relief is in the public interest. Failure to grant the requested relief will effectively sanction Defendants' theft of Primo's proprietary assets.

56. A temporary and permanent injunction are necessary to preserve the status quo in the face of the prospect that Defendants will imminently flood the world market with hundreds of thousands of animals in which Primo has a proprietary interest without cause, without right, and without remorse.

## ARGUMENT

### A.    Standard for Granting Preliminary Relief.

57. Allowance of temporary injunction rests in discretion of trial court, guided by established rules and principles of equity jurisprudence arising from facts of the particular case.    *Muss v. City of Miami Beach,* 312 So.2d 553, 554 (Fla. 3d DCA 1975).

58. The party seeking a temporary restraining order must establish (1) a likelihood of irreparable harm; (2) unavailability of an adequate legal remedy; (3) a substantial likelihood of succeeding on the merits; and (4) considerations of the public interest support the entry of the injunction. *Parker v. State Bd. of Pardons & Paroles,* 275 F.3d 1032, 1034-35 (11th Cir. 2001); *Schiavo ex rel. Schindler v. Schiavo,* 430 F.3d 1223, 1225-26 (11th Cir. 2005). *Masters Freight, Inc. v. Servco, Inc.,* 915 So.2d 666, 666 (Fla. 2d DCA 2005).

59. The party seeking the injunction "has the burden of providing competent, substantial evidence" to satisfy each of these elements. *SunTrust Banks, Inc. v. Cauthon & McGuigan, PLC,* 78 So.3d 709, 711 (Fla. 1st DCA 2012).

60. The purpose of a temporary or preliminary injunction is not to resolve disputes but rather to prevent irreparable harm by maintaining status quo until a final hearing can occur when full relief may be given. *Michele Pommier Models, Inc. v. Diel,* 886 So.2d 993, 995 (Fla. 3d DCA 2004).

61. Additionally, under Rule 65(b) of the Federal Rules of Civil Procedure, a court may issue a temporary restraining order without notice to the adverse party only

if (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

62. Rule 4.05(a) of the Middle District of Florida Local Rules also requires that *ex parte* restraining "orders will be entered only in emergency cases to maintain the status quo until the requisite notice may be given and an opportunity is afforded to opposing parties to respond to the application for a preliminary injunction." M.D. Fla. R. 4.05(a).

63. In this case, as was described above, exigent circumstances exist where Primo is under the reasonable belief based upon the conduct of the Defendants that Plaintiff's intellectual property (the shrimp) will be exported overseas.

64. Further, the undersigned counsel has contacted counsel for the Defendants, AMI, API and Robin Pearl in order to ascertain their willingness to agree to a voluntary, temporary hiatus whereby no shrimp would be shipped. Counsel for AMI, API and Robin Pearl represented

20

that he had spoken with his clients and they are unwilling to agree to maintain the status quo and keep the shrimp at the St. James City location until a hearing can be held.

65.  Counsel also indicated that he would be out of the area and would not be available for a hearing in the immediate future.

66.  Consequently, Primo having attempted to obtain cooperation from API, AMI and Robin Pearl (those currently in possession of the shrimp) but said request having been denied, has no other choice but to seek a temporary restraining order until a hearing can be held whereby each side can be afforded the opportunity to provide evidence of and respond to the application for the injunction.

### MEMORANDUM IN SUPPORT OF THE TEMPORARY RESTRAINING ORDER

**B.  Primo Has A Substantial Likelihood of Success on the Merits.**

67.  A substantial likelihood of success on the merits is shown if good reasons for anticipating that result are demonstrated. *City of Jacksonville v. Naegele Outdoor Advert. Co.*, 634 So.2d 750, 753 (Fla. 1st DCA 1994), *approved sub nom. Naegele Outdoor Advert. Co., Inc. v. City of Jacksonville*, 659 So.2d 1046 (Fla. 1995).

68.   In   other   words,   prior   to   issuing   a   temporary injunction,  a  trial  court  must  determine  that  the  petition or  other  pleadings  demonstrate  a  prima  facie,  clear  legal right   to   the   relief   requested.   *Id.*   citing   *Oxford International   Bank   and   Trust,   Ltd.   v.   Merrill,   Lynch, Pierce,  Fenner  &  Smith,  Inc.,* 374  So.2d  54  (Fla.  3rd  DCA 1979).

      **i.   Primo  has  a  likelihood  of  success  on  its conversion claim.**

69.   Florida  law  defines  conversion  as  "an  unauthorized act  which  deprives  another  of  his  property  permanently  or for  an  indefinite  time."  *Senfeld  v.  Bank  of  Nova  Scotia Trust  Co.  (Cayman)  Ltd.,*  450  So.2d  1157,  1160-61  (Fla.  3d DCA  1984);  *Mabie  v.  Tutan,*  245  So.2d  872,  874  (Fla.  3d  DCA 1971)   ("[C]onversion   is   an   act   of   dominion   wrongfully asserted  over  another's  property  inconsistent  with  his ownership therein.").

70.   To  prove  a  conversion  claim,  a  plaintiff  must  show "ownership  of  the  subject  property  and  ...  that  the  other party  wrongfully  asserted  dominion  over  that  property." *Mattocks  v.  Black  Entm't  Television  LLC,*  43  F.  Supp.  3d 1311,  1321  (S.D.  Fla.  2014).

71.   "[W]here a person having a right to possession of property makes demand for its return and the property is not relinquished, a conversion has occurred." *Prou v. Giarla*, 62 F. Supp. 3d 1365, 1380 (S.D. Fla. 2014).

72.   Actions for conversion may properly be brought for a wrongful taking over of intangible interests in a business venture. *In re Corbin's Estate*, 391 So.2d 731, 732 (Fla. 3d DCA 1980).

73.   Here, Primo has sufficiently shown that AMI is wrongfully asserting dominion and control over Primo's property (*i.e.,* Primo's proprietary shrimp) and that Defendants are utilizing Primo's intangible interests in its proprietary methods for procuring Primo breeder shrimp.

74.   Primo is the rightful owner of the Primo broodstock and their offspring located at the AMI Facility from which the Defendants have hatched their scheme.

75.   Defendants are currently asserting dominion and control over the Primo broodstock and their offspring. They falsely claim that Primo abandoned its proprietary rights to the live broodstock and associated intellectual property right without pointing to a single agreement or acknowledgement by Primo or Ken Gervais that they ever intended to abandon their nearly two decade combined

commitment to the confidential development of Primo's broodstock and associated intellectual property rights.

76. Primo demanded that AMI and Pearl return the broodstock and cease and desist all sales and marketing any shrimp, or the offspring thereof, that ever belonged to Primo, but AMI and Pearl have failed to do so, and instead they and the other Defendants have conspired to further their scheme of usurping Primo's proprietary assets.

77. As such, Primo has a high likelihood of success on the merits of its Conversion claim.

       ii. **Primo has a likelihood of success on its Trade Secret Misappropriation claim.**

78. The Florida Uniform Trade Secret Act ("FTSA") provides for injunctive relief for "actual or threatened misappropriation" of a trade secret. §688.003, Fla. Stat. Ann.

79. The FTSA defines trade secret as:

> Information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

24

> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. Ann. Section 688.002; *Bright House Networks, LLC v. Cassidy*, 129 So.3d 501, 503 (Fla. 2d DCA 2014).

80.   Primo's proprietary state-of-the-art method of selecting and grouping shrimp using DNA markers to provide disease-resistant, accelerated growth shrimp breeding stock (the "Primo Method") is not known outside of Primo.

81.   The Primo Method is known only by certain Primo employees and others involved in Primo's business on a need-to-know basis.

82.   The Primo Method was developed over approximately 16 years and at a substantial cost to Primo (including but not limited to the Primo's principals studying and refining the methods used in the Republic of Ecuador for increasing the disease resistance and accelerating the growth of shrimp breeding stock).

83.   The Primo Method is especially valuable to Primo and provides it with a significant competitive edge in the marketplace, as it would be very time-consuming and expensive for others to duplicate. Broods incorporating the Primo Method also survive as much as four times the average of conventional broodstocks.

84.   Primo has enacted a number of measures to guard its proprietary methods and to guard against theft. Examples of such measures adopted in respect of AMI include:

a.   Primo advised each employee at the time of hiring about the strictly confidential nature of the Primo Method and the requirement that they preserve such strict confidentiality as a condition of their employment, which requirement the employees were regularly reminded of during the course of their employment.

b.   Primo had its own employees at AMI's Premises to ensure the integrity of the grow-out processes of Primo broodstock, including guarding against theft or other loss;

c.   The AMI Agreement expressly required AMI to agree that: (i) Primo's broodstock was Primo's intellectual property (¶ 8); (ii) all live broodstock remained Primo's property, even while on AMI's Premises (¶ 9); (iii) broodstock which cannot be sold at the time and size determined by Primo will be killed by AMI before it is sells them as fresh or frozen shrimp (¶ 3); and (iv) no Primo broodstock will be used, transferred, or

26

sold by AMI without Primo's written consent (¶ 7); and

d.   Primo required that AMI sign the Mutual NDA.

85.   Defendants conspired to acquire Primo's trade secrets and broodstock through improper means, including but not limited to falsely claiming that Primo abandoned all live broodstock and associated intellectual property rights in the Primo broodstock at the conclusion of the AMI Agreement, misappropriating Primo's animals and associated intellectual property rights, actively working to drive Primo out of business, and preparing to imminently flood the world market with millions of the finest shrimp breeds the world has ever seen.

86.   Defendants undertook these actions in concert for purposes of serving their own interests at the direct expense of Primo.

87.   As a proximate result of Defendants' misconduct, Defendants have each been unjustly enriched in an amount that cannot readily be determined, and their enrichment will grow exponentially if not halted immediately. Once the broods are released to the market, it will be very difficult—if not impossible—to put the genie back in the bottle.

88.   Because the full extent of Primo's damages cannot be readily ascertained, Primo has no adequate remedy at law.

89.   As noted above, the potential harm to Primo strongly outweighs the potential harm to Defendants, which is negligible.

90.   Primo has a substantial likelihood of success on the merits.

91.   Injunctive relief is in the public interest in that such interest is served by preserving Primo's private property rights from misappropriation by Defendants for their own personal gain.

92.   A temporary injunction is necessary to preserve the status quo in light of the likelihood that, absent an injunction, Defendants will flood the world market, particularly in China where they recently concluded marketing meetings. The resultant impact on goodwill to Primo will be devastating and Defendants lack adequate resources to compensate Primo for potential money damages (including statutory and common law exemplary damages) to which Primo would be entitled as a result of their illegal actions.

iii. **Primo** has a **likelihood** of **success** on its **Lanham Act claim.**

93.   The Lanham Act is a remedial statute and should be broadly rather than strictly construed.   *Irven v. Dep't of Health & Rehab. Services*, 790 So.2d 403, 405 (Fla. 2001) (discussing the interpretation of remedial statutes); *Campers World of Orlando, Inc. v. Nat'l Trailer Supply Co., Inc.*, 213 U.S.P.Q. 172 (Fla. Cir. Ct. 1980).

94.   Section 1125 of the Lanham Act provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,

or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activitiesshall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125

95.  A section 1125(a) violation may be established by showing the uses of a false designation of origin or false description or representation. *Campers World of Orlando, Inc.*, 213 U.S.P.Q. 172 (Fla. Cir. Ct. 1980).

96.  Primo has made a substantial investment of time, effort and money in developing the Primo Method.

97.  At little or no cost to themselves, Defendants wrongfully misappropriated the Primo Method and the resultant physical manifestation of that method embodied in Primo's broodstock, and thus they were unjustly enriched.

98.  Defendants made false and misleading statements of fact to a host of commercial enterprises concerning their purported rights over significant portions of Primo's broodstock and associated intellectual property rights.

99.  Those false and misleading statements have caused, and will continue to cause confusion regarding the affiliation, connection, or association of Defendants with the live Primo broodstock and associated intellectual property rights.

100. Defendants undertook these actions in concert for purposes of serving only their own interests to the detriment of Primo.

101. As a proximate result of Defendants' misconduct, they have each been unjustly enriched in an amount that cannot readily be determined. Their advantage will grow exponentially if not halted immediately.

102. Because the full extent of Primo's damages is not readily ascertainable, Primo has no adequate remedy at law.

103. As noted above, the potential harm to Primo strongly outweighs the potential harm to Defendants, which is negligible.

104. Primo has a substantial likelihood of success on the merits.

105. Injunctive relief is in the public interest in that such interest is served by preserving Primo's private property rights from misappropriation by Defendants for their own personal gain.

106. A temporary injunction is necessary to preserve the status quo in the face of the prospect that Defendants will flood the world market following their recent marketing pitch to Chinese breeders. The resultant loss of goodwill to Primo will be devastating and Defendants lack adequate resources to compensate Primo for the potential award of money damages (including statutory and common law exemplary damages) resulting from their illegal actions.

31

C.   **Primo   Faces   Irreparable   Harm   As   A   Result   Of Defendants' Wrongful Conduct and Primo has No Adequate Remedy at Law.**

107. "[A]n injury is irreparable where the damage is estimable only by conjecture, and not by any accurate standard." *JonJuan Salon, Inc. v. Acosta*, 922 So. 2d 1081, 1084 (Fla. 4th DCA 2006); Sun Elastic Corp. v. O.B. Indus., 603 So.2d 516, 517 n. 3 (Fla. 3d DCA 1992).

108. Irreparable harm for the purpose of temporary injunction is established where the harm cannot be compensated adequately by money damages. *Supreme Serv. Station Corp. v. Telecredit Serv. Ctr., Inc.*, 424 So.2d 844, 844 (Fla. 3d DCA 1982); *City of Miami Springs v. Steffen*, 423 So.2d 930, 931 (Fla. 3d DCA 1982).

109. Irreparable harm is presumed when a breach or wrongful conduct involves the "use" of specific trade secrets, customer lists, or direct solicitation. *First Miami Sec., Inc. v. Bell*, 758 So.2d 1229, 1230 (Fla. Dist. Ct. App. 2000); *Capraro v. Lanier Bus. Products, Inc.*, 466 So.2d 212, 213 (Fla. 1985) (in the context of covenants not to compete or not to divulge trade secrets, irreparable injury may be presumed).

110. A plaintiff has no adequate remedy at law when there is disclosure of confidential and propriety

32

information to a competitor.   *Tupperware Brands Corp. v. Hand*, 27 IER Cases 1585 (Fla. Cir. Ct. 2007).

111. Here, not only will monetary damages be unable to make Primo whole, it is impossible for Primo to accurately assess in monetary terms the damage that will occur to its business if Defendants are not enjoined from absconding with Primo's intellectual property and trade secrets.

112. In addition, the negative impact on Primo's goodwill, business relationships and market position, while not quantifiable with any precision, is devastatingly clear. Primo simply will not survive if Defendants are permitted to steal its trade secrets and associated intellectual property, particularly when the Defendants own maneuvers demonstrate that Primo's broodstock and associated intellectual property rights have real value.

113. Without an injunction, Defendants can use Primo's property and trade for their benefit and to the detriment of Primo, and Primo's business and its competitive advantages in the marketplace will be devastated.

**D.    The Considerations of the Public Interest Support the Entry of a Temporary Restraining Order against AMI and API.**

114.   The harm faced by Primo far outweighs any risk to the Defendants posed by temporary injunctive relief.

33

115. Defendants have no legal right to possess Primo's propriety shrimp or market it to third parties.

116. Defendants have no legal right to use Primo's propriety shrimp and trade secret methods. Defendants' misappropriation of Primo's rights enables them to obtain a grossly unfair competitive advantage over Primo.

117. Restraining Defendants from committing unlawful acts is in the best interest of the public.

118. Restraining Defendants from making misleading and false statements in marketing the course of their sale of shrimp is in the best interest of the public consumers.

**E.    Request to Expedite Proceedings.**

119. Primo respectfully requests this Court expedite the proceedings for a hearing.

120. As outlined more specifically above, Primo alleges Defendants currently are actively engaged in the misappropriation and conversion of Primo's proprietary shrimp broodstock for their own purpose, use, and profit.

121. Based upon good information and belief, Defendants intend to imminently ship significant quantities of Primo broodstock to customers in China. If the injunction is not entered, Primo believes that Defendants will endeavor to ship all Primo broodstock in their possession out of the

country so that it is beyond the territorial jurisdiction of this Court. Were Defendants permitted to ship the live Primo broodstock out of the country, Primo would be irreparably harmed as it would be virtually impossible to reverse that shipment and Primo would suffer devastating financial losses as its broodstock multiplied exponentially.

122. Besides the severe financial consequences Primo would suffer absent an injunction, Primo would also be forced to chase parties around the world to litigate issues regarding the ownership and origins of each shrimp exported by Defendants. Such an outcome would be highly costly and prejudicial to Primo.

123. Plaintiff is aware that the "stringent restrictions" of Rule 65 recognize that "our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 438-39 (1974.)

124. However, there are cases such as this, where in accordance with Fed. R. P. 65(b), the interests of justice warrant the granting of a temporary restraining order, without prior notice especially given the efforts Primo has

undertaken to obtain an agreement between the parties and avoid the need for this request.

## CONCLUSION

For the foregoing reasons, Primo Broodstock respectfully requests that the Court grant its Motion for a Temporary Restraining Order in all respects and:

a.    enter a temporary restraining order for a period of fourteen (14) days enjoining Defendants AMI, API Robin Pearl and each of their respective parents, subsidiaries, affiliates, officers, employees, agents, representatives, and anyone acting in concert with them, anywhere in the world, from shipping, selling or otherwise removing or relocating any shrimp broodstock in their possession or under their control, whether directly or indirectly, pending determination of whether such broodstock are descended or derived from Primo's broodstock; and

b.    grant such other relief as the Court deems just and proper.

Respectfully submitted this 6th day of January, 2017.

Pavese Law Firm
*Attorneys for Plaintiff*
Post Office Drawer 1507
Fort Myers, Florida 33902-1507
(239) 334-2195 Telephone
Primary Email:
CheneThompson@PaveseLaw.com
Secondary Email:
MichelleCornele@PaveseLaw.com

By:  /s/ Chené M. Thompson
      Chenè M. Thompson
      Florida Bar No. 541540
      Trial Counsel

### VERIFICATION

Under penalty of perjury under the laws of the United States of America and the State of Florida, I declare that I have read the foregoing, and that the facts alleged therein are true and correct to the best of my knowledge and belief. I understand that a false statement in this Verification will subject me to penalties of perjury.

Randall Lloyd Augnst, Vice President
Primo Broodstock, Inc.