PRIMO BROODSTOCK, INC., a
Texas corporation,

      Plaintiff,

v.                          Case No: 2:17-cv-9-FtM-29CM

AMERICAN MARICULTURE, INC.,
a Florida corporation,
AMERICAN PENAEID, INC., a
Florida corporation, and
ROBIN PEARL.

      Defendants.

_____

## OPINION AND ORDER

This matter comes before the Court on Plaintiff's Alternative Motion for Preliminary Injunction (Doc. #21) filed on January 26, 2017 and Supplement to the Motion for Preliminary Injunction (Doc. #68) filed on February 28, 2017. Defendants filed a Response in Opposition (Doc. #39) on February 7, 2017 and a Supplement to the Response (Doc. #64) on February 21, 2017. The Court conducted a hearing on the Motion on February 10, 2017. For the reasons set forth below, the Court grants in part and denies in part Plaintiff's request for injunctive relief.

### I.

Former United States Supreme Court Justice Byron White - quoting a "piscatorially favored" Louisiana district court - once described shrimp as "a gustatory delight." Deepsouth Packing Co. v. Laitram Corp., 406 U.S. 518, 518 (1972) (quoting Laitram Corp. v. Deepsouth Packing Co., 301 F. Supp. 1037, 1040 (E.D. La. 1969)).

Benjamin Buford Blue ("Bubba"), of "Forrest Gump" fame, memorably called shrimp "the fruit of the sea."[1]  To assist Mother Nature's efforts and produce enough of this "fruit" to satisfy society's cravings for the "gustatory delight," people around the world have turned to shrimp farming.[2] This case involves a dispute between American business partners-turned-competitors in that industry.

Primo Broodstock, Inc. (Plaintiff or Primo) is a Texas corporation engaged in the business of studying shrimp genetics and breeding and selling "highly disease-resistant" shrimp from the Ecuadorian *litopenaeus vannamei* strain.  (Doc. #20, ¶¶ 10-11.) Defendant Robin Pearl (Mr. Pearl) has an extensive background in shrimp farming and is the co-founder of defendants American Mariculture, Inc. (AMI) and American Penaeid, Inc. (API).  (Doc. #41, ¶¶ 2, 4.)  AMI is a supplier of fresh and frozen shrimp, which is produced at AMI's large shrimp farming facility (the AMI Facility) located in St. James City, Florida.  (Id. ¶ 5.)  API is AMI's wholly-owned subsidiary, formed in 2016.  (Doc. #40, ¶ 40.)

## A.    The Mutual Nondisclosure Agreement

The parties' relationship began in December 2014, when AMI hired Neil Gervais (N. Gervais) – at the time, Primo's lead scientist – to serve as a paid consultant to help API improve the viability of its shrimp farming operations.  (Doc. #41, ¶ 18, 31.)

---

[1] "Forrest Gump" was the 1994 Academy Award winner for Best Picture.

[2] Shrimp farming is the practice of producing new shrimp through controlled breeding operations, as opposed to fishing them out of the sea.

On December 11, 2014, Plaintiff and AMI entered into a Mutual Nondisclosure Agreement (the NDA) (Doc. #20-1) for the purpose of "explor[ing] a business possibility in connection with which each may disclose its Confidential Information to the other," and under which each party agreed not to "use" or "disclose" the other's "Confidential Information." It did not take long for this business possibility to become a reality.

**B.  The Grow-Out Agreement**

On January 1, 2015, Plaintiff and AMI formalized a new written agreement (the Grow-Out Agreement),[3] the "primary goal" of which was "to use a defined portion of AMI grow-out capacity to produce broodstock for Primo for sale to third parties." (Doc. #20-2.) Specifically, AMI agreed to grow young, post-larval shrimp - supplied by Primo - to large adult size at the AMI Facility in Florida.[4] AMI would then either sell the live adult shrimp back to Primo at fixed prices based on the animal's weight, or "harvest" (kill) the animals to sell as fresh or frozen dead shrimp, with the proceeds belonging exclusively to AMI. (<u>Id.</u> ¶¶ 1, 3, 4, 9.) The Grow-Out Agreement states that Primo shrimp are considered Plaintiff's intellectual property and prohibits AMI from selling or transferring any live Primo Shrimp to others without Plaintiff's permission. (<u>Id.</u> ¶¶ 7, 8.)

---

[3] The Grow-Out Agreement was signed by Mr. Pearl and Ken Gervais (K. Gervais), Primo's President. (Doc. #41, ¶ 31.)

[4] Primo's own facility in Texas did not have the space necessary to grow out sufficient quantities of shrimp to meet the demand that Primo believed it could generate.

**C.    The State Court Lawsuit and Resultant "Term Sheet"**

The business relationship quickly began to deteriorate. Among other perceived breaches, Defendants claimed Plaintiff was not repurchasing the live adult shrimp, as required by the Grow-Out Agreement. This, in turn, was causing Defendants to incur significant costs to maintain the large animals, which already exceeded the size at which Plaintiff was supposed to buy them back. In January 2016, Defendants threatened to harvest all live Primo shrimp of a certain size that Plaintiff did not buy back within ten days. Plaintiff filed suit in state court seeking a temporary restraining order to prevent this shrimp-ocide. (Doc. #20, ¶ 44.)

Ultimately, the parties resolved the dispute out of court. On January 28, 2016, Mr. Pearl and Randall Aungst (Mr. Aungst), Primo's Vice President, signed a one-page handwritten "Term Sheet" (Doc. #20-3), giving Primo until April 30, 2016 to remove all of its live shrimp from the AMI Facility.[5] Ultimately, Plaintiff left about 46,000 live adult shrimp at the Facility, which it could not afford to repurchase, as well as 650,000 shrimp that were too young to buy back. (Doc. 20, ¶¶ 51, 52.) The Term Sheet does not state what would happen to any live animals not removed from the Facility by April 30, 2016. The Amended Complaint avers, however, that Mr. Aungst "obtained unqualified verbal assurances from [Mr.] Pearl prior to executing the Term Sheet that, consistent with

---

[5] The parties disagree on whether this was an "accommodation" affording Plaintiff an extra three months to buy back the live Primo shrimp if it chose to do, so or instead imposed a contractual repurchase obligation on Plaintiff. (See Doc. #53, p. 71.)

Sections 3 and 7 of the Grow-Out Agreement, AMI would harvest (*i.e.*, kill) all live shrimp left behind on April 30, 2016." (<u>Id.</u> ¶ 50.) Mr. Pearl denies he ever made any such statement.

## D. Defendants' Disposition of Primo's Animals

In late July 2016, Plaintiff learned that Mr. Pearl and the newly-formed API were seemingly attempting to attract buyer interest, particularly in China, for the shrimp Primo had left at the AMI Facility. (<u>Id.</u> ¶ 59.) At the time, Primo animals were available for purchase in China only through Primo's exclusive distributor, Haimao Group. (<u>Id.</u> ¶ 37.)

Plaintiff's attorney sent AMI a cease and desist letter (Doc. #20-5) on August 30, 2016, which stated that any sale of Primo's shrimp would constitute a breach of the NDA and the Grow-Out Agreement. The September 16, 2016 response of AMI's attorney (Doc. #20-6) disputed this contention and asserted that Plaintiff possessed no continued rights in the live shrimp left at the AMI Facility past April 30, 2016. The letter asserted further that AMI was entitled to sell or otherwise dispose of the animals as it pleased.

## E. This Federal Lawsuit

### 1) The First Motion for TRO

Plaintiff filed suit in federal court on January 9, 2017 (Doc. #1) and immediately moved for an <u>ex parte</u> temporary restraining

order (Motion for TRO) (Doc. #2).[6]  The Motion for TRO sought to enjoin Defendants for fourteen days "from shipping, selling or otherwise removing or relocating any shrimp broodstock in their possession or under their control, whether directly or indirectly, pending determination of whether such broodstock [were] descended or derived from Primo's broodstock." (Id. p. 36.)  Plaintiff contended that distribution of live Primo Shrimp outside of Plaintiff's control would permit others to study and then replicate, through breeding, the animals' genetic superiority, destroying the "decades of painstaking selection, testing, cross-breeding, and trial and error [that was needed for Plaintiff] to finally achieve what is recognized as the heartiest and most disease-resistant shrimp ever created." (Id. pp. 2-3.)

The Court denied the Motion for TRO (Doc. #9) primarily on the ground that there was no "true emergency" justifying a grant of ex parte relief.  To the contrary, the evidentiary materials showed that the shrimp whose distribution Plaintiff sought to enjoin "ha[d] been available for distribution since at least as early as July 2016" and had seemingly already been sent to China – the geographic location of primary concern to Plaintiff – the previous month.  (Id. p. 5.)  In other words, "the genie [was] likely already out of the bottle." (Id.)  Moreover, there was

_____

[6] The original Complaint alleged claims of common law conversion, trade secret misappropriation, and "passing off" under the Lanham Act.

nothing indicating that future shipments had been scheduled, let alone were imminent. (Id.)

**2)    The Amended Complaint and Renewed Motion for TRO**

On January 26, 2017, Plaintiff filed a nine-count Amended Complaint (Doc. #20), as well as a Renewed Motion seeking a temporary restraining order (Renewed Motion for TRO) or, alternatively, a preliminary injunction (Alternative Motion for Preliminary Injunction) (both Doc. #21).[7]  The Renewed Motion for TRO alleged that, absent an injunction, Defendants would be able to "effectively eliminate Primo from the Chinese market."  (Id. at 52.)  This claim was based on allegations regarding Defendants' wide-scale breeding operations in China, as well as Defendants' use of the "Primo" trade name in connection with the animals they send to China for further breeding and for sale to farmers.[8]  (Id. ¶¶ 50-59.)  The Renewed Motion for TRO requested an ex parte order enjoining Defendants from shipping any shrimp and from "advertising or otherwise marketing or making any reference to any products or services that in any way, directly or indirectly,

---

[7] The Amended Complaint asserts claims for breach of contract; conversion; defamation; trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836; trade secret misappropriation under the Florida Uniform Trade Secrets Act, Fla. Stat. §688.001 et seq.; unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a); unfair competition under Florida common law; violation of the Florida Unfair and Deceptive Trade Practices Act, Fla. Stat. § 501.201 et seq.; and unjust enrichment.

[8] As discussed in greater detail below, Plaintiff also claims that Defendants are lying to the Chinese market about the "pure" genetic makeup of the shrimp and the "completeness" of the Primo genetic bank they supposedly now possess.

relate[d] to the manufacturing, marketing, distributing, shipping, offering for sale, selling, or conducting of research, testing, or analysis of the viability of Primo shrimp." (Doc. #21-7, p. 4.)

The Court again found insufficient evidentiary grounds to grant the ex parte relief sought. Specifically, there was "no plausible indication that additional shipments [of any shrimp would] occur before Defendants ha[d] the opportunity to be heard on th[e] matter." (Doc. #25, pp. 5-6.) The fact that, after receiving Defendants' attorney's response to the cease and desist letter, Primo delayed taking legal action for months also mitigated against an award of emergency ex parte relief. (Id. p. 6.) Nonetheless, appreciating the "significant legal rights, and perhaps billions of dollars, at stake," the Court expedited Defendants' response to, and a hearing on, Plaintiff's pending Alternative Motion for Preliminary Injunction. (Id. pp. 5, 7.)

### 3) Request For Preliminary Injunction

Primo now seeks an order enjoining Defendants, and those acting in concert, from:

1. manufacturing, marketing, distributing, shipping, offering for sale, or conducting of research, testing, or analysis of the viability[,] of Primo Shrimp;

2. soliciting (or assisting others in such solicitation) of shrimp breeders, shrimp distributors, shrimp farmers, or consultants in the shrimp industry that in any way, directly or indirectly, relates to the manufacturing, marketing, distributing, shipping, offering for sale, selling, or conducting of research, testing, or analysis of the viability[,] of Primo Shrimp;

3. disclosing Plaintiff's confidential, proprietary or trade secret information to others, including but not

limited to any shrimp breeders, shrimp distributors, shrimp farmers, or consultants in the shrimp industry;

4. advertising or otherwise marketing or making any reference to any products or services that in any way, directly or indirectly, relates to the manufacturing, marketing, distributing, shipping, offering for sale, selling, or conducting of research, testing, or analysis of the viability[,] of Primo Shrimp, including, inter alia, on Defendants' websites.

(Doc. #68-3.)

Plaintiff argues that it is entitled to a preliminary injunction because Defendants continue to: (i) breach the restrictive covenants contained in the NDA and in the Grow-Out Agreement; (ii) convert Primo's property; (iii) misappropriate the "trade secrets" embodied in the superior genetics of Primo's twenty-four "unique" families of shrimp; and (iv) and engage in unfair competition and violate the Lanham Act and the Florida Unfair and Deceptive Trade Practices Act by continuing to "mislead the world markets into believing that [Defendants], and they alone, have the 'real Primo'" – all of which will cause Plaintiff to suffer continued, irreparable harm.

Defendants oppose a preliminary injunction, except as to the use of the "Primo" name. Regarding Plaintiff's claim of irreparable harm absent an injunction, Defendants note that any Primo shrimp left at the AMI Facility have since died, and point out that Primo has remained in business in the year since Defendants began breeding and selling the shrimp Primo did not repurchase by April 30, 2016. (Doc. #64, p. 16.) Defendants assert that, in contrast, issuance of the broad injunction

Plaintiff seeks – namely, an order enjoining Defendants from breeding and selling its animals – will result in "a loss of employment for [Defendants'] 25 current employees [and] a complete loss of investment for AMI's investors."[9] (Doc. #39, p. 24.) Defendants contend further that "the American public will lose the largest current supplier of U.S.-grown, all natural, fresh shrimp, which will reduce the ability of the United States to become self-sufficient in its domestic seafood supply."[10] (Id.) To the extent the Court does grant the injunction Plaintiff seeks, Defendants request a bond of at least $10 million to cover the damages they expect to incur through the end of trial.

## II.

"[A] preliminary injunction in advance of trial is an extraordinary remedy" whose purpose "is to preserve the positions of the parties as best [the court can] until a trial on the merits may be held." Bloedorn v. Grube, 631 F.3d 1218, 1229 (11th Cir. 2011) (citations omitted). Primo seeks "a 'traditional' injunction, which may be issued as either an interim or permanent remedy for certain breaches of common law, statutory, or constitutional rights." Klay v. United Healthgroup, Inc., 376

---

[9] At the hearing, attorneys for both parties described this case as "bet the company litigation" for their clients.

[10] Mr. Pearl's Affidavit states that "[t]he United States' seafood trade deficit is $11.2 billion (2014 NOAA), which makes seafood the second largest trade deficit item of natural resources second only to oil. This complete reliance on imports makes the United States' seafood supply a major threat to United States' [sic] food security." (Doc. #41, ¶ 9.)

F.3d 1092, 1097 (11th Cir. 2004) (footnote omitted). A traditional injunction is warranted where the movant succeeds in establishing four things: (1) that it has a substantial likelihood of success on the merits of one or more of its claims; (2) that it will suffer irreparable injury, absent an injunction; (3) that the harm posed to the party opposing the injunction does not outweigh the movant's threatened injury; and (4) that the injunctive relief sought is not adverse to the public interest. Id.; Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam). The "failure to meet even one [of these four prerequisites] dooms" a request for injunctive relief. Wreal, LLC v. Amazon.com, Inc., 840 F.3d 1244, 1248 (11th Cir. 2016). Where an injunction is deemed warranted, the court has considerable discretion in shaping the particular relief afforded. Pac. & S. Co. v. Duncan, 792 F.2d 1013, 1014–15 (11th Cir. 1986) ("Framing an injunction appropriate to the facts of a particular case is a matter peculiarly within the discretion of the district judge." (quoting Gore v. Turner, 563 F.2d 159, 165 (5th Cir. 1977))).

### III.

The Court now turns to whether Plaintiff has shown entitlement to injunctive relief for each of the claims for which such relief has been requested,[11] and if so, the scope of relief that is appropriate under the facts of the case.

---

[11] Plaintiff's Alternative Motion for Preliminary Injunction does not request injunctive relief based on the claims for defamation (Count III) and unjust enrichment (Count IX).

## A. The Breach of Contract Claim (Count I)

Count I of the Amended Complaint asserts a breach of contract claim against AMI, for which Plaintiff requests an award of money damages, including punitive damages. Count I also seeks an order (1) enjoining AMI "from further breaches of the NDA . . . [and] the Grow-Out Agreement," and (2) requiring AMI "to kill all Primo shrimp in its possession for sale as dead fresh or frozen shrimp product into the market." (Doc. #20, ¶¶ 93-97.) According to Plaintiff, under Florida law, where an enforceable restrictive covenant is breached, irreparable harm is presumed, and an award of injunctive relief is typically warranted. (Docs. ## 21, ¶ 17; 53, pp. 9, 136.) Plaintiff also invokes a provision in the NDA stating that "each party agrees and acknowledges that any . . . violation [of the obligations imposed] will cause irreparable injury to [Plaintiff]," entitling Plaintiff "to obtain injunctive relief against . . . the continuation of any such breach." (Id. p. 9 (quoting Doc. #20-1, ¶ 10).)

Defendants admittedly sold at least 2,330 live shrimp that Primo left at the AMI Facility (Doc. #64-1, ¶ 10), and they also admittedly bred Primo shrimp with shrimp from other sources to create the new "High Vigor" hybrid line that API now sells. (Doc. #41, ¶ 101.) Defendants argue that no injunction is warranted, however, since Plaintiff is unlikely to succeed on the merits of the breach of contract claim, and since Plaintiff cannot show irreparable harm absent an injunction. Specifically, Defendants contend that: (1) shrimp do not fall within the NDA's definition

of "Confidential Information"; (2) the Term Sheet terminated the Grow-Out Agreement and transferred title in the remaining Primo animals at the AMI Facility to Defendants; and (3) due to their short lifespan, any live shrimp left at the AMI Facility on April 30, 2016 have since died. (Doc. #39, pp. 9-13.)

Normally, a breach of contract claim will not support issuance of a preliminary injunction because breaches can typically be remedied through an award of money damages. See United Steelworkers of Am., AFL-CIO-CLC v. USX Corp., 966 F.2d 1394, 1405 (11th Cir. 1992) (injunctive relief on the plaintiff's breach of contract claim deemed inappropriate where an "adequate remedy at law in the form of money damages" existed); Stand Up for Animals, Inc. v. Monroe Cty., 69 So. 3d 1011, 1013 (Fla. 3d DCA 2011) ("Because the allegations assert no more than a breach of contract compensable by a damage award, no irreparable harm essential to secure injunctive relief . . . could be demonstrated."). While the Court will assume without deciding that Primo is, in fact, eligible for injunctive relief for its breach claim based on the above-mentioned language in the NDA and/or Fla. Stat. § 542.335(1)(j), this assumption does not obviate Primo's obligation to "show a sufficient likelihood that [it] will be affected by the allegedly unlawful conduct in the future" in order "to obtain [the] forward-looking [injunctive] relief" that it seeks. Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1283 (11th Cir. 2001); see also Hoop Culture, Inc. v. GAP Inc., 648 F. App'x 981, 986 (11th Cir. 2016) ("[P]ast harm is not a basis for preliminary

injunctive relief, which requires a showing of likely future injury if an injunction does not issue."). Indeed, the Eleventh Circuit has stressed that the presumption of irreparable injury created under Florida law by the breach of a restrictive covenant is "rebuttable,"[12] Proudfoot Consulting Co. v. Gordon, 576 F.3d 1223, 1231 (11th Cir. 2009) (citing JonJuan Salon, Inc. v. Acosta, 922 So.2d 1081, 1084 (Fla. 4th DCA 2006)), and a remote (or non-existent) possibility of future irreparable harm is sufficient to rebut that presumption. TransUnion Risk & Alternative Data Sols., Inc. v. Challa, No. 16-11878, --- Fed. App'x ---, 2017 WL 117128, at *3 (11th Cir. Jan. 12, 2017).

Thus, a threshold question underlying Plaintiff's entitlement to injunctive relief as to its claim for breach of contract is whether Defendants are capable of breaching the NDA or the Grow-Out Agreement in the future, thereby exposing Plaintiff to additional harm. The answer is no.

## 1) The Non-Disclosure Agreement

Paragraph 3 of the NDA imposes on Defendant AMI the obligation "(i) to hold in trust and confidence and not disclose to any third parties . . . any Confidential Information and (ii) not to use any Confidential Information for any purpose other than to carry out

---

[12] Similarly, multiple courts of appeals have held that a contractual stipulation as to irreparable harm – like the one in the NDA – does not relieve the movant's burden of proving that such harm is actually expected to occur. E.g., Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1266 (10th Cir. 2004); Patio Enclosures, Inc. v. Herbst, 39 F. App'x 964, 970 (6th Cir. 2002); Smith, Bucklin & Assocs., Inc. v. Sonntagz, 83 F.3d 476, 481 (D.C. Cir. 1996).

discussions concerning, and the undertaking of, the Relationship."
(Doc. #20-1, ¶ 3.) Plaintiff alleges that "AMI breached and
continues to breach the NDA by failing to preserve the
'Confidential Information' (as defined in the NDA) that had been
imparted to it by Primo, including by transferring both males and
females of several highly desirable, disease-resistant lines to
the AMI's [sic] agents and instrumentalities." (Doc. #20, ¶ 84.)
Defendants dispute that they have used or disclosed anything that
constitutes "Confidential Information" under the NDA.

"[P]arties to a contract have the right to define the terms
of that contract." Buce v. Allianz Life Ins. Co., 247 F.3d 1133,
1150 (11th Cir. 2001) (Barkett, J., concurring); see also
Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc., 145 So. 3d 989,
993 (Fla. 4th DCA 2014) ("Contracts are voluntary undertakings,
and contracting parties are free to bargain for — and specify —
the terms and conditions of their agreement."). As relevant here,
the NDA defines "Confidential Information" as "any information,
technical data, or know-how, including, but not limited to, that
which relates to . . . research, product plans, [and] products."
(Doc. #20-1, ¶ 2.) Defendants argue that Plaintiff is not likely
to succeed with the merits of this claim because "there has been
no showing by Primo that the subject shrimp constitute information,
technical data, or know-how," as is necessary to bring Defendants'
activities within the scope of Paragraph 3's prohibitions. (Doc.
#64, p. 12.)

But Plaintiff's argument is not that a Primo shrimp itself constitutes "information, technical data, or know-how"; rather, it is that "genetic material traceable to Primo Shrimp" constitutes "Confidential Information." (Doc. #68, p. 22.) It is this "information relating to a product" that was "used" when Defendants created new hybrids using Primo shrimp and "disclosed" when Defendants sold Primo shrimp to others. The Court sees no reason why shrimp genetics would not fall within the NDA's broad "information relating to a product" definition to which the parties agreed.[13] See United States v. Kriesel, 720 F.3d 1137, 1145 (9th Cir. 2013) ("The district court also properly concluded that the blood sample itself is a tangible object, and the genetic code contained within the blood sample is information.").

But – and ultimately dispositive on Plaintiff's request for injunctive relief - Plaintiff's assertion that *all* genetic material *traceable* to Primo shrimp is Confidential Information is not supported by the record. The evidentiary materials instead show that Plaintiff has never deemed "confidential" the genetic material contained in **one** pure shrimp or in a **hybrid** (or "locked"[14])

---

[13] The NDA was actually supplied (and required) by AMI, not Primo. (Doc. #53, p. 65.)

[14] According to Mr. Pearl, the combination of a male breeder shrimp and a female breeder shrimp from different family lines creates a "locked" pair. "Locked pairs are production breeders that when crossed will produce a hybrid that will perform very well, but if a farmer were then to propagate future shrimp using these hybrids, the offspring would be severely inbred and thus would have poor results. This is how genetic shrimp broodstock companies" – like Primo – "protect their stocks and ensure that hatcheries keep ordering replacement breeders after each cycle." (Doc. 41, ¶ 26.)

pair.  Rather, the information Primo considers "confidential" is
the genetic material contained in Primo's "crown jewels": a "pure
**breeder pair**," i.e., a male and a female *from the same family line*.
Indeed, this is the information Plaintiff has scrupulously sought
to protect by never providing pure breeder pairs to anyone other
than AMI.  (See Doc. #20, ¶¶ 132-33 ("The breeder pairs of a single
genetic  family  of  shrimp  constitute  trade  secrets  of  Primo.
Primo's maintained the secrecy of its trade secrets by not making
its breeder pairs available for sale but only a male or female of
a particular family line.").)  As Plaintiff's counsel explained
in further detail at the preliminary injunction hearing:

> [Primo doesn't] sell the breeders, males and
> females, to [its] clients. And even Haimao,
> [Primo's] exclusive distributor, does not get
> a male and a female [from the same family].
> What they get is an A and a B.  And that AB
> combination,  through  [Primo's]  testing  and
> through all the[] work that [Primo's] done
> over time, has been able to produce 80 plus
> percent.
>
> So  [that's]  the  information  that's  secret
> here,  that's  confidential  -  and  the  only
> parties that got it[,] is Mr. Pearl's company.
> . . . They're the only parties that got A and
> B [breeders] together from the same family. .
> . . [Mr. Pearl] basically got the keys to the
> castle.

(Doc. #53, pp. 14-15.)  Indeed, the reason Primo admittedly did
not sign NDAs with others to whom it sold live shrimp was because
no one else was "handling breeder pairs."  (Doc. #53, pp. 127-28.)

Limiting the definition of "Confidential Information" to the
genetic material contained in pure Primo breeder pairs is fatal to
Plaintiff's claim  for  injunctive relief  as to  the  NDA because,

despite Defendants' access to those breeder pairs, there is insufficient evidence that Defendants actually bred or sold those pairs.   To the contrary, it appears that Defendants did not actually know the family lines of the shrimp Primo supplied.[15] Moreover, all of those breeder pairs have since died.[16]   (Id.; see also Doc. #53, pp. 45, 151-52.)   As such, not only has Plaintiff has not shown a substantial likelihood that Defendants "used" or "disclosed" Plaintiff's "Confidential Information" in the past, Plaintiff cannot establish that Defendants are likely to do so in the future.   Accordingly, Primo is not entitled to injunctive relief on its claim for breach of the NDA.

---

[15] Defendants contend they "received absolutely no information whatsoever about Primo's breeder pairs."   (Doc. #64, p. 13.) According to Mr. Pearl, "[t]he shipments of pure Primo PLs [post-larval shrimp] from Primo to AMI were never accompanied by any paperwork.   We had to guess as to its quantity, age, and family line, etc.   [A]t the time I assumed [Primo] would be able to figure out what family was what using their DNA-marking protocols." (Doc. #41, ¶ 38; see also id. ¶ 46 ("[N]one of the pure PL shipments had clearly defined origins, there was no certain way of knowing which family was which.").)   Thus, "once Primo abandoned the shrimp to AMI, AMI bred the abandoned shrimp not with each other, as [it] might have done had AMI had information regarding the breeder pairs, but with other non-Primo shrimp at AMI."   (Doc. #64-1, ¶ 17.)   Plaintiff acknowledges that Defendants were not supplied "a full genomic analysis of the breeder pairs" but claims that "each family line was scrupulously tracked."   (Doc. #68, p. 19.)   Emails exchanged between Mr. Pearl and K. Gervais support Defendants' claim that they were *not* provided adequate paperwork regarding the Primo animals' genetics or family lines.   (Doc. 41-1, p. 13.)

[16] "[T]he shrimp in question have a fairly short life span."   (Doc. #64, p. 15.)   At the time of the hearing, Defendants' shrimp were two generations removed from (i.e. the "grandchildren" of) the Primo shrimp left at the AMI Facility on April 30, 2016.   (Doc. #53, p. 152.)

### 2) The Grow-Out Agreement

Plaintiff also alleges that Defendants have breached the restrictive covenants contained in Paragraphs 3 and 7 of the Grow-Out Agreement. Paragraph 3 states that "[i]n the event an animal cannot be sold in an agreed upon time or size the animal will be killed and sold as dead fresh or frozen shrimp product into the market." Under Paragraph 7, AMI is prohibited from using, transferring, or selling "Primo shrimp of any size" without Primo's written authorization, including using a "Primo animal in AMI or alternative shrimp maturation, hatchery or grow-out facility."

According to Plaintiff, Defendants breached these covenants by selling and breeding the live shrimp that Primo did not repurchase from AMI by April 30, 2016, and continue to breach the covenants by breeding and selling hybrid shrimp derived from that proprietary stock. Defendants respond that they have not breached the restrictive covenants because the Term Sheet (i) transferred title in the animals left at the AMI Facility to AMI and (ii) extinguished the Grow-Out Agreement's restrictive covenants.[17] Defendants further contend that, even if the Grow-Out Agreement does embody a bailment relationship – as might have restricted their ability to sell or breed the shrimp even after April 30, 2016 – those restrictions applied only to the "pure" animals left

---

[17] In support, Defendants rely on the "Terminate Agreement" and "AMI to provide Bill of Sale" language in the Term Sheet. (Doc. #20-3.)

at the AMI Facility - all of which have since died – not to any hybrids derived therefrom.[18]  (Doc. #64, p. 15.)

The covenants limit Defendants' actions as to "Primo animals" and "Primo shrimp."  The Grow-Out Agreement does not, however, explicitly define these terms.  Plaintiff would seemingly have the Court construe "Primo shrimp" (and presumably "Primo animals") as:

> (i) any proprietary shrimp Plaintiff delivered to AMI, (ii) any shrimp, including all hybrids and "mutts,"[19] derived in any way from any proprietary shrimp Plaintiff delivered to AMI, or (iii) any shrimp delivered to any of the AMI Defendants from any source that are[,] or are derived in any way from[,] any of Plaintiff's proprietary shrimp.

(Doc. #68, p. 1 n.1.)  In other words, Plaintiff asks the Court to construe the terms "Primo shrimp" and "Primo animal" as all shrimp – whether larval or post-larval - having even the smallest fraction of the same genetic makeup as one of Plaintiff's "proprietary shrimp."

---

[18] "Bailment" is "a contractual relationship among parties in which the subject matter of the relationship is delivered temporarily to and accepted by one other than the owner." S & W Air Vac Sys., Inc. v. Dep't of Revenue, State of Fla., 697 So. 2d 1313, 1315 (Fla. 5th DCA 1997) (citing 5 Fla. Jur.2d Bailments § 1 (1978)). "As a general rule, delivery of the item to the bailee must give him or her the right to exclusive use and possession of the item for the period of the bailment."  Meeks ex rel. Estate of Meeks v. Fla. Power & Light Co., 816 So. 2d 1125, 1129 (Fla. 5th DCA 2002) (citing 8A Am. Jur. 2d Bailments § 28 (1997)).

[19] In his Supplemental Affidavit, Mr. Pearl defines shrimp "mutts" as the 3.6 million Nauplii (one-day old shrimp larvae) that Primo sent Defendants pursuant to a separate agreement "as a way to compensate [Defendants] for [Primo's] fail[ure] to comply with the Grow-Out Agreement by shipping [pure] breeders."  (Doc. #64-1, ¶ 12.)  Mr. Pearl asserts that Primo had no "right to re-purchase these [mutt] shrimp or restrict [Defendants'] use of these shrimp." (Id.)

Defendants do not believe the Grow-Out Agreement restricts what they can do with the hybrid animals they have created from either the pure Primo shrimp or the "mutts." The Court agrees that Plaintiff has not established a likelihood of succeeding with its interpretive position. This, in turn, forecloses the possibility of future breaches of the Grow-Out Agreement and thereby renders injunctive relief unavailable.[20]

"It is well settled that the actual language used in the contract is the best evidence of the intent of the parties . . . ." Rose v. M/V "Gulf Stream Falcon", 186 F.3d 1345, 1350 (11th Cir. 1999) (citations omitted); MDS (Can.) Inc. v. Rad Source Techs., Inc., 143 So. 3d 881, 890 (Fla. 2014). Paragraph 9 states that: "AMI is to receive **Post-larva** from Primo and grow them to at least 20g in specifically designate [sic] tanks. . . . All live animals grown out from designated tanks for the sole purpose of producing Primo broodstock remain the property of Primo at all times."[21] (Doc. #20-2, ¶ 9 (emphasis added).) Nauplii (the "mutt" shrimp) are not post-larval animals; they are "larva in usually the first stage after leaving the egg." Nauplius, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/NAUPLII

---

[20] It is, therefore, unnecessary for the Court to address whether the Term Sheet is an enforceable agreement that extinguished the restrictive covenants in the Grow-Out Agreement and transferred title in the Primo shrimp from Plaintiff to Defendants.

[21] Primo's attorney's cease and desist letter states that, under the Grow-Out Agreement, "the parties agreed that AMI was to receive **post-larva shrimp** from Primo and AMI was to raise these shrimp until they reached adult size." (Doc. #20-5 (emphasis added).)

(last accessed April 27, 2017); see also Country of Origin of Shrimp; Shrimp Hatching & Grow-Out Operations; Substantial Transformation, HQ 562998, 2004 WL 2303667, at *1, 2 (May 21, 2004).[22]

Because the Grow-Out Agreement ostensibly does not apply to Nauplii, Plaintiff is not likely to succeed in establishing that covenants restricted Defendants' ability to breed and sell descendants of those "mutt" shrimp. See Int'l Bhd. of Elec. Workers Sys. Council U-4 v. Fla. Power & Light Co., 627 F. App'x 898, 902 (11th Cir. 2015) ("In interpreting a contract, we must read the words of the contract in the context of the contract as a whole."); cf. "S&B/BIBB Hines PB 3 Joint Venture v. Progress Energy Fla., Inc., 365 F. App'x 202, 207 (11th Cir. 2010) ("Courts will not rewrite unambiguous contracts to make them more advantageous for one of the parties or to 'relieve one of the parties from the apparent hardship of an improvident bargain.'" (quoting Home Dev. Co. of St. Petersburg, Inc. v. Bursani, 178 So.2d 113, 117 (Fla. 1965))). As such, the Court will not enjoin future breeding operations involving these mutt shrimp or the sale of their descendants, nor require Defendants to harvest them.

---

[22] "Under Florida contract law . . . . [c]ourts may resort to reference materials to determine the accepted plain meaning of a particular term." Nat'l R.R. Passenger Corp. (Amtrak) v. Rountree Transp. & Rigging, Inc., 422 F.3d 1275, 1284 (11th Cir. 2005) (citing Burns v. Barfield, 732 So.2d 1202, 1205 (Fla. 4th DCA 1999)); see also Roper v. City of Clearwater, 796 So. 2d 1159, 1162 (Fla. 2001) ("Where terms which are key to the analysis have not otherwise been defined, the Florida courts have looked to various sources for definitions.").

The second contract interpretation question - whether the restrictive covenants encompass hybrids derived from the "pure" Primo shrimp Defendants received from Plaintiff - reveals a latent ambiguity in the Grow-Out Agreement. "A latent ambiguity is said to exist where a contract fails to specify the rights or duties of the parties in certain situations" - in this case, the fate of the ill-gotten fruits of Defendants' putative breach. <u>MDS (Can.) Inc. v. Rad Source Techs., Inc.</u>, 720 F.3d 833, 844 (11th Cir. 2013) (quoting <u>Forest Hills Util., Inc. v. Pasco Cnty.</u>, 536 So.2d 1117, 1119 (Fla. 2nd DCA 1988)). In such case, "extrinsic evidence is necessary for interpretation or a choice between two possible meanings."[23] <u>Id.</u>; <u>see also</u> <u>LSQ Funding Grp., L.C. v. EDS Field Servs.</u>, 879 F. Supp. 2d 1320, 1332 (M.D. Fla. 2012) ("If a latent ambiguity exists, extrinsic evidence is admissible to determine the intent of the parties."). Furthermore, "the rule of <u>contra proferentem</u> requires [the Court] to construe any ambiguities against the drafter." <u>Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan</u>, 833 F.3d 1299, 1307 (11th Cir. 2016).

The extrinsic evidence available to the Court supports resolution of the hybrid-shrimp ambiguity in Defendants' favor –

---

[23] A patent ambiguity, in contrast, "arises from defective, obscure, or insensible language, and Florida law does not permit the introduction of extrinsic evidence to discern the parties' intentions." <u>MDS (Can.)</u>, 720 F.3d at 844 (citing <u>Ace Elec. Supply Co. v. Terra Nova Elec., Inc.</u>, 288 So.2d 544, 547 (Fla. 1st DCA 1973)).

at least at this preliminary stage.[24]  The record shows that the purpose of the restrictive covenants at issue was to prevent anyone from obtaining the invaluable "keys to [Primo's] castle": female and male breeders from the same Primo family line.[25] (Doc. #53, p. 15). Because Plaintiff has not demonstrated a likelihood of success on the merits of its claim that the restrictive covenants encompass the use or sale of hybrids,[26] and because Defendants currently possess only hybrids, an order enjoining Defendants' actions with respect to the sale or breeding of those animals is not warranted.[27]

---

[24] The rule of <u>contra</u> <u>proferentem</u> is also appropriately invoked here.  At the hearing, Defendants' attorney stated that the Grow-Out Agreement was drafted by K. Gervais.  (Doc. #53, pp. 86-87.) Primo's attorney objected to this statement because no evidence had been presented as to who drafted the Agreement.  The Court overruled the objection and provided Plaintiff's counsel the opportunity to "argue to the contrary on rebuttal." (<u>Id.</u> p. 57.) Plaintiff's attorney did not present any rebuttal argument.

[25] (<u>Id.</u> pp. 16 ("The only way to reproduce the genetic makeup of the breeder to create more breeders that you can then create combinations and hybrids is to -- is to have testing, et cetera, et cetera, that allows you to establish that pure family line. It's a blue blood. Each one is a blue bloodline."), 117 ("[W]e're talking about breeder pairs.  That's what matters here.  It's not the offspring we care about.  They can sell the offspring.").)

[26] On the issue of hybrids, Defendants' counsel noted at the hearing that dog breeders "have no control over whether the consumer or the purchaser of those pups goes out and breeds them with another type of dog to create hybrids."  (Doc. #53, p. 101.)  In response, Plaintiff's attorney stated: "You can take the puppies. You can take all the puppies you want.  There's nothing you can do with them. Nobody wants to buy your bred puppies.  They want the parents, that's who they want, the mom and dad, Seattle Slew and, you know, whoever else . . . . Seattle Slew has mated with.  That's who they want."  (<u>Id.</u> p. 128.)

[27] The same analysis applies to Plaintiff's conversion claim; even if Defendants converted Plaintiff's property – the pure Primo shrimp – the subsequent death of those animals means there is no basis for believing that any future conversion is possible.

**B.    The Trade Secret Misappropriation Claims (Counts IV and V)**

Plaintiff also seeks an injunction to prevent continued violation of federal and state trade secret laws. Plaintiff contends that Defendants have "misappropriated numerous trade secrets belonging to Primo embodied in the genetic code of its living shrimp and the male and female breeder pairs of each shrimp broodstock family containing highly desirable production traits."[28] (Doc. #20, ¶ 129.) Defendants respond that Plaintiff is unlikely to succeed with its claims for trade secret misappropriation, primarily because there is no case law supporting the broad proposition that animal genetics obtained through selective breeding can constitute a trade secret. (Id. pp. 16-17.)

Both the federal Defend Trade Secrets Acts[29] (DTSA) and Florida's Uniform Trade Secrets Act (FUTSA) authorize a court to grant an injunction to prevent "actual" or "threatened" misappropriation of a "trade secret." 18 U.S.C. § 1836(b)(3)(A)(i); Fla. Stat. § 688.003(1). Under the DTSA,

> the term "trade secret" means all forms and
> types of financial, business, scientific,
> technical, economic, or engineering
> information . . . if –

---

[28] To support this claim, Plaintiff has presented the Court with a number of cases purportedly holding that plant genetics can constitute a trade secret, which secret is misappropriated when another uses or discloses those genetics through unauthorized sale or breeding.

[29] The DTSA applies "only to acts of misappropriation occurring after the effective date of May 11, 2016. Adams Arms, LLC v. Unified Weapon Sys., Inc., No. 8:16-CV-1503-T-33AEP, 2016 WL 5391394, at *5-6 (M.D. Fla. Sept. 27, 2016). Defendants have not argued that the actions underlying Plaintiff's DTSA claim occurred before that date.

**(A)** the owner thereof has taken reasonable measures to keep such information secret; and

**(B)** the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).[30] "Information that is generally known or readily accessible to third parties cannot qualify for trade secret protection." Am. Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998) (citing Bestechnologies, Inc. v. Trident Envtl. Sys., Inc., 681 So.2d 1175, 1176 (Fla. 2d DCA 1996)). Ultimately, "[w]hether information constitutes a 'trade secret' is a question of fact." Penalty Kick Mgmt. Ltd. v. Coca Cola Co., 318 F.3d 1284, 1291 (11th Cir. 2003) (citations omitted).

As relevant here, to "misappropriate" a trade secret means to

disclos[e] or use . . . a trade secret of another without express or implied consent by a person who . . . [a]t the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

18 U.S.C. 1839(5)(B)(ii)(II); see also Fla. Stat 688.002(2).

Thus, to succeed on Counts IV (DTSA) and V (FUTSA), Primo must establish that Defendants: (i) possessed "information" of "independent economic value" that (a) was lawfully owned by Primo

---

[30] FUTSA's definition of "trade secret" is nearly identical, but does not limit the definition of "information" to "financial, business, scientific, technical, economic, or engineering information." See Fla. Stat. § 688.002(4).

and (b) for which Primo took reasonable measures to keep secret, and (ii) "used" and/or "disclosed" that "information," despite (iii) a duty to maintain its secrecy. See Am. Red Cross, 143 F.3d at 1410 ("In a trade secret action, the plaintiff bears the burden of demonstrating both that the specific information it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy." (citing Lee v. Cercoa, Inc., 433 So. 2d 1, 2 (Fla. 4th DCA 1983))).

Defendants vigorously dispute that an animal's genetic information can be a trade secret, even if the genetics embody superior traits resulting from selective breeding efforts. Defendants contend further that, specifically, Primo shrimp genetics cannot meet the definition of "trade secret," since the shrimp "originated in Ecuador[] [and have] been sold and resold all over the world," (Doc. #53, p. 111), and since Plaintiff did not take reasonable - or any - measures to keep that information secret. (Id. p. 101.)

Whether Plaintiff indeed possesses a "trade secret" and whether Defendants "misappropriated" that secret are questions for another day. Assuming Primo shrimp genetics constitute a trade secret, and assuming Defendants continue to misappropriate that trade secret by breeding the "grandchildren" of those shrimp,[31]

---

[31] See Penalty Kick, 318 F.3d at 1292 ("[A]n actor is liable for using the trade secret with independently created improvements or modifications if the result is *substantially derived* from the trade secret." (quoting Restatement (Third) of Unfair Competition § 40 cmt. c. (1995))).

the putative trade secret's real, intrinsic value derives from, and is irreparably harmed by, another's access to a <u>pure Primo breeder pair</u>.[32]   Plaintiff has provided no support for the proposition that Defendants' continued sale of hybrid animals – the only type of shrimp that remains in their possession - will irreparably harm the value of that genetic trade secret (or Plaintiff).   Accordingly, an injunction on trade secret misappropriation grounds is not warranted.   <u>See</u> <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."); <u>Bd. of Regents of State of Fla. By & Through Univ. of S. Fla. v. Taborsky</u>, 648 So. 2d 748, 754 (Fla. 2d DCA 1994) ("Florida courts uniformly recognize their ability to grant injunctive relief to prevent ***further injury*** for the misappropriation of trade secrets or protected research." (emphasis added)); <u>see also</u> <u>Faiveley Transp. Malmo AB v. Wabtec Corp.</u>, 559 F.3d 110, 118–19 (2d Cir. 2009) (observing that a misappropriator's mere use of a trade secret for profit in a way that is not likely to impair the value of the secret undermines a finding of irreparable harm).

---

[32] (Doc. #53, p. 117 ("[T]he reason why this is confidential information, the reason why it is a secret to us is because we don't transmit the breeder pairs. . . . [Defendants] were the only ones who got the breeder pairs. They were the only ones who could actually replicate what we did. . . . And anybody who doesn't have the breeder pair is just breeding it with something else, and that doesn't create the line anymore.").)

**C.   Unfair Competition, the Lanham Act, and the FDUTPA (Counts V, VII, and VIII)**

Plaintiff also seeks an order enjoining Defendants from continuing to engage in unfair competition under Florida law and from committing further violations of the Lanham Act and the Florida Deceptive and Unfair Trade Practices Act (the Competition Claims).  The Competition Claims arise primarily from Plaintiff's allegation that "Defendants have made, and continue to make, false and misleading statements to a host of commercial enterprises about [Defendants'] non-existent and unlawful 'rights' over significant portions of Primo's broodstock and associated intellectual property rights."  (Doc. #21, ¶ 44.)

Specifically, Plaintiff contends that Defendants are calling the shrimp they send to China "Primo" shrimp and are lying about the "pure" genetic makeup of those animals "to confuse the customers and trade on Primo's reputation."  (Doc. #68-1, ¶ 60.)  According to Plaintiff, the world is "clamoring for the 'real Primo' shrimp," and Defendants' statements continue to "mislead the world markets into believing that [Defendants], and they alone, have the 'real Primo.'"  (Doc. #68, p. 2.)  Plaintiff believes that, seeking to capitalize on their access to Primo shrimp, Defendants have implemented a "scheme to obfuscate the market in China – and ultimately the world – regarding the genuineness of Plaintiff's proprietary shrimp broodstock."  (Doc. #21, p. 2.)  As part of this "scheme," Defendants sell live breeder shrimp to Chinese companies whose names contain the word "Primo" (or who

otherwise advertise that they sell "real Primo" shrimp). (Doc. #68, pp. 25-27.) Further, rather than clarify that the breeders they supply to these companies are merely hybrids derived from pure Primo stock, Defendants continue to propagate the illusion that the live shrimp they sell are "the real Primo." (Id. p. 2.) This scheme has "already caused and, more importantly, will continue to cause even more confusion regarding the genuineness of shrimp that Plaintiff markets as 'Primo' broodstock[] . . . [and] further erode confidence in Plaintiff as the legitimate source of Primo Shrimp." (Doc. #21, ¶ 45.)

Defendants contend that any statements they have made regarding their rights over the shrimp and the animals' genetics are truthful. Further, while Defendants do "agree that the use of [the Primo] name is improper," they assert that the name is being used by their Chinese customers, over whom Defendants "have no direct control."[33] (Id. p. 20, n.7.) Defendants do not, however, "necessarily oppose" an injunction preventing use of the "Primo" name. (Doc. #53, p. 111.) They claim, in fact, to have already requested their distributors "cease using the name 'Primo' in any capacity while marketing [Defendants'] products." (Id.)

### 1) The Evidentiary Materials

Plaintiff relies primarily on five documents to support the Competition Claims. The first is a translated article titled

---

[33] According to Mr. Pearl, Defendants sell their hybrid shrimp derived from Primo breeders under the name "High Vigor," not "Primo." (Doc. #41, ¶ 101.)

"API: Who is the real 'Primo?' This question is left to the Chinese farmer to answer." (Doc. #21-3, pp. 9-22.) This article allegedly appeared in a Chinese trade magazine called <u>Fish First</u> and was also posted on the website of a company named Primo (China) Broodstock Co., Ltd (Primo China) on or around January 18, 2017.[34] (Doc. #21-3, ¶¶ 4, 5.) The article features a Q & A with Mr. Pearl, as well as one with Fusheng Huang (Mr. Huang), who is the CEO of Primo China. (<u>Id.</u> p. 17.) In the article, Mr. Pearl – whose photograph appears on page two – purportedly discusses the history of API's shrimp and states that API "selected Primo (China) Broodstock Co., Ltd. to be [API's] official recognized partner" in China.[35] (<u>Id.</u> p. 16.) Mr. Huang states that his company, Primo (China), is "the officially designated partner[] of high-resistance 'Primo' shrimp breeding by API in China" (<u>id.</u> p. 19), and "welcome[s] the customers who are confident and full of

_____

[34] The article was translated from Chinese into English by Helen Guan (Attorney Guan), an attorney in China who claims to be fluent in English. (Doc. #21-3, ¶¶ 2, 3, 6.)

[35] In his Affidavit, Mr. Pearl avers that he never used the term "Primo" in the written answers he provided to those interview questions" (Doc. #41, ¶ 114), which answers he attaches to his Affidavit (Doc. #41-2, pp. 66-70). It is unclear to the Court whether those answers represent all of the material Mr. Pearl submitted, particularly since they contain no discussion of AMI's history with Plaintiff or business relationship with Primo China – two issues discussed in the article in fairly significant detail. Mr. Pearl's Affidavit also states that "Primo is not a word that can be translated into Chinese. As a result there are several different translations in use." (Doc. #41, ¶ 113.) One of these words is "Puruimo" and another is "Pulimao." (<u>Id.</u>) According to Mr. Pearl, "Primo's attorneys conveniently translate every mention of Pulimao or Puruimo as being Primo, when in fact they are completely different in Chinese." (<u>Id.</u>) No additional materials are provided to support these assertions.

intention about the 'Primo' to join us to make the shrimp better together." (Id. p. 21.)

The second document is a transcription of video recordings (Doc. #21-2, pp. 9-12) taken at a November 3, 2016 "Primo shrimp" sales presentation held in China before approximately 55 to 60 people.[36] There were at least three speeches given at the presentation: one by (former Defendant) Charles Tuan, who introduced Mr. Pearl, one by Mr. Pearl, and one by Mr. Huang. According to the transcript of those speeches,[37] when introducing Mr. Pearl, Mr. Tuan asks (referring to Defendants'/Mr. Huang's product): "If it's the real Primo, then why need change the name? . . . [A]ll breeder sources are written in black and white on the paper and establish for you that these are the real Primo." (Doc. #21-1, p. 9.) Mr. Tuan then tells the audience that "the breeder source of Haimao" – presumably Plaintiff – "is fake." (Id.)

After being introduced, Mr. Pearl first thanks his "agents who are helping [API] promote Primo Broodstock here in China" and then discusses the failed business relationship between Primo and AMI. (Doc. #21-1, pp. 9-10.) He states that Primo had removed only one family of broodstock from AMI's facility by April 30,

---

[36] The recordings were taken by Yijun Zhang, who is a manager at Haimao – Plaintiff's exclusive Chinese distributor. (Doc. #21-4, ¶ 2.) Plaintiff has provided the Court with "true copies" of the recordings, and Defendants have not objected to the recordings' authenticity.

[37] Attorney Guan interpreted and transcribed the recordings of Mr. Tuan and Mr. Huang (Doc. #21-3, ¶¶ 10, 13), and Mr. Pearl's speech was transcribed by Steven Jakubowski, Plaintiff's attorney. (Doc. #21-1, ¶ 7.)

2016, leaving Defendants with "the full bank of genetics at [their] farm." (Id. p. 11.) Mr. Pearl also notes that Defendants are "spending a lot of time and a lot of money taking the Primo APE animal[][38]. . . to the next level."[39] (Id.)

During his speech, Mr. Huang asserts that "Primo does not have breeder shrimp" (Doc. #21-3, p. 27), and discusses how he set up a new company - Primo China - "for purposes of importing the Primo shrimp" to China.[40] (Doc. #21-3, p. 28.)

The third document is a brochure allegedly given to those who attended the November 3, 2016 presentation, and which contains material in both Chinese and English. (Doc. #21-4, ¶ 6.) Among other things, the brochure states that "Primo abandoned over 650,000 animals and all its genetic material" at the AMI Facility. (Id. p. 10.)

The fourth document is a translated article allegedly published in a Chinese magazine called Agricultural Wealth on or around February 13, 2017.[41] (Doc. #67-2, pp. 2, 9-13.) Mr. Pearl (whose photograph again appears on page two) allegedly states that

---

[38] "APE" stands for "All Pathogen Exposed," which means that the animals have survived "a full virus attack." (Doc. #21-3, p. 13.)

[39] The Court has briefly reviewed the video recording of Mr. Pearl's speech and can confirm the accuracy of Attorney Jakubowski's transcription of the portions just quoted.

[40] There is no indication that, during the presentation, Mr. Pearl ever corrected or otherwise addressed Mr. Tuan's or Mr. Huang's allegations that Plaintiff has no "real" breeder shrimp left and is instead supplying "fake" Primo shrimp.

[41] Attorney Guan also translated this article. (Doc. #67-2, ¶ 5.)

"most of the broodstock of API in [the] Chinese market came from Primo (China)," which imports its "disease-free" shrimp "from API." (Id. p. 9.) He also states that Primo China is API's "official designated 'Primo' high resistance PL [post-larvae] production partner in China." (Id. p. 10.)

The final document is the transcription of cell phone video recordings (Doc. #67-2, pp. 15-37) allegedly taken at a February 10, 2107 promotional event held in Northern China called "Hello, Who Is the Real Primo?".[42]  The event was sponsored by Hainan Dingda Agriculture Co., Ltd. (Dingda), a Chinese company claiming to be "the first company to introduce the Primo breeder shrimp" in China, and which also appears to use the name "Dingda Primo PL." Some of the statements allegedly made at the event include:

- A statement by the event hostess that "API designated and authorized Dingda to market Primo breeder shrimp." (Doc. #67-2, p. 18.)

- Statements by "Mr. Liang" – presumably Dingda's President or CEO – that "Dingda Primo PL has brought new hope to the gloomy farming market" in China (id.), and that the "Dingda Primo PLs [that] came from API. . . . are the real Primo." (Id. at 22.)

- A statement made by Mr. Pearl via video-conference thanking Mr. Liang for "entrust[ing] [API] to stock his Dingda hatchery with [API's] breeders."[43] (Id. at 21.)

---

[42] The video was recorded by Teng Zhou, a Haimao salesman, and provided to Attorney Guan for translation on or about February 14, 2017. (Doc. #68-2, ¶ 6.)

[43] According to the translated conference agenda, Mr. Pearl was scheduled to give a speech in person at the event, to be followed by a "PRIMO trademark Q & A." (Doc. #49, p. 4.) He ultimately called in via video-conference, in order to attend the February 10, 2017 preliminary injunction hearing.

## 2) Plaintiff's Entitlement to Injunctive Relief

According to Plaintiff, these documents demonstrate that Defendants have violated the Lanham Act (as well as the FDUTPA and Florida's unfair competition law) and should be enjoined in a way that inhibits their continued ability to do so. The Lanham Act serves to "protect persons engaged in commerce within the control of Congress against unfair competition" – that is, against "injuries to business reputation and present and future sales."[44] Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1389-90 (2014). As relevant here, Section 43(a) of the Lanham Act imposes liability on

> **(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]

15 U.S.C. § 1125(a)(1)(A)).

---

[44] The Court's discussion of Plaintiff's Lanham Act claim also encompasses Plaintiff's unfair competition and FDUTPA claims. See Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of Knights Hospitallers of Sovereign Order of Saint John of Jerusalem, Knights of Malta, Ecumenical Order, 702 F.3d 1279, 1296 (11th Cir. 2012) ("The success of [a plaintiff's] state unfair competition and FDUTPA claims is tied to the federal Lanham Act claims for infringement and false advertising." (citing Nat. Answers, Inc. v. Smithkline Beecham Corp., 529 F.3d 1325, 1333 (11th Cir. 2008))).

As far as the Court can tell, Plaintiff's Lanham Act claim is based on (1) Defendants' alleged dissemination of false or misleading representations of fact, in connection with the genetic makeup of the shrimp they sell to China, and (2) Defendants' alleged deceptive exploitation of "the 'Primo' name[] [and] Primo's goodwill for [Defendants'] commercial benefit."[45] (See Doc. #21, ¶¶ 42-45.) Succeeding on a claim of false advertising in violation of Section 43(a) requires plaintiff to establish:

> (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been — or is likely to be — injured as a result of the false advertising.

Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citations omitted). A claim of deceptive use of a name (or one of false designation of origin, i.e., "passing off" or "palming off") requires a plaintiff to show "(1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it such that consumers were

---

[45] Although the Amended Complaint also avers that "Defendants' acts have caused and, unless enjoined, will continue to cause Primo's tradename and proprietary products to be tarnished[] [and] diluted" (Doc. #20, ¶ 159), Plaintiff has not pled a Section 43(c) "dilution" cause of action under the Lanham Act.

likely to confuse the two."[46]  Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 647 (11th Cir. 2007) (citations omitted).

"Under the Lanham Act, a court may issue an injunction to prevent the use of a 'false or misleading representation of fact' in 'commercial advertising or promotion,'" Osmose, Inc. v. Viance, LLC, 612 F.3d 1298, 1323 (11th Cir. 2010) (quoting 15 U.S.C. §§ 1116, 1125(a)(1)(B)), or to prevent the commercial use of a "any word, term, name, symbol, or device" in a way likely to confuse or deceive consumers.  See W. Union Holdings, Inc. v. E. Union, Inc., 316 F. App'x 850, 853-54 (11th Cir. 2008) (per curiam); Jellibeans, Inc. v. Skating Clubs of Ga., Inc., 716 F.2d 833, 838 & n.12 (11th Cir. 1983).

According to Plaintiff, an injunction is warranted because Defendants' actions "have caused, and will continue to cause, confusion regarding the affiliation, connection, or association of Defendants to Primo's proprietary shrimp broodstock and Primo's tradename" (Doc. #20, ¶ 156), and "confusion regarding the genuineness of shrimp that Plaintiff markets as 'Primo' broodstock" (Doc. #21, ¶ 45); will "dilute" and "tarnish" the

---

[46] "[A] false designation of origin claim[] . . . . proscribes the behavior of 'passing off' or 'palming off,' which 'occurs when a producer misrepresents his own goods or services as someone else's.'" Midway Servs., 508 F.3d at 647 (quoting Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28 n. 1 (2003)). The original Complaint labeled the Lanham Act claim as one of "passing off" (i.e., false designation of origin) but the Amended Complaint does not.  It is therefore unclear whether Plaintiff's claim is one of "confusing use of a name" or for "palming off."

"Primo" trade name and Primo's products (Doc. #20, ¶ 159); and will continue to "erode confidence in Plaintiff as the legitimate source of Primo Shrimp." (Doc. #21, ¶ 45.) These actions have allegedly already resulted in "lost sales of authentic Primo shrimp broodstock." (Doc. #20, ¶ 165; see also Doc. #21-5, ¶ 13.)

While Defendants apparently do not oppose a preliminary injunction restricting Defendants' use of the "Primo" name (Doc. #53, p. 111), they also believe Plaintiff is unlikely to succeed on the merits of its Lanham Act claim, since all of Defendants' statements have been "entirely truthful." (Doc. #39, pp. 19-20.) Defendants also claim that API and Mr. Pearl have "studiously avoided giving any impression of association with Primo" and "have no direct control over [Mr. Huang]," who "formed his company prior to any affiliation with . . . Defendants." (Id. p. 20 & n.7; see also Doc. #53, p. 106.)

The Court finds that Plaintiff has carried its burden of demonstrating a substantial likelihood of success on its Lanham Act claim. First, Defendants' statement that it possesses Primo's "full genetic bank" was likely false and resulted in injurious consumer confusion and/or deception. In so concluding, the Court credits Mr. Aungst's affidavit testimony that Plaintiff never provided Defendants with breeders from more than six of Primo's family lines (Doc. #21-2, ¶ 26) – a far cry from Primo's "full bank" of twenty-four families. The Court also considers the fact that, in June 2016, Defendants conducted "a DNA genetic analysis of all animals of AMI," including shrimp from sources other than Primo,

which revealed that Defendants had only fourteen different groups of animals.[47] (Doc. #41, ¶ 101.)

Moreover, the evidence belies Defendants' assertions that they "have studiously avoided giving any impression of association with Primo" (Doc. #29, p. 20), and want no association with the Primo trade name because of the company's "horrible reputation." (Doc. #41, ¶ 108.) The record demonstrates that, at least in China – "the world's largest shrimp farming country" (Doc. #41-2, p. 69) – using the name "Primo" in connection with shrimp is financially advantageous.[48] "API," in contrast, seemingly had little reputation or goodwill in China prior to associating with the name "Primo." (Doc. #68-2, p. 2.) Indeed, rather than distance themselves from Primo, API chose to work with Mr. Huang <u>after</u> he had already formed a company called "Primo China," and allowed Mr. Pearl to attend events designed to tout the "realness" of the "Primo" shrimp API ships to its Chinese distributors. Mr. Pearl himself has used the word "Primo" to refer API's product, and has thanked API's agents for helping to promote that "Primo" product in China. (Doc. #21-3.)

The Court is also persuaded that failure to grant a Lanham Act injunction would likely result in continued – and irreparable

---

[47] It is difficult to see how Defendants could claim, in good faith, that they possessed all of Primo's pure genetic lines, while simultaneously asserting they received no paperwork or genetic information about the animals Primo sent.

[48] It is clear from the translated documents that Chinese shrimp distributors and shrimp farmers' want "real Primo" shrimp. (<u>E.g.</u>, Docs. ## 21-3, p. 29; 68-2, pp. 27-28.)

- harm to Primo's reputation and goodwill, at least in China. Ferrellgas Partners, L.P. v. Barrow, 143 F. App'x 180, 190 (11th Cir. 2005) (per curiam) ("Grounds for irreparable injury include loss of control or reputation, loss of trade, and loss of goodwill. Irreparable injury can also be based upon the possibility of confusion." (quoting Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d Cir. 1998))); Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 16 (7th Cir. 1992) ("[I]t is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations [of the Lanham Act]."); see also Nane Jan, LLC v. Seasalt & Pepper, LLC, No. 2:14-CV-208-FTM-29CM, 2014 WL 5177655, at *7 (M.D. Fla. Oct. 14, 2014) (finding a likelihood of irreparable harm where "[d]amage to plaintiff's reputation and goodwill would be difficult to quantify and could not be undone through an award of money damages").  Not only is the Court confident that this injury outweighs whatever harm (if any) that a preliminary injunction may cause Defendants, the public has an interest in ensuring that American businesses compete fairly with each other, both at home and abroad, and refrain from engaging in trade practices that confuse and deceive consumers.

Because all four elements for injunctive relief are satisfied as to Plaintiff's Lanham Act claim, the Court finds that Plaintiff is entitled to a preliminarily injunction, tailored in scope to curb the harmful effects Defendants' dissemination of false commercial statements and use of the "Primo" name have caused.

The preliminary injunction shall apply to Defendants, Defendants' officers, agents, servants, employees, and attorneys, and other persons who are in "active concert" or "participation" with Defendants, within the meaning of Federal Rule of Civil Procedure 65(c)(2), and who receive proper notice of the preliminary injunction. See ADT LLC v. NorthStar Alarm Servs., LLC, No. 16-15351, --- F.3d ---, 2017 WL 1364978, at *2 (11th Cir. 2017). Such persons and entities are enjoined from the following:

1.      Referring to AMI's or API's shrimp as "Primo" anything, including "Primo shrimp," "Primo animals," "Primo breeders," or "Primo broodstock";

2.      Stating that AMI's or API's shrimp were created by breeding a male shrimp and a female shrimp from the same Primo family line[49];

3.      Stating that AMI or API acquired or possessed Primo's "genetic bank" or "full genetic bank" or that Primo left or abandoned its "genetic bank" or "full genetic bank" at the AMI Facility; and

4.      Appearing via teleconference, videoconference, or in person at any Primo China or Dingda promotional event.

The preliminary injunction will enter by separate order. Additionally, the Court finds, in the exercise of its discretion, that no bond is necessary for this preliminary injunction. BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F.3d 964, 971 (11th Cir. 2005) ("[I]t is well-established that the amount of security required by the rule is a matter within

---

[49] Defendants are not, however, enjoined from stating that certain of their animals were *derived* from pure Primo stock, whose genetic makeup was unknown to Defendants at the time. Indeed, to fail to mention Primo at all could constitute grounds for a "reverse passing off" claim under the Lanham Act. See Dastar, 539 U.S. at 28 & n.1.

the discretion of the trial court, and the court may elect to require no security at all." (internal alterations and quotation omitted)); TracFone Wireless, Inc. v. Washington, 978 F. Supp. 2d 1225, 1235 (M.D. Fla. 2013) (finding no bond necessary where preliminary injunction issued on Lanham Act claim only).

Accordingly, it is hereby

**ORDERED:**

Plaintiff's Alternative Motion for Preliminary Injunction (Doc. #21) is **GRANTED in part and DENIED in part** as set forth herein. The preliminary injunction will issue under separate order.

**DONE and ORDERED** at Fort Myers, Florida, this 27th day of April, 2017.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record