UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PB LEGACY, INC, and TB FOOD
USA, LLC,

    Plaintiffs,

v.                                     Case No:     2:17-cv-9-FtM-29NPM

AMERICAN MARICULTURE, INC.,
AMERICAN PENAEID, INC., and
ROBIN PEARL,

    Defendants.
_____

AMERICAN MARICULTURE, INC.,

    Counter-Plaintiff,

v.

PB LEGACY, INC, KENNETH GERVAIS,
and RANDAL AUNGST,[1]

    Counter-Defendants.
_____

**REPORT AND RECOMMENDATION**

This matter comes before the Court on Plaintiff TB Food USA, LLC's Motion for Leave to Amend the Amended Complaint, filed on June 26, 2019. (Doc. 208). Defendants American Mariculture, Inc., American Penaeid, Inc., and Robin Pearl filed a Response in Opposition on July 10, 2019. (Doc. 210). Plaintiff filed a Reply on August

---

[1] On November 20, 2017, Randall Aungst filed a Suggestion of Bankruptcy. (Doc. 90). The Court stayed this action as to Randall Aungst only. (*See* Doc. 91). The Court maintained the stay as to Randall Aungst and required him to file a status report as to the status of the bankruptcy matter on or before December 4, 2019, or sooner if appropriate. (*See* Doc. 134).

26, 2019. (Doc. 224). This matter is ripe for review. After careful consideration of the parties' arguments, the Court recommends that the motion for leave to amend be denied.

### I. Background

On January 9, 2017, Plaintiff Primo Broodstock, Inc. ("Primo") brought this action against Defendants American Mariculture, Inc., American Penaeid, Inc., Robin Pearl, Advanced Hatchery Technology, Inc., and Charles T. Tuan. On January 26, 2017, Primo filed an Amended Complaint, which is the operative complaint. (Doc. 20).

On May 10, 2017, Primo moved to amend the Amended Complaint to change its name from Primo Broodstock, Inc. to PB Legacy, Inc. and to add TB Food USA, LLC as an additional plaintiff. (Doc. 86). Apparently, TB Food purchased substantially all of Primo's assets, including Primo's intellectual property at issue in this case as well as its rights in certain causes of action. (Doc. 86 at 2). In addition, after the sale, Primo Broodstock, Inc. changed its name to PB Legacy, Inc. (*Id.*). The Court granted the Motion on May 15, 2017, and deemed the Amended Complaint (Doc. 20) to be amended so that Plaintiffs are PB Legacy, Inc. and TB Food USA, LLC. (Doc. 87 at 4).[2]

*Allegations in Amended Complaint (Doc. 20)*

Plaintiff alleges that PB Legacy, Inc.'s founders developed a unique method of breeding highly disease-resistant strains or families of shrimp ("broodstock lines"), each with unique genetic markers. (Doc. 20 at 3 ¶ 11). The result is shrimp offspring that are the most disease resistant in the world, and which may also have other unique characteristics such as being able to thrive in high temperatures. (*Id.* at 3-4 ¶¶ 12, 13).

---

[2] Only Plaintiff TB Food USA, LLC filed the Motion for Leave to Amend. Plaintiff PB Legacy, Inc. did not join in the Motion. Thus, when the Court refers to "Plaintiff," it is referring to TB Food USA, LLC, only.

Plaintiff used utmost care to preserve the confidential and proprietary nature of its genetic codes and cross-breeding strategies. (*Id.* at 4 ¶ 18). Specifically, Plaintiff: (1) did not provide customers with a breeding pair from any single broodstock line, thereby preventing replication by a customer; (2) did not provide any testing, research, or grow-out facility "more than a handful or so of the full genetic bank of 24 unique families that Primo possessed;" and (3) did not disclose to customers its proprietary selection and cross-breeding methodologies. (*Id.* at 4-5 ¶¶ 19-21).

Due to its success, Plaintiff decided that it was ready for a global market and needed more post-larval shrimp grow-out space than it had at its facility. (*Id.* at 5 ¶ 23). Plaintiff had discussions with Defendant American Mariculture, Inc. ("AMI") about providing growth-tank services to grow Plaintiff's broodshrimp to adult market size (*Id.* at 5 ¶ 24).

Plaintiff and AMI entered into a Mutual Nondisclosure Agreement, under which Plaintiff and AMI essentially agreed to preserve each other's confidential information. (*Id.* at 6 ¶¶ 29-30). On January 1, 2015, Plaintiff and AMI entered into a Grow-Out Agreement. (*Id.* at 7 ¶ 31). Under this Agreement, among other things: (1) Plaintiff could continue its work to develop genetically-superior, disease-tolerant shrimp; (2) AMI would grow Plaintiff's broodstock to a certain minimum weight; (3) Plaintiff would compensate AMI for its grow-out service; and (4) AMI agreed not to use, sell or transfer any of Plaintiff's shrimp without Plaintiff's authorization. (*Id.* at 7 ¶ 31). As stated in the Agreement, Plaintiff considered its shrimp stock to be its intellectual propriety, Plaintiff's broodstock and all shrimp grown from it remained Plaintiff's property, and employees of Plaintiff and AMI were required to sign non-disclosure agreements. (*Id.* at 8 ¶ 32).

Plaintiff claims that AMI and Robin Pearl, President and Chief Executive Office of AMI, devised a scheme to force Plaintiff to abandon its intellectual property rights to its broodstock at AMI's facilities. (*Id.* at 9 ¶¶ 8, 39). In furtherance of the scheme, Plaintiff contends that AMI and Pearl incorporated American Penaeid, Inc. ("API'") "to serve as the vehicle through which AMI and Pearl would develop a new business using Primo's trade secrets and intellectual property rights as embodied in the live Primo shrimp." (*Id.* at 9 ¶¶ 40, 41). Plaintiff alleges that API applied for an import/export license and began overbilling Plaintiff for undersized shrimp. (*Id.* at 10 ¶¶ 42-43). Plaintiff further alleges that when it complained about the overbilling, AMI demanded immediate payment of $100,000 or threatened to harvest (that is, kill) all of Plaintiff's shrimp and sell them, which would have caused Plaintiff millions of dollars of potential losses. (*Id.* at 10 ¶ 44).

Plaintiff sued AMI in state court, asking for a temporary restraining order to enjoin AMI from harvesting the shrimp. (*Id.* at 10 ¶ 45). The parties met and entered into an agreement entitled, "Term Sheet." (*Id.* at 10 ¶ 47). Plaintiff claims that in the Term Sheet: (1) the parties agreed to terminate the Grow-Out Agreement early and provide mutual releases in exchange for Plaintiff dismissing the lawsuit, paying certain funds, and leaving the premises by April 30, 2016; and (2) AMI agreed not to destroy any of Plaintiff's broodshrimp prior to April 30, 2016 and, after that date, it would harvest or kill all live shrimp left behind. (*Id.* at 11 ¶¶ 49, 50).

Plaintiff lacked the funds to purchase the approximately 46,000 adult-sized shrimp that remained on April 30, 2016 and, therefore, AMI retained these shrimp as well as approximately 650,000 shrimp that were too young to meet the minimum size for purchase. (*Id.* at 11 ¶¶ 51, 52). Plaintiff claims that AMI was obligated to kill all of

Plaintiff's shrimp that remained in AMI's facility and sell it as dead fresh or frozen shrimp products. (*Id.* at 12 ¶ 53). Plaintiff alleges that AMI did not harvest the live shrimp Plaintiff left at AMI's facility and instead transferred all of the live shrimp to its wholly owned subsidiary API. (*Id.* at 12 ¶¶ 55,56).

Plaintiff claims that AMI and API enlisted the assistance of Charles T. Tuan and others to convert Plaintiff's shrimp to AMI's possession, to breed hundreds of thousands of Plaintiff's shrimp, to bring Plaintiff's shrimp to market in China and other East Asian countries, and to enlist the combined resources of some of the largest shrimp breeders and distributors in China and the Far East to implement this scheme. (*Id.* at 12-13 at ¶ 58). Plaintiff claims that Pearl advertised the shrimp left at AMI as owned by API, renamed API High Vigor Animals, and ready for immediate shipping; and that API would be able to supply next generation animals in two months. (*Id.* at 13 ¶¶ 60, 61). Plaintiff's counsel sent AMI and Pearl a cease-and-desist letter, and AMI and Pearl responded by denying that Plaintiff had any rights to the animals left behind at AMI. (*Id.* at 13 ¶ 63).

Plaintiff further contends that in October 2016, AMI, API, Pearl and their agents in China conducted a sales presentation to promote "Primo" shrimp products and made false representations concerning Plaintiff's broodstock left at AMI as well as other false statements (*Id.* at 14-15 ¶ 66). Plaintiff claims Tuan spoke at this presentation, introducing Pearl to the audience and then translated everything Pearl said into Chinese. (*Id.* at 15 ¶ 68). And Plaintiff asserts that Tuan made false statements concerning API's shrimp and the shrimp that Plaintiff previously sold through its agent, Haimao. (*Id.* at 15 ¶ 68).

Another individual, Fusheng Huang spoke at the meeting  (*Id* at 15 ¶ 69).  As the chief executive officer of Primo (China) Broodstock Co., Ltd. (an entity apparently unrelated to Plaintiff's predecessor, Primo Broodstock, Inc.), Huang stated, among other things, that Plaintiff no longer had breeder shrimp, API has Primo shrimp, his company will now import Primo shrimp from Tuan, and his company may bring in breeder shrimp. (*Id.* at 15-16 ¶ 71).  At this presentation, Pearl, API, Tuan and their agents distributed an API brochure that according to Plaintiff contained false statements.  (*Id.* at 16 ¶¶ 72, 73). Plaintiff also contends that Primo (China) Broodstock Co.'s CEO made statements in an article published on January 18, 2017, establishing a direct connection between Primo China's shrimp and Plaintiffs' proprietary shrimp.  (*Id.* at 17 ¶ 76).  In addition, Plaintiff claims that Pearl made statements concerning the renamed and misappropriated Primo shrimp and his aggressive business plan for 2017.  (*Id.*).

Plaintiff alleges that Primo China and API's marketing of genuine "Primo shrimp" caused confusion in the marketplace.  (*Id.* at 20 ¶ 79).  In addition, Plaintiff claims that Defendants, aided by their Chinese agents and distributors, began disparaging Plaintiff and its broodstock through a constant stream of false statements about API having all of the "Primo" broodstock lines and through claims that Plaintiff's broodstock is inferior compared to API's broodstock.  (*Id.* at 20-21 ¶ 80).  Plaintiff asserts that as a result of these false and misleading statements, API is in the process of obtaining hundreds of millions of dollars of orders for Primo broodstock and "unauthorized derivatives of Plaintiff's proprietary broodstock."  (*Id.* at 21 ¶ 81).

Based on these allegations, Plaintiff advances the following theories of recovery in its Amended Complaint:

> Count I – Breach of Contract against AMI;
>
> Count II – Common Law Conversion against all Defendants;
>
> Count III – Defamation against all Defendants;
>
> Count IV – Trade Secret Misappropriation Under the Defend Trade Secrets Act, 18 U.S.C. § 1836 against all Defendants;
>
> Count V – Trade Secret Misappropriation Under the Florida Trade Secrets Act against all Defendants;
>
> Count VI – Unfair Competition in Violation of 15 U.S.C. § 1125(a) against all Defendants;
>
> Count VII – Unfair Competition Under Florida Common Law against all Defendants;
>
> Count VIII – Violation of Florida Unfair & Deceptive Trade Practices Act against all Defendants; and
>
> Count IX – Unjust Enrichment against all Defendants.

(Doc. 20 at 21-41).

*Procedural History*

The procedural history as it relates to the instant Motion for Leave to Amend (Doc. 208) is instructive. Nearly three years ago, on January 6, 2017, Plaintiff filed the operative Amended Complaint. (Doc 20). On February 17, 2017, both Defendants Charles Tuan and Advanced Hatchery Technology, Inc. ("Advanced Hatchery") filed Motions to Dismiss for Lack of Personal Jurisdiction. (*See* Docs. 55, 56). Plaintiff filed a Motion for Leave to File Second Amended Complaint seeking leave to file a Second Amended Complaint in lieu of filing responses to the outstanding Motions to Dismiss. (Doc. 70 at 2). Defendants Charles Tuan and Advanced Hatchery consented to the relief requested and on March 6, 2017, the Court granted the Motion for Leave to File Second Amended Complaint. (*Id.*, Doc. 71).

Rather than file a Second Amended Complaint, Plaintiff chose to file a joint stipulation of dismissal of Advanced Hatchery and Tuan on March 16, 2017. (Doc. 73). On March 20, 2017, the Court dismissed Advanced Hatchery and Tuan without prejudice and denied as moot their then-pending motions to dismiss. (Doc. 74 at 1-2).

At about the same time, on March 23, 2017, the Court entered a Case Management and Scheduling Order (Doc. 75) setting the deadlines for this case, including a May 10, 2017 deadline to add parties or amend pleadings.[3] (Doc. 75 at 1). Subsequently, the Court granted a joint case-management motion of the parties and, on April 17, 2018, required the parties to file an Amended Case Management Report. (Docs. 100, 101 at 2, 103). In the Amended Case Management Report, the parties indicated that the deadline to add parties or amend pleadings was "Completed." (Doc. 104 at 2). Consequently, with the deadline having passed, the May 24, 2018 Case Management and Scheduling Order did not include a deadline to add parties or amend pleadings. (Doc. 105 at 1-2).

Then, the parties later entered into an Agreed Stipulation and Joint Motion to Modify the Scheduling Order to extend the expert disclosure and discovery deadlines, but, again, they did not request an extension of the deadline to add parties or amend pleadings. (Doc. 199 at 3). In response, the Court entered its third case management and scheduling order on June 21, 2019, and it likewise did not include a new deadline to add parties or amend pleadings. (Doc. 204 at 1-2). Thus, the deadline to add parties or amend pleadings has always remained May 10, 2017. (*See* Doc. 75 at 1).

---

[3] The May 10, 2017 deadline was agreed upon and jointly proposed by the parties in their Case Management Report, which also acknowledged the then-pending motions to dismiss by Advanced Hatchery and Tuan.

## II. The Untimely Request for Leave to Amend

More than 25 months later, Plaintiff filed the instant Motion for Leave to Amend the Amended Complaint (Doc. 208). Plaintiff requests that the Court allow it to file a Second Amended Complaint to re-add Charles Tuan and Advanced Hatchery as Defendants, add Tuan's employee John Wu as a Defendant, add a claim for conspiracy against all Defendants, and supplement the allegations in support of its currently-asserted theories of recovery. (*Id.* at 5, 7).

Plaintiff asserts that in February 2017, Tuan filed a false affidavit that induced Plaintiff's counsel "to enter into a Rule 41(a) stipulation dismissing [Advanced Hatchery] and Tuan without prejudice." (*Id.* at 2). In particular, Plaintiff appears to take issue with Tuan's representations that: (1) he never conducted business in Florida in his individual capacity, (2) he visited AMI in Lee County, Florida, twice as an employee of Advanced Hatchery; and (3) he never conducted business in his individual capacity with Plaintiff's predecessor, Primo Broodstock, Inc. (*Id.*).

Plaintiff argues that the false or deceptive nature of these representations was not revealed until Tuan filed an allegedly contradictory affidavit on March 19, 2019, Plaintiff deposed Tuan on May 8, 2019, and other evidence came to light during an evidentiary hearing in this matter on May 7 and 8, 2019. Plaintiff argues that, contrary to the averments in his February 2017 affidavit, Tuan admitted in his March 2019 affidavit that he was Primo's agent and assisted Primo in marketing its shrimp prior to 2015, he conducted business in Florida in his individual capacity with Primo, and he conducted business with Pearl in 2016 as Pearl's agent. (*Id.*).

Further, Plaintiff deposed Tuan for a half-day on May 8, 2019, and received a transcript of the deposition on June 19, 2019. (*Id.* at 4).[4] From Tuan's testimony at the May 8, 2019 deposition, Plaintiff claims: (1) Tuan was deceitful in his February 2017 affidavit; (2) John Wu is Tuan's employee; (3) Tuan and Wu have been in regular contact since their relationship began; (4) Tuan and Wu have minimum contacts with Florida; (5) Tuan along with Wu conspired with Defendants in registering the mark Primo as "Pu Rui Mo" with the Chinese Trademark Office to harm Primo; (6) Wu tried to sell "Pu Rui Mo" to Haimao and kept raising the price when a deal was close; (7) Defendants paid Tuan and Wu a million dollars in commissions for marketing and selling Defendants' shrimp in China; (8) Tuan and Wu had ill-will and wanted retribution against Primo; and (9) Tuan and Wu knew that Defendants' customers were using and associating the name Primo with Defendants' broodstock shrimp. (Doc. 208 at 4-5).

Finally, Plaintiff concludes that the recently obtained testimony of Tuan along with the evidence from the May 7-8, 2019 evidentiary hearing "provide a well-founded and legitimate basis to re-add Tuan" and Advanced Hatchery, and to add John Wu, given that he is Tuan's employee and allegedly acted in concert with Tuan. (Doc. 208 at 5). Moreover, Plaintiff contends that this recently obtained testimony and evidence also justifies adding a claim for conspiracy against all Defendants. (*Id.*).

Thus, Plaintiff asserts that it has demonstrated good cause under Rules 15(a) and 16 of the Federal Rules of Civil Procedure for re-adding Defendants Tuan and Advanced

---

[4] Plaintiff does not explain why it could not obtain a transcript of the deposition any sooner. (Doc. 208 at 4).

Hatchery, adding Wu, amending its present claims, and adding an additional claim for conspiracy against all Defendants.  (*Id.* at 7-9).

Defendants respond that this action has a long procedural history, and that despite revisiting the case management schedule multiple times, the parties never requested an extension of the deadline to amend pleadings or join parties.  (Doc. 210 at 1-4).  In fact, the parties' Amended Case Management Report (Doc. 104) filed in April 2018 acknowledged that this deadline was "Completed."  (*Id.*).  Thus, Defendants assert that Plaintiff failed to establish good cause or excusable neglect to justify the untimely request for leave.  (*Id.* at 8-10).  Defendants also argue that allowing Plaintiff to amend the Amended Complaint at this time will delay the trial (*Id.* at 6-7), and claim that they will be substantially prejudiced if the Motion for Leave to Amend were granted.  (*Id.* at 10-12).

*Legal Standard*

Federal Rule of Civil Procedure 15(a)(2) provides that after a responsive pleading is served, "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The Court should freely give leave when justice so requires."  The decision whether to permit an amendment is within the sound discretion of the court. *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Pursuant to the March 23, 2017 Case Management and Scheduling Order, however, the deadline to add parties or amend pleadings was May 10, 2017, over two years prior to the date Plaintiff requested leave to amend.  (*See* Docs. 75, 208).

"When a party files a motion for leave to amend a pleading after the applicable scheduling order deadline has passed, the party is in effect seeking to modify this deadline."  *Coach Inc. v. Visitors Flea Mkt., LLC*, No. 6:11-CV-1905-ORL-19GJK, 2012

WL 12905809, *1 (M.D. Fla. June 11, 2012) (citing *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998)).  Thus, a court applies the good cause and excusable neglect standards found in Rules 6 and 16 to determine whether an untimely motion for leave to amend should be granted.  *See* Fed. R. Civ. P. 6(b)(1) ("When an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect."); Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."); *Estate of Miller ex rel. Miller v. Thrifty Rent-A-Car Sys., Inc.*, 609 F. Supp. 2d 1235, 1252 (M.D. Fla. 2009) ("[W]hen a party files a motion for leave to amend a pleading after the relevant scheduling order deadline has passed, the party must demonstrate both good cause and excusable neglect for the untimely motion.").  Only then does the court consider whether amendment is proper under Rule 15(a).  *Sosa*, 133 F.3d at 1419.

The "good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" *Id.* at 1418.  And the determination of whether a party has established excusable neglect "is at bottom an equitable one." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993).  The Supreme Court has identified four factors courts should consider:  "(1) the danger of prejudice to the other party; (2) the length of the delay and its potential impact on the judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith." *Estate of Washington v. Carter's Retail, Inc.*, No. 3:10-CV-1136-J-32TEM, 2011

WL 2731291, *3 (M.D. Fla. July 13, 2011) (citing *Pioneer Inv. Servs. Co.*, 507 U.S. at 395).  The Court first addresses good cause and then turns to excusable neglect.

*Good Cause*

To demonstrate good cause, Plaintiff must show that, despite its due diligence, it could not have justified its request for leave to amend and join parties until it filed its motion on June 26, 2019.  *Sosa*, 133 F.3d at 1418.  Plaintiff asserts that the information that the amendments rest on was not available to it until Tuan's deposition and the Order to Show Cause hearing held on May 7-8, 2019.  (Doc. 208 at 8).  Plaintiff further claims that this "information could not have been ascertained sooner despite Plaintiff's assiduous discovery efforts, due largely to Tuan's fraudulent misrepresentations and resistance to sit for a deposition.  Moreover, once Plaintiff did learn the truth, Plaintiff acted quickly to file this motion to amend." (*Id.*).

Even assuming *arguendo* Tuan's statements were false or misleading, the Court sees the events differently.[5]  This action was filed on January 9, 2017, and Plaintiff named both Tuan and Advanced Hatchery in the original complaint, but did not attempt

---

[5] The Court is not convinced that Tuan's February 16, 2017 statements in his affidavit are as *blatantly or clearly false* as Plaintiff claims.  Plaintiff focuses on Tuan's February 16, 2017 statements that he never conducted business in his individual capacity in Florida, never conducted business in his individual capacity with Primo Broodstock, Inc., and visited AMI as an employee of Advanced Hatchery.  (Doc. 208 at 2).  Plaintiff compares these statements with Tuan's March 19, 2019 averments that he marketed shrimp for Primo prior to 2015, Primo was one of Tuan's customers, and in March 2016, Tuan began working for Pearl marketing API shrimp broodstock pairs.  (*Id.*).  From these statements, Plaintiff argues that "Tuan admitted he conducted business in his individual capacity in Florida and with Primo . . .[and] conducted business with Pearl in 2016 as Pearl's agent."  (Doc. 208 at 2).  Plaintiff does not mention that during Tuan's deposition, he clarified that when he said "I" in the March 19, 2019 Affidavit, he meant Advanced Hatchery and, thus, arguably was not acting in his individual capacity but instead as an employee of Advanced Hatchery.  (Doc. 201 at 70-73).  Consequently, the Court cannot conclude that Tuan's statements are blatantly or clearly false as argued.

to depose Tuan until April of 2019. (Doc. 161-8). While Plaintiff claims that its "counsel was induced to enter into a Rule 41(a)" dismissal (Doc. 208 at 2), before Plaintiff agreed to dismiss Tuan and Advanced Hatchery, it had ample opportunity to conduct discovery to verify Tuan's statements in his affidavit, including the opportunity to depose him prior to dismissing him and Advanced Hatchery from the lawsuit. *See Am. Civil Liberties Union of Fla., Inc. v. City of Sarasota*, 859 F.3d 1337, 1341 (11th Cir. 2017) (finding that parties have a qualified right to jurisdictional discovery and "a district court abuses its discretion if it completely denies a party jurisdictional discovery, [ ] unless that party unduly delayed in propounding discovery or seeking leave to initiate discovery"). Instead, Plaintiff waited until April 2019, over two years later, to attempt to depose him. (*See* Doc. 161-8). Further, Plaintiff has not discussed whether or when it attempted to depose Wu or a corporate representative of Advanced Hatchery. Thus, the Court finds that Plaintiff has not demonstrated that it could not have met the deadline to add parties or amend pleadings despite due diligence and, further, the Court finds that Plaintiff has not established good cause for the lengthy delay in seeking leave to amend and add parties.

*Excusable Neglect*

Even though the Court finds Plaintiff has not met the good cause standard, the Court will also consider whether Plaintiff has demonstrated excusable neglect. For excusable neglect, the Court should consider: (1) prejudice to Defendants; (2) the impact of the delay on the case, including the established deadlines; (3) the reason for the delay, including whether it was within the reasonable control of Plaintiff; and (4) whether Plaintiff acted in good faith. *Estate of Washington*, 2011 WL 2731291, at *3.

The Court begins its analysis by looking at the present case management deadlines. As previously stated, the deadline to add parties or amend pleadings was May 10, 2017, over two years prior to the Motion for Leave to Amend. (*See* Docs. 75, 208). In fact, the parties agreed that motions to add parties or amend pleadings was completed by April 30, 2018. (Doc. 104 at 2). Other case management deadlines have been extended two additional times and, in these subsequent Case Management and Scheduling Orders, the parties did not request and the Court did not include a new deadline for motions to add parties or amend pleadings. (*See* Doc. 105, 204).

This case has been pending for nearly three years, and the proposed amendments would substantially delay this case once again. In seeking to re-add Tuan and Advanced Hatchery, add Wu, and add a new conspiracy claim, arguably, all of the deadlines in the case would need to be reset such that the case would return to square one. Thus, Defendants will be prejudiced by essentially beginning this litigation anew. The Court therefore finds that Plaintiff has not demonstrated excusable neglect such that it overcomes the prejudice to Defendants and the impact on this litigation if the Court were to allow Plaintiff to amend its pleadings at this late date.

Next, the Court addresses the reason for the delay and whether Plaintiff acted in good faith. As the Court found above, Plaintiff could have investigated Tuan's statements in February 2017, prior to dismissing Advanced Hatchery and Tuan from the lawsuit, but instead waited until April 2019 to pursue discovery from Tuan. (*Id.*; *see also* Doc. 161-8). Further, the submissions do not show that Plaintiff attempted to pursue discovery from Advanced Hatchery or Wu during the pendency of this case.

The Court finds that Plaintiff could have avoided the excessive delay by taking discovery prior to dismissing Tuan and Advanced Hatchery or by conducting discovery about them immediately after their dismissal. Further, waiting until the eve of trial to attempt to rejoin defendants that were voluntarily dismissed near the inception of the litigation suggests an absence of good faith. Thus, for the reasons set forth herein, the Court finds that Plaintiff has demonstrated neither good cause nor excusable neglect for the untimely request for leave to amend and join parties.

### III. Conclusion

For the reasons set forth above, the Court finds that Plaintiff has not demonstrated good cause or excusable neglect to permit Plaintiff to amend the Amended Complaint to re-add Tuan and Advanced Hatchery, to add Wu, and to add an additional claim against Defendants at this late stage in the litigation.

Accordingly, it is **RESPECTUFLLY RECOMMEDNED**:

The Motion for Leave to Amend the Amended Complaint (Doc. 208) be **DENIED**.

Respectfully recommended in Chambers in Ft. Myers, Florida on October 17, 2019.

_____
NICHOLAS P. MIZELL
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual

finding or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th Cir. R. 3-1.

Copies furnished to:

Counsel of Record
Unrepresented Parties