PB LEGACY, INC, a Texas
Corporation and TB FOOD USA,
LLC,

        Plaintiffs,

v.                              Case No:  2:17-cv-9-FtM-29NPM

AMERICAN MARICULTURE, INC.,
a   Florida   corporation,
AMERICAN  PENAEID,  INC.,  a
Florida   corporation,   and
ROBIN PEARL,

        Defendants.
_____

AMERICAN MARICULTURE, INC.,
a Florida corporation,

        Counter-Plaintiff,

v.

PB  LEGACY,  INC,  a  Texas
Corporation,         KENNETH
GERVAIS, and RANDALL AUNGST,

        Counter/Third-Party
        Defendants.
_____


## OPINION AND ORDER

        This matter comes before the Court on defendants' Motion for

Final Summary Judgment (Doc. #252) filed on November 19, 2019.

Plaintiffs filed a Response in Opposition (Doc. #273) on December

30, 2019, defendants filed a Reply (Doc. #282) on January 14, 2020,

and plaintiffs filed a Sur-Reply (Doc. #286) on January 28, 2020. For the reasons set forth below, the motion is granted to the extent that PB Legacy, Inc. is dismissed as a plaintiff. The motion is otherwise denied.

**I.**

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Baby Buddies, Inc. v. Toys "R" Us, Inc., 611 F.3d 1308, 1314 (11th Cir. 2010). A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A court must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004)(quoting Anderson, 477 U.S. at 251).

In ruling on a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party. Scott v. Harris, 550 U.S. 372, 380 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010). However, "if reasonable minds might differ on the inferences arising from

undisputed facts, then the court should deny summary judgment." St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999)(quoting Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296-97 (11th Cir. 1983)(finding summary judgment "may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts")). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007).

## II.

The relevant undisputed material facts are as follows:

At all relevant times, Primo Broodstock, Inc. (Primo), the original plaintiff in this case, operated a commercial shrimp breeding business and American Mariculture, Inc. (AMI) operated a large indoor grow-out facility for shrimp in St. James City, Florida. Because Primo had great success in breeding shrimp with dramatically improved survival rates, Primo decided to market its disease-resistant shrimp on a global scale. This required more grow-out space than Primo's Texas facility provided and brought Primo into discussions with AMI.

To facilitate these discussions, on December 11, 2014, Primo and AMI, through their corporate officers, executed a Mutual Nondisclosure Agreement (the NDA). (Doc. #20-1.) The NDA described the purpose of the agreement as follows: "AMI and [Primo] wish to explore a business possibility in connection with which each may disclose its Confidential Information to the other (the **Relationship**.)" (Id. ¶ 1) (emphasis in original.) In relevant part, the NDA provided that AMI and Primo would not disclose "Confidential Information" to third parties and would not use such information "for any purpose other than to carry out discussions concerning, and the undertaking of, the Relationship." (Id. ¶ 3.) The commitments of the parties "shall survive any termination of the Relationship between the parties, and shall continue" for defined lengths of time thereafter. (Id. ¶ 8.) The NDA is governed by Florida law. (Id. ¶ 9.)

The discussions proved fruitful, and on January 1, 2015, Primo entered into a three-year shrimp farming Agreement (the Grow-Out Agreement) with AMI. (Doc. #20-2.) Among other things, the Grow-Out Agreement provided that AMI would grow post-larvae "Primo shrimp" for Primo at AMI's facility, which Primo would then live-harvest and sell to third parties. (Doc. #20-2, Agreements ¶¶ 1-2.) Shrimp which could not be harvested in that manner were to be killed and sold as dead fresh or frozen shrimp product by AMI.

(Id. Agreements ¶ 3.)   The Grow-Out Agreement is governed by
Florida law.  (Id. ¶ 28.)

In January of 2016, Primo and AMI became involved in disputes
regarding Primo's performance under the Grow-Out Agreement and
AMI's billing.  At some point between January 1 and January 20,
2016, Kenneth Gervais (Mr. Gervais), the President of Primo, and
Randall Aungst (Mr. Aungst), the Vice President of Primo, informed
Robin Pearl (Mr. Pearl), the AMI Chief Executive Officer, that
Primo had contracted to sell 100,000 Primo shrimp to a Chinese
company, which would result in $750,000 in revenue for AMI pursuant
to the Grow-Out Agreement.  (Doc. #80, pp. 3-4; Doc. #235, p. 3.)
The transaction never materialized, Primo did not harvest or sell
the shrimp, and AMI never received payment.   AMI therefore
notified Primo that it intended to harvest the Primo shrimp at its
facility.  (Doc. #80, p. 4; Doc. #235, pp. 2-3.)  Primo filed suit
against AMI in state court seeking to enjoin AMI from harvesting
the shrimp.  (Id.)

On January 28, 2016, Mr. Pearl met Mr. Aungst (with Mr.
Gervais participating by telephone) to attempt a resolution of the
state-court litigation and the disputes under the Grow-Out
Agreement.  (Doc. #80, pp. 4-5; Doc. #235, p. 3.)  As a result of
this meeting, Mr. Pearl and Mr. Aungst signed a one-page, untitled
handwritten document (the Term Sheet) (Doc. #20-3.)  The Term Sheet
contains nine numbered bullet points; three other unnumbered

bullet points were also written on the page.  In part, the Term Sheet stated that "AMI will give Primo [until] April 30th 2016 to remove all animals." (Doc. #20-3, p. 2.)  The Term Sheet contained no reference to which law governed.

Primo did not remove the shrimp from AMI's facility by April 30, 2016.  AMI retained the Primo shrimp and began breeding and selling the shrimp on the open market. (Doc. #80, p. 5; Doc. #235, p. 3.)

Effective November 23, 2016, Primo and its Shareholders entered into a $2.7 million-plus Asset Purchase Agreement (the Asset Purchase Agreement) with Ningbo-Tech Bank Co., Ltd. (Ningbo) in which Ningbo agreed to purchase substantially all of Primo's broodstock business assets.  (Doc. #253-1.)  Specifically, the Asset Purchase Agreement agreed to sell and assign:

> all of [Primo's] right, title and interest in, to and
> under all of the assets, properties and rights of every
> kind and nature, whether real, personal or mixed,
> tangible or intangible (including goodwill), wherever
> located and whether now existing or hereafter acquired
> (other than the Excluded Assets), which relate to, or
> are used or held for use in connection with, the Business
> (collectively, the "Purchased Assets"), . . . .

(Doc. #253-1, p. 8, § 2.01.)  This provision then identified fourteen specific categories of assets being sold. (Id. pp. 8-9, § 2.01(a)-(n).)

Under the Asset Purchase Agreement, contracts which were not Assigned Contracts were Excluded Contracts, and were not included

as Purchased Assets being sold to Ningbo.  (Id. p. 9, § 2.02(b).)
The Schedule of Assigned Contracts did not include either the NDA
or the Grow-Out Agreement.  (Id. p. 68.)  Accordingly, Primo's
interests in the NDA and the Grow-Out Agreement were not being
sold or assigned to Ningbo, but remained with Primo.

While the Asset Purchase Agreement "is made effective as of
November 23, 2016" (Id. p. 7), the consummation of its transactions
did not actually take place until the Closing.  (Id. p. 8, § 2.01;
p. 13, § 3.01.)  After the execution of the Asset Purchase
Agreement and prior to the Closing, the Primo business was to be
operated by a Service Provider pursuant to a Management Agreement.
(Id. pp. 32-33, § 6.01.)  The Asset Purchase Agreement is governed
by Delaware law.  (Id. p. 57, § 10.10.)

On January 9, 2017, TB Food USA, LLC (TB Food) was authorized
by internal resolution to accept an assignment of Ningbo's interest
in the Asset Purchase Agreement.  (Doc. #253-3, pp. 71-74.)  The
parties agree that on or about this date Ningbo assigned its
interest in the Primo broodstock business to TB Food.  Because the
Closing had not yet taken place, Ningbo's assignment to TB Food
did not require Primo's consent.  (Doc. #253-1, § 10.07.)

Since Primo's interests in the NDA and the Grow-Out Agreement
were not being sold or assigned to Ningbo in the Asset Purchase
Agreement, they were not included in Ningbo's assignment to TB

Food.  Additionally, the Closing had not yet occurred, so the asset sale had not been consummated.

Also on January 9, 2017, Primo filed this federal action against defendants AMI, American Penaeid, Inc. (API), and Mr. Pearl (collectively, Defendants).  (Doc. #1.)  On January 26, 2017, Primo filed a nine-count Amended Complaint (Doc. #20) against the three Defendants.

Effective February 17, 2017, Primo and TB Food executed a First Amendment to Asset Purchase Agreement (Doc. #253-1, pp. 121-26.)  One of the Shareholders (GF Trust) listed in the Asset Purchase Agreement had been determined not to have been a shareholder, was removed as a party to the Asset Purchase Agreement, and agreed to provide a Restrictive Covenant Agreement (Doc. #253-2, pp. 3-11) at the Closing.  The Schedule 2.01(c) (Assigned Contracts) section was amended to delete a Lease, but was not amended to include the NDA or the Grow-Out Agreement. Additional changes not relevant to the issues in this case were also agreed upon, and the Asset Purchase Agreement as amended was ratified by the parties.  Thus, after the First Amendment to the Asset Purchase agreement, Primo still retained its interests in the NDA and Grow-Out Agreement.  The First Amendment is governed by Delaware law.  (Id. at ¶9.)

Also effective February 17, 2017, Primo and TB Food executed an Assignment and Assumption Agreement (Doc. #253-2, pp. 17-20)

(the Assignment.)   Pursuant to the Assignment, Primo sold and assigned, and TB Food purchased and accepted, "all of [Primo's] right, title and interest in and to the contracts listed in **Section 2.02(c)** of the Disclosure Schedules to the Original Agreement as amended by the First Amendment (the 'Assigned Contracts.')."  (Id. p. 17) (emphasis in original.)   The Assignment is governed by Delaware law. (Id. ¶ 6.)  As noted, neither the NDA nor the Grow-Out Agreement were identified as an Assigned Contract in the Asset Purchase Agreement or its First Amendment or in the Assignment.

On February 20, 2017, the Closing of the Asset Purchase Agreement took place.  (Doc. #253-3, p. 88.)

Primo Broodstock, Inc. thereafter changed its name to PB Legacy, Inc. (Doc. #86, ¶¶ 4-5.)  On May 15, 2017, with the consent of all parties, the name Primo Broodstock, Inc. was changed on the Amended Complaint to PB Legacy, Inc., and TB Food, USA LLC was added as a plaintiff.  (Doc. #87.)[1]

On December 4, 2018, the Court filed an Opinion and Order (Doc. #135) granting defendants' request for partial summary judgment as to the conversion claim in Count II and the unjust enrichment claim in Count IX.  The Court found that Counts II and

---

[1] While the Order (Doc. #87) refers to TB Foods USA, LLC, the correct name is apparently TB Food USA, LLC.  The Court refers to PB Legacy and TB Food collectively as "Plaintiffs."

IX were preempted by the Florida Uniform Trade Secrets Act (FUTSA) claim in Count V.

On October 24, 2019, PB Legacy and TB Food entered into an Assignment of Claims Agreement (the Assignment of Claims). (Doc. #271-1.) "To the extent the Asset Purchase Agreements do not already provide, for clarity" PB Legacy assigned TB Food its

> right, title and interest in and to the claim or claims of [PB Legacy] arising out of or related to the business relationship between American Mariculture, Inc. ("AMI"), American Penaeid, Inc.("API"), and Robin Pearl ("Pearl") on one hand, and [PB Legacy] on the other hand (the "Claim"), including but not limited to those that [PB Legacy] has filed and is litigating in the Litigation as defined above including all rights, title and interest [PB Legacy] has in the [Grow-Out Agreement] with AMI, API and/or Pearl.

(Doc. #271-1, p. 2.) The Assignment of Claims identifies "the Litigation" as the present federal case, Case No. 2-17-cv-9, and states that "[t]he Plaintiffs' claims and the Counterclaim arise out of or are related to the business relationship among the Defendants and the Counter-Defendants from 2014 through 2016." (Id.) The Assignment of Claims also provided:

> All liabilities of Assignor not set forth in the Asset Purchase Agreements remain with Assignor including those under the "Growout Agreement." This Assignment does not affect Assignor's rights, title or interest in the Intellectual Property Litigation.

(Id.) The Assignment of Claims further provided that it "is effective as of January 9, 2017 but is formalized as of the date

of the signatures of the Parties, below." (Id. p. 1.) The Assignment of Claims is governed by Texas law. (Id. at ¶ 4.)

**III.**

As a result of the unopposed motion to amend the pleadings (Doc. #86) and the Order (Doc. #87) granting that motion, each count of the Amended Complaint is being prosecuted by two plaintiffs: PB Legacy, Inc. and TB Food USA, LLC. Defendants assert that TB Food USA, LLC is an improper plaintiff as to Count I, and that PB Legacy, Inc. is an improper plaintiff as to the remaining counts. (Doc. #252, pp. 1-2.) The Court concludes that TB Food USA, LLC is the only proper plaintiff as to all counts.

Defendants' initial Motion focuses on whether TB Food and PB Legacy are a real party in interest as to various counts of the Amended Complaint. In their Reply, Defendants shift their focus, asserting that TB Food and/or PB Legacy lack constitutional standing to assert various claims. Although Defendants appear to use the terms "standing" and "real party in interest" interchangeably, each is a distinct legal concept.[2]

> Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. The law of Article III standing,

---

[2] The Court addresses constitutional standing, despite being first raised in a reply brief, because "every court has an independent duty to review standing as a basis for jurisdiction at any time, for every case it adjudicates." Fla. Ass'n of Med. Equip. Dealers, Med-Health Care v. Apfel, 194 F.3d 1227, 1230 (11th Cir. 1999)(citations omitted).

which is built on separation-of-powers
principles, serves to prevent the judicial
process from being used to usurp the powers of
the political branches. Our standing doctrine
accomplishes this by requiring plaintiffs to
alleg[e] such a personal stake in the outcome
of the controversy as to ... justify [the]
exercise of the court's remedial powers on
[their] behalf. To establish Article III
standing, the plaintiff seeking compensatory
relief must have (1) suffered an injury in
fact, (2) that is fairly traceable to the
challenged conduct of the defendant, and (3)
that is likely to be redressed by a favorable
judicial decision. Absent such a showing,
exercise of its power by a federal court would
be gratuitous and thus inconsistent with the
Art. III limitation.

Our standing decisions make clear that
standing is not dispensed in gross. To the
contrary, a plaintiff must demonstrate
standing for each claim he seeks to press and
for each form of relief that is sought. The
same principle applies when there are multiple
plaintiffs. At least one plaintiff must have
standing to seek each form of relief requested
in the complaint.

Town of Chester, N.Y. v. Laroe Estates, Inc., 137 S. Ct. 1645,

1650-51 (2017)(citations and internal punctuation omitted).

Rule 17(a) of the Federal Rules of Civil Procedure provides

that "[a]n action must be prosecuted in the name of the real party

in interest." Under this Rule, the real party in interest is "'the

party who, by the substantive law, has the right sought to be

enforced.'" Symonette v. V.A. Leasing Corp., 648 F. App'x 787,

789 (11th Cir. 2016)(quoting Lubbock Feed Lots, Inc. v. Iowa Beef

Processors, Inc., 630 F.2d 250, 257 (5th Cir. 1980)). Unlike

standing, the real party in interest requirement is not a constitutional prerequisite that implicates a court's subject matter jurisdiction. See Dunn v. Advanced Med. Specialties, Inc., 556 F. App'x 785, 789 (11th Cir. 2014). Rather, the purpose of the real party in interest rule is "to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." Fed. R. Civ. P. 17 Advisory Committee Notes. A party may have constitutional standing and still not be a real party in interest. See e.g., Barger v. City of Cartersville, Ga., 348 F.3d 1289, 1290 (11th Cir. 2003), overruled on other grounds by Slater v. United States Steel Corp., 871 F.3d 1174 (11th Cir. 2017).

## A.    Standing/Real Party in Interest as to Count I

In Count I, PB Legacy and TB Food allege that AMI breached the NDA and the Grow-Out Agreement. Defendant AMI argues that TB Food is not a real party in interest, and has no constitutional standing, to assert this breach of contract claim. This is so, AMI asserts, because TB Food was not a party to the contracts and no interest in these contracts was ever transferred to TB Food by Primo.

It is undisputed that TB Food was not a party to either the NDA or the Grow-Out Agreement. Primo has, however, executed

contracts and assignments which impact who is a proper plaintiff as to Count I.

As discussed above, the November 23, 2016 Asset Purchase Agreement agreed to sell and assign substantially all of Primo's assets to Ningbo except "Excluded Asssets." Excluded Assets included contracts which had not been assigned to Ningbo, and neither the NDA nor the Grow-Out Agreement was on the Schedule of Assigned Contracts. (Doc. #253-1, p. 8.) Thus, Ningbo was not to receive an interest in either the NDA or the Grow-Out Agreement pursuant to the Asset Purchase Agreement. When Ningbo assigned its acquired rights to TB Food on or about January 9, 2017, that assignment did not include Primo's interests in the NDA or Grow-Out Agreement (since those interests were not Ningbo's to assign). Additionally, regardless of what interest was to be conveyed at Closing, Closing had not yet occurred, and so no sale or assignment had been consummated. Accordingly, when Primo filed the original Complaint on January 9, 2017, and the Amended Complaint on January 27, 2017, it was the real party in interest and had constitutional standing to assert its claim for breach of the NDA and the Grow-Out Agreement. Defendant's arguments to the contrary are rejected.

The February 17, 2017 First Amendment to the Asset Purchase Agreement added nothing which affected the transfer of Primo's interest in the NDA or the Grow-Out Agreement. Thus, at the

February 20, 2017 Closing, TB Food did not acquire any interest in the NDA or the Grow-Out Agreement.

Recently, in the Assignment of Claims on October 24, 2019, PB Legacy (formerly Primo) assigned its claims under the NDA and the Grow-Out Agreement to TB Food.  Specifically, PB Legacy assigned TB Food its

> right, title and interest in and to the claim or claims of [PB Legacy] arising out of or related to the business relationship between American Mariculture, Inc. ("AMI"), American Penaeid, Inc.("API"), and Robin Pearl ("Pearl") on one hand, and [PB Legacy] on the other hand (the "Claim"), including but not limited to those that [PB Legacy] has filed and is litigating in the Litigation as defined above including all rights, title and interest [PB Legacy] has in the [Grow-Out Agreement] with AMI, API and/or Pearl.

(Doc. #271-1, p. 2.)  Thus, PB Legacy assigned all its rights and interests "arising out of or related to the business relationship between American Mariculture, Inc. ("AMI"), American Penaeid, Inc.("API"), and Robin Pearl ("Pearl") on one hand, and [PB Legacy] on the other hand (the "Claim"), . . . ."  (Id.)  The Assignment further defined what was being assigned as "including but not limited to those that [PB Legacy] has filed and is litigating in the Litigation as defined above including all rights, title and interest [PB Legacy] has in the [Grow-Out Agreement] with AMI, API and/or Pearl."  (Id.)

Texas law, which governs the Assignment of Claim, has long allowed the assignment of causes of action. HSBC Bank USA, N.A. v.

<u>Watson</u>, 377 S.W.3d 766, 774 (Tex. App.—Dallas 2012, pet. dism'd). While Texas law allows an assignee to file in its own name or in the name of the assignor, it is the assignee who is the real party in interest. "An assignee may file suit and recover either in his own name or in the name of the assignor. Nevertheless, whatever name he chooses to sue under, when a cause of action is assigned or transferred, the assignee becomes the real party in interest with the authority to prosecute the suit to judgment." <u>S. County Mut. Ins. Co. v. Ochoa</u>, 19 S.W.3d 452, 465 (Tex. App. 2000), on reh'g (May 11, 2000)(citations omitted). Given TB Food's ability to prosecute the case in its own name, there is no need for PB Legacy to remain a named plaintiff. Thus, there can be no question that, based upon the Assignment, as of October 24, 2019, TB Food became the real party in interest and the only plaintiff with constitutional standing.[3]

Judgment will be entered dismissing PB Legacy from Count I without prejudice.

---

[3] The Assignment was purported to be made retroactively effective to January 9, 2017, (Doc. #271-1, p. 1), the date the original Complaint was filed. Whatever effect the purported retroactive effective date may have on the rights and obligations between PB Legacy and TB Food, it does not re-write history for constitutional standing purposes. The historical fact remains that on the dates the Complaint and Amended Complaint were filed, Primo had retained its interests in both the NDA and the Grow-Out Agreement.

**B.    Standing/Real Party in Interest for Counts II through IX**

Defendants argue they are entitled summary judgment against PB Legacy on Counts II[4] through IX because Primo (now PB Legacy) assigned away its interests in such claims prior to filing the Amended Complaint.  Defendants assert that Primo had assigned all claims <u>except</u> those under the NDA and Grow-Out Agreement to Ningbo as of January 9, 2017.  Because the assignee is the real party in interest, Defendants argue that Primo was not the real party in interest and lacked standing to assert Counts II through IX when it filed the Amended Complaint.  Defendants also assert that the statute of limitations has now run on Counts III, IV, and V, so dismissal as to these counts must be with prejudice.

For the reasons discussed regarding Count I, Primo/PB Legacy had retained all of its rights under the NDA and Grow-Out Agreement, but has recently assigned away its right to sue for

> the claim or claims of [PB Legacy] arising out of or related to the business relationship between American Mariculture, Inc. ("AMI"), American Penaeid, Inc.("API"), and Robin Pearl ("Pearl") on one hand, and [PB Legacy] on the other hand (the "Claim"), including but not limited to those that [PB Legacy] has filed and is litigating in the Litigation as defined above including all rights, title and interest [PB Legacy] has in the [Grow-Out Agreement] with AMI, API and/or Pearl.

(Doc. #271-1, p. 2.)  The "Litigation" as defined in the Assignment of Claims includes all claims in this case.  (<u>Id.</u> at p. 1, ¶ A.)

---

[4] The Court previously dismissed Count II.  <u>See</u> (Doc. #185.)

Since Counts II through IX all constitute claims which have now been assigned to TB Food, and since an assignee may prosecute the cause of action in its own name, PB Legacy no longer has any interests in such claims. PB Legacy has neither constitutional standing to assert the claims nor real party in interest status, while TB Foods has both. The Court grants Defendants' motion in part and dismisses without prejudice PB Legacy as a plaintiff in Counts II through IX.

**IV.**

Defendants also argue they are entitled to summary judgment on each of the counts for substantive reasons. The Court addresses each count.

**A.    The Breach of Contract Claim (Count I)**

Count I asserts a breach of contract claim against AMI, alleging that AMI breached the NDA and the Grow-Out Agreement. AMI argues it is entitled to summary judgment because the NDA was superseded by the Grow-Out Agreement, and AMI thus had no further obligations under the NDA. As to the alleged breach of the Grow-Out Agreement, AMI argues that the Term Sheet terminated the Grow-Out Agreement, thus extinguishing AMI's obligations under the Grow-Out Agreement. Thus, according to AMI, its only surviving obligations were set forth in the Term Sheet, which Count I does not allege AMI violated. (Doc. #252, pp. 9-11.)

**(1) AMI's Alleged Breach of the NDA**

Count I of the Amended Complaint asserts that AMI breached the NDA by "failing to preserve the 'Confidential Information' (as defined in the NDA) that had been imparted to it by Primo." (Doc. #20, ¶ 84.)

On December 10, 2014, Primo and AMI entered into the NDA, in which they agreed

> (i) to hold in trust and confidence, and not disclose to any third parties (except as provided herein), any Confidential Information and (ii) not to use any Confidential Information for any purpose other than to carry out discussions concerning, and the undertaking of, the Relationship. Each party agrees that it will disclose Confidential Information only to its directors, officers, employees, representatives, advisors, Contractors or agents (collectively, "Representatives") who have a clear need to know such information in order to carry out the discussions regarding the Relationship.

(Doc. #20-1, p. 1.) The NDA defined "Confidential Information" as:

> any information, technical data, or know-how, including, but not limited to, that which relates to business plans, private placements, research, product plans, products, services, customers, markets, software, developments, inventions, processes, designs, drawings, engineering, hardware configuration information, marketing, sales or finances of the disclosing party or any of its affiliates, which is designated in writing to be confidential or proprietary, or if given orally, is confirmed promptly in writing as having been disclosed as confidential or proprietary.

(Id. p. 2.) The NDA further provided that it remained in effect "for a period terminating on the later to occur of (i) five (5) years following the date of [the NDA] or (ii) three (3) years from

19

the date on which Confidential Information is disclosed under [the NDA]." (Id. p. 3.) The NDA provided that it "shall be governed by and construed and enforced in accordance with the internal laws of the State of Florida." (Id.)

AMI asserts that its obligations under the NDA came to an end because the NDA was superseded by the January 1, 2015 Grow-Out Agreement between Primo and AMI. The "specific primary goal" of the Grow-Out Agreement was to "use a defined portion of AMI grow-out capacity to produce broodstock for Primo for sale to third parties." (Doc. #20-2, p. 2.) Primo agreed to "supply AMI at no cost with 100 breeder pairs (200 animals) every three months" and AMI agreed to grow "Post-larva [] Primo" shrimp. (Doc. #20-2, p. 4.)

The Grow-Out Agreement also contained the following "merger" or "integration" clause:

> This agreement, together with the exhibits described below which are attached hereto and incorporated herein for all purposes, set forth all agreements between AMI and Primo relative to the Premises. All prior negotiations and agreements are merged herein, and no subsequent agreement relative to the subject matter hereof or modification of this agreement shall be binding unless reduced to a writing signed by both parties hereto. The following exhibits have been attached to and incorporated into this agreement: [blank space].

(Id. p. 5.) The Grow-Out Agreement further provided that it "shall be governed by the law of the State or Florida." (Id.)

"The well established rule of law is that a contract may be discharged or extinguished by merger into a later contract entered into between the parties in respect to the same subject which replaces the original contract." <u>Aly Handbags, Inc. v. Rosenfeld</u>, 334 So.2d 124, 126 (Fla. 3d DCA 1976) (citing 7 Fla. Jur. Contracts § 166 (1956)). AMI's assertion that "the Grow-Out Agreement supersedes the NDA" (Doc. #252, p. 9) is, however, incorrect.

In arguing that the Grow-Out Agreement extinguished AMI's obligations – and Primo's right to sue – under the NDA, AMI relies on the Grow-Out Agreement's provision stating that it "set[s] forth all agreements between AMI and Primo." (Doc. #20-2, p. 5.) But the integration clause does not state that it supersedes *every* agreement Primo and AMI ever entered, as AMI suggests. AMI fails to quote the full, relevant portion of the Grow-Out Agreement, which states:

> This agreement, . . . set[s] forth all agreements between AMI and Primo **relative to the Premises.** All prior negotiations and agreements are merged herein, and no subsequent agreement **relative to the subject matter hereof** or modification of this agreement shall be binding unless reduced to a writing signed by both parties hereto.

(Doc. #20-2, p. 5)(emphasis added.) The Grow-Out Agreement thus limits its integration clause's applicability to "all agreements between AMI and Primo <u>relative to the Premises</u>." (<u>Id.</u>) (emphasis added.)

The subject matters of the two agreements are quite different from one another. The NDA is limited to prohibiting AMI from disclosing Primo's confidential information to third parties, while the Grow-Out Agreement provides the terms and manner in which AMI would grow post-larvae shrimp for Primo, and how Primo would compensate AMI for doing so. Nothing in the Grow-Out Agreement, which relates to the Premises for raising the shrimp, discusses or allows AMI to disclose confidential information it had previously received.

Since the NDA and the Grow-Out Agreement concern different subject matters, the Court finds that the Grow-Out Agreement does not supersede the NDA. Therefore, the Court denies AMI's motion for summary judgment as to alleged breach of the NDA in Count I.

**(2)  AMI's Alleged Breach of the Grow-Out Agreement**

Count I also alleges that AMI breached its contractual obligations under the Grow-Out Agreement by "transferr[ing] all right, title, and interest in the Primo shrimp to API, its wholly-owned subsidiary . . . ." (Doc. #20, ¶ 88.)  AMI argues that the Term Sheet, "[w]hile pithy," "explicitly terminated" the Grow-Out Agreement, and thus extinguished AMI's responsibilities under the Grow-Out Agreement. (Doc. #252, p. 10.)  In response, TB Food asserts that the Term Sheet is not a binding contract because it did not include "the essential specific terms pertaining to the" parties' purported agreement, and therefore did not terminate the

parties' responsibilities under the Grow-Out Agreement. (Doc. #273, p. 23.)

Florida law is clear that a subsequent agreement can terminate or modify a contract. St. Joe Corp. v. McIver, 875 So. 2d 375, 381 (Fla. 2004)("It is well established that the parties to a contract can discharge or modify the contract, however made or evidenced, through a subsequent agreement."). Florida law is also clear that "[c]ontracting parties are at liberty to address any issue they see fit, including the question of whether their agreement may be modified at all, and, if so, how." Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc., 145 So.3d 989, 993 (Fla. 4th DCA 2014) (citation omitted).

Here, the Grow-Out Agreement imposed restrictions on subsequent agreements or modifications:

> This agreement, together with the exhibits described below which are attached hereto and incorporated herein for all purposes, set forth all agreements between AMI and Primo relative to the Premises. All prior negotiations and agreements are merged herein, **and no subsequent agreement relative to the subject matter hereof or modification of this agreement shall be binding unless reduced to a writing signed by both parties hereto.** The following exhibits have been attached to and incorporated into this agreement: [blank space].

(Id. p. 5.)(emphasis added.) The Term Sheet was "reduced to a writing signed by both parties" and relates "to the subject matter" of the Grow-Out Agreement. Thus, if the Term Sheet is a

"subsequent agreement" or a "modification" of the Grow-Out Agreement, it will be "binding."

Essentially, AMI asserts that the Term Sheet is a new contract which terminated the Grow-Out Agreement, while TB Food asserts that the Term Sheet is not a contract at all. The Court agrees that the "subsequent agreement" language requires the existence of a valid contact, but concludes that the Term Sheet does not qualify.

The relevant contract principles are well established under Florida law. To succeed on a breach of contract claim, one of the elements a plaintiff must establish is the existence of a valid contract. Friedman v. New York Life Ins. Co., 985 So. 2d 56, 58 (Fla. 4th DCA 2008)(citations omitted). "To prove the existence of a contract, a plaintiff must [establish]: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1272 (11th Cir. 2009) (applying Florida law)(citations omitted). For a contract to be binding, the parties must mutually assent to the essential terms of an agreement. David v. Richman, 568 So. 2d 922, 924 (Fla. 1990). "So long as any essential matters remain open for further consideration, there is no completed contract." Jacksonville Port Auth., City of Jacksonville v. W.R. Johnson Enterprises, Inc., 624 So. 2d 313, 315 (Fla. 1st DCA 1993)(citation and quotation omitted).

Florida law provides no precise definition as to what constitutes an "essential term." <u>Nichols v. Hartford Ins. Co. of the Midwest</u>, 834 So. 2d 217, 219 (Fla. 1st DCA 2002)(citations omitted). Rather, "essential terms will vary widely according to the nature and complexity of each transaction and will be evaluated on a case by case basis." <u>Socarras v. Claughton Hotels, Inc.</u>, 374 So. 2d 1057, 1060 (Fla. 3d DCA 1979)(citation omitted). A court may consider any number of factors, including "the type of contract at issue, the number of terms agreed upon relative to all of the terms to be included, the number of details yet to be ironed out, the relationship of the parties, and the degree of formality attending similar contracts . . . ." <u>Midtown Realty, Inc. v. Hussain</u>, 712 So. 2d 1249, 1252 (Fla. 3d DCA 1998)(citation and quotation omitted).

Here, AMI contends the Term Sheet was a contract intended to formalize the termination of Primo and AMI's business relationship and to settle the state court litigation between the parties. Indeed, Primo's attorney referred to the Term Sheet as "an untitled contract." (Doc. #1-5, p. 3.) The form and substance of this document, however, are inconsistent with "the degree of formality attending similar contracts" intended to settle complex business disputes and litigation, and to terminate a contractual relationship involving hundreds of thousands of dollars. <u>Hussain</u>, 712 So. 2d at 1252.

As noted above, this one-page, handwritten document contains nine numbered bullet points, with three other unnumbered bullet points also written on the page.  Portions of the Term Sheet are illegible, some bullet points have checkmarks next to them, while others do not, and most of the bullet point "provisions" are comprised of incomplete sentences.  It is clear that the contents of this document fail to encompass all essential terms between Primo and AMI.  See Hussain, 712 So. 2d at 1252 ("[I]t is more than reasonable to conclude that the parties did not intend to be bound by a skeletal Letter of Intent . . . ."); see also Morningstar Healthcare, L.L.C. v. Greystone & Co., No. 8:05-CV-949-T-MAP, 2007 WL 9736041, at *6 (M.D. Fla. Aug. 27, 2007)(rejecting argument that "sophisticated parties . . . sufficiently spelled out all the essential terms for financing a complex, multi-million dollar, highly regulated asset in a brief, written paragraph.").  It is not reasonable to believe that the one-sheet handwritten, sometimes cryptic note sets forth all terms to terminate a contract with a business which just ten months later sold for over $2.7 million.

In addition, "the relationship of the parties" further demonstrates that the Term Sheet is lacking essential terms of a termination agreement.  Midtown Realty, Inc, 712 So. 2d at 1252. Since the inception of the parties' business relationship, Primo and AMI had executed two written agreements (the NDA and the Grow-

Out Agreement) stating that Primo shrimp broodstock was Primo's intellectual property. The Term Sheet states "AMI will not destroy animals" and "AMI will give Primo April 30th 2016 to remove all animals." (Doc. #20-3, p. 2.) Yet it fails to state the legal consequences if Primo failed to remove its purported intellectual property from AMI's facility.

AMI argues that this omission definitively establishes that Primo transferred its ownership interests in the Primo broodstock to AMI when Primo failed to remove its shrimp from AMI's facility by April 30, 2016. Neither the omission nor the sparse language in the Term Sheet supports such a significant consequence. The omission relating to the impact on Primo's ownership interests in its intellectual property – which Primo had vigorously safeguarded since the inception of the parties' relationship - is not a "nonessential or small item[]." Williams v. Ingram, 605 So. 2d 890, 893 (Fla. 1st DCA 1992). Indeed, the parties' competing arguments as to the effect of this absent provision demonstrates it is one of the most essential terms to the parties' alleged agreement.[5]

---

[5] AMI nonetheless argues the Term Sheet is a binding contract because Primo undertook some actions consistent with the Term Sheet's requirements (Primo voluntarily dismissed AMI from the state court litigation). The Court is unpersuaded, as "neither [a] contract nor any of its provisions come into existence" when essential terms are lacking. Gibson v. Courtois, 539 So. 2d 459, 460 (Fla. 1989).

The Court finds the Term Sheet is not an enforceable contract because it is lacking essential terms to the parties' alleged agreement. <u>Johnson Enterprises</u>, 624 So. 2d at 315 ("[I]f there has been no agreement as to essential terms, an enforceable contract does not exist."). Therefore, the Court finds that the Term Sheet did not supersede the Grow-Out Agreement as a "subsequent agreement" and therefore denies this portion of AMI's motion as to Count I.

The Grow-Out Agreement also provided that it could be modified by a signed written document:

> All prior negotiations and agreements are merged herein, **and no** subsequent agreement relative to the subject matter hereof or **modification of this agreement shall be binding unless reduced to a writing signed by both parties hereto.** The following exhibits have been attached to and incorporated into this agreement: [blank space].

(<u>Id.</u> p. 5)(emphasis added.) In contrast to terminating a contract, a modification merely replaces some terms of a valid and existing agreement while keeping those not abrogated by the modification in effect. <u>Bornstein v. Marcus</u>, 275 So. 3d 636, 639 (Fla. 4th DCA 2019) (citation omitted). "Whether the parties have validly modified a contract is usually a question of fact." <u>McIver</u>, 875 So. 2d at 382. The Court finds that the issue of whether the Term Sheet is a valid modification of the Grow-Out Agreement is a matter on which there are disputed issues of material fact, thus

precluding summary judgment.  AMI's motion for summary judgment on Count I is denied.

**B.    The Defamation Claim (Count III)**

In Count III, TB Food asserts a defamation claim against Defendants.  TB Food contends that in late 2016, Defendants:

> falsely conveyed to the public that (i) the breeder shrimp that Primo was offering for sale, including through its exclusive distributor in China (i.e., Haimao), are "fake" and not the "real Primo" shrimp, (ii) Primo had abandoned all intellectual property rights in the shrimp it left behind with AMI on April 30, 2016, and (iii) Primo had given the full bank of all its genetic lines to AMI under the Grow-Out Agreement, while retaining none of the lines for itself at its headquarters in Brookshire, Texas.

(Doc. #20, ¶¶ 114-16.)  TB Food further alleges that Defendants made such defamatory statements in the Chinese media and in sales publications in 2016.  (Id.)

Defamation[6] is defined as "the unprivileged publication of false statements which naturally and proximately result in injury to another."  Wolfson v. Kirk, 273 So. 2d 774, 776 (Fla. 4th DCA 1973).

> A claim of defamation requires "the following
> five elements: (1) publication; (2) falsity;

---

[6] Defendants assert that this count is more properly characterized as slander.  (Doc. #252, p. 11.)  "Slander is a spoken or oral defamation of another which is published to others and which tends to damage that person's reputation, ability to conduct that person's business or profession, and which holds that person up to disgrace and humiliation."  Scott v. Busch, 907 So. 2d 662, 666 (Fla. 5th DCA 2005).  The Court accepts plaintiffs' characterization of Count III.

(3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." Jews For Jesus, Inc. v. Rapp, 997 So.2d 1098, 1106 (Fla. 2008). Clearly, a false statement about another is a required element of defamation. Cape Publ'n, Inc. v. Reakes, 840 So.2d 277, 279-80 (Fla. 5th DCA 2003). However, "falsity only exists if the publication is substantially and materially false, not just if it is technically false." Smith v. Cuban Am. Nat'l Found., 731 So.2d 702, 707 (Fla. 3d DCA 1999).

"Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true." Id. at 706. "The question of falsity, the [Supreme] Court held, 'overlooks minor inaccuracies and concentrates upon substantial truth.' " Id. at 707 (quoting Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) ). Furthermore, in determining whether a statement is "substantially true," the statement in question must be read in full context of its publication. Id. at 705-06.

"Where a communication is ambiguous and reasonably susceptible of a defamatory meaning, it is for the trier of fact to decide whether the communication was understood in the defamatory sense." Perry v. Cosgrove, 464 So.2d 664, 666 (Fla. 2d DCA 1985); see also Pep Boys, 711 So.2d at 1328 ("The questions of whether the broadcast contained false statements and/or statements that could be interpreted as false are questions of fact which should be left for a jury to determine where the communication is ambiguous and is reasonably susceptible of a defamatory meaning.").

Kieffer v. Atheists of Florida, Inc., 269 So. 3d 656, 659-60 (Fla. 2d DCA 2019).

Defendants contend that TB Food's defamation claim fails as a matter of law because the statements published by defendants were not false.  Defendants assert that their alleged statements that Primo's distributor in China was selling "fake" Primo shrimp and that only API was selling the "real Primo" shrimp "is substantially and demonstrably true."  (Doc. #252, p. 12.) Defendants argue that such statements were true then, and are true now, because Wudi Tenfly owns the rights to the tradename "pu rui mo" (the phonetic spelling of the Chinese word for "Primo") in China under Chinese law.  And since Wudi Tenfly had not granted Haimao (Primo's distributor in China) a license to use the trademarked term "pu rui mo" in China, Defendants assert that API was in fact the only party selling "real" pu rui mo shrimp in China.

As TB Food notes in its Response, Wudi Tenfly did not grant API the right to use the name "pu rui mo" until 2019.  (Doc. #171-2.)  This does not retroactively establish the truth of Defendants' alleged statement in 2016 that only API had the "real" Primo or "pu rui mo" shrimp.  The Court finds that Defendants have not shown that the undisputed material facts establish that their alleged statements regarding "real" and "fake" Primo shrimp were "substantially and demonstrably true" in 2016.

Defendants also contend that their alleged statements that Primo abandoned its intellectual property were not false because the Term Sheet "terminated any 'intellectual property' rights created by the" Grow-Out Agreement. (Doc. #252, p. 13.) The Court has rejected that there was a contractual termination for the reasons noted *supra*, and concluded that whether there was a modification is an issue for the trier of fact. The Court cannot otherwise determine on summary judgment that such statements do not give rise to a claim for defamation. <u>Kieffer v. Atheists of Fla., Inc.</u>, 269 So. 3d 656, 659 (Fla. 2d DCA 2019)("Where a communication is ambiguous and reasonably susceptible of a defamatory meaning, it is for the trier of fact to decide whether the communication was understood in the defamatory sense." (citation and quotation omitted)).

Defendants also argue they are entitled to summary judgment because their allegedly defamatory publications are qualifiedly privileged under Florida law. Under Florida law, even where a party makes a defamatory publication, "no liability will attach to it if it was published upon an occasion that makes it qualifiedly privileged and the privilege was not abused." <u>Thomas v. Tampa Bay Downs, Inc.</u>, 761 So. 2d 401, 404 (Fla. 2d DCA 2000)(citation omitted). The "essential elements of the qualified privilege are: (1) good faith; (2) an interest in the subject by the speaker or a subject in which the speaker has a duty to speak; (3) a

corresponding interest or duty in the listener or reader; (4) a proper occasion; and (5) publication in a proper manner." _Id._ (citations omitted). Defendants bear the burden of proving their entitlement to the qualified privilege. _Kieffer v. Atheists of Fla., Inc.,_ 269 So. 3d 656, 660 (Fla. 2d DCA 2019)(citation omitted). "The question of whether allegedly defamatory statements are [] privileged is one of law to be decided by the court and consequently is ripe for determination on motion for summary judgment." _Stephens v. Geoghegan,_ 702 So. 2d 517, 522 (Fla. 2d DCA 1997) (internal citation omitted).

Defendants contend their allegedly defamatory publications are privileged because they had "a duty to inform actual and potential Chinese customers of the provenance of [their] product, as well as the circumstances by which [they] came into possession of that product." (Doc. #252, p. 13.) Florida courts have provided little guidance as to how a party satisfies the duty element. In general, "[t]he nature of the duty or interest may be public, personal or private, either legal, judicial, political, moral, or social." _Lewis v. Evans,_ 406 So. 2d 489, 492 (Fla. 2d DCA 1981).

The Court finds no basis for concluding Defendants had a duty to inform potential Chinese customers in 2016 that only API was selling "real" Primo shrimp and that Primo was selling "fake" Primo shrimp. As noted _supra_, API was not granted a license to use the

Chinese trademark "pu rui mo" until 2019 – approximately three years after Defendants' allegedly defamatory communications. The Court likewise finds no basis for finding that Defendants had a duty to inform potential Chinese customers that Primo had abandoned its rights to its intellectual property. Because Defendants have not established this duty element, the Court finds that Defendants have failed to carry their burden in establishing their entitlement to summary judgment based on qualified privilege. Defendants' motion as to Count III is therefore denied.

**C.    Trade Secret and Unfair Competition Claims (Counts IV through VIII)**

TB Food asserts claims against Defendants for trade secret misappropriation under the Defend Trade Secrets Act (Count IV) and the Florida Trade Secrets Act (Count V); unfair competition under the Lanham Act (Count VI) and Florida common law (Count VII); and violation of the Florida Deceptive and Unfair Trade Practices Act (Count VIII). Defendants argue that "neither state nor federal law recognize[] intellectual property rights in bred shrimp or any other bred animal," and thus contend that Primo shrimp cannot qualify as trade secrets. (Doc. #252, pp. 13-14.) Defendants assert they are entitled to summary judgment on Counts IV through VIII, which (according to Defendants) are all premised on the existence of a trade secret in shrimp under state and federal law.

The Defend Trade Secrets Act broadly defines a trade secret
as:

> all forms and types of financial, business, scientific,
> technical, economic, or engineering information,
> including patterns, plans, compilations, program
> devices, formulas, designs, prototypes, methods,
> techniques, processes, procedures, programs, or codes,
> whether tangible or intangible, and whether or how
> stored, compiled, or memorialized physically,
> electronically, graphically, photographically, or in
> writing if--
>
> (A) the owner thereof has taken reasonable measures to
> keep such information secret; and
>
> (B) the information derives independent economic value,
> actual or potential, from not being generally known to,
> and not being readily ascertainable through proper means
> by, another person who can obtain economic value from
> the disclosure or use of the information.

18 U.S.C. § 1839(3). Florida law similarly defines a trade secret
as follows:

> information, including a formula, pattern, compilation,
> program, device, method, technique, or process that:
>
> (a) Derives independent economic value, actual or
> potential, from not being generally known to, and not
> being readily ascertainable by proper means by, other
> persons who can obtain economic value from its
> disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under
> the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).

While Defendants concede that the definition of a trade secret
is "undeniably broad in reach," (Doc. #252, p. 15), they contend
that TB Food has failed to establish that Primo possessed a trade

secret as contemplated by the foregoing statutes. Defendants reason that "[b]oth statutes are focused on 'information' as the fundamental nature of an alleged trade secret" and Primo's shrimp broodstock cannot satisfy such definition. (Doc. #252, p. 15.)

Throughout this case, Plaintiffs have submitted evidence detailing the manner in which Primo selectively bred its genetic line of shrimp to be resistant to White Spot and Early Mortality Syndrome (EMS) – diseases which are prevalent in shrimp grown in Asian non-biosecure ponds and can kill shrimp before reaching "table" size. (Doc. #271-7, p. 4.) Primo sold its White Spot and EMS resistant post-larvae shrimp to farmers in China, who could grow such shrimp in non-biosecure ponds and profitably sell the grown shrimp as "table" shrimp. (Id.) To prevent such farmers from being able to perpetually breed the post-larvae Primo shrimp on their own – and negate the need to purchase Primo broodstock - Primo would sell those customers "locked" pairs of breeder shrimp. (Id. pp. 6-9.) These "locked" pairs were genetically derived from a limited number of family lines, so the second and third generations of these "locked" pairs would suffer from inbreeding and would not be as disease resistant as the first generation. (Id.); (Doc. #271-5, p. 95.) The only way to prevent such inbreeding effects would be to breed the "locked" pairs' offspring with Primo shrimp from an unrelated family line (which would be

impossible without access to Primo's entire genetic bank). (Doc. #271-7, pp. 6-9); (Doc. #271-5, p. 127.)

In short, Primo's broodstock business was premised on knowledge of the underlying Primo shrimp genetics, the manner in which its shrimp can be successfully bred for generations as broodstock, and the manner in which "locked" pairs can be used to prevent customers from breeding such pairs as broodstock lines. The Court finds such information may qualify as being among the "all forms and types" of "business, scientific, technical, [and] economic [] information" under the Defend Trade Secrets Act. 18 U.S.C. § 1839(3). The Court similarly finds such information to be a "method, technique, or process" that "[d]erives independent economic value . . . from not being generally known," as contemplated by the Florida Trade Secrets Act. Fla. Stat. § 688.002(4).

While Defendants are correct that neither statute "include[] the terms 'goods,' or 'animals'" as definitions of trade secrets, (Doc. #252, p. 15), that is not dispositive. Indeed, courts have found "goods" and underlying genetics to constitute trade secrets in analogous situations. See Pioneer Hi-Bred Int'l, Inc. v. Holden Found. Seeds, Inc., No. CIV. 81-60-E, 1987 WL 341211, at *31 (S.D. Iowa Oct. 30, 1987)("[T]he genetic messages of H3H and H43SZ7 [lines of corn] are 'trade secrets'" because "[t]he genetic message of these lines of corn which Pioneer spent a great amount of money

and effort developing is akin to a secret formula."); Midwest Oilseeds, Inc. v. Limagrain Genetics Corp., 231 F. Supp. 2d 942, 953 (S.D. Iowa 2002)("Genetic information can be property.").[7]

The Court is also unpersuaded by Defendants' assertion that Neil Gervais, Primo's chief scientist, disclaimed any trade secret interests in Primo's broodstock. Defendants rely on Mr. Gervais' deposition testimony where he testified that:

> I never used a term 'Primo method.' I never marketed a term Primo method. I would -- I was never asked to define what that ever meant, that Primo didn't sell a method. Primo sold animals. The person that sold Primo coined that term.

(Doc. #275-1, p. 92.) The Court does not find such testimony dispositive of the legal issue of whether the Primo broodstock genetics, and the accompanying information, constitute trade secrets. Indeed, Mr. Gervais also testified at deposition that he has limited knowledge of the legal principles relevant to this analysis:

> Now techniques, if y'all say that this is intellectual property that can be defended in court, [] that's the lawyer's definitions. It's not, it's not my world. It's not my, my area of expertise.

(Doc. #271-5, p. 95.)

---

[7] Defendants rely on N. Carolina Farm P'ship v. Pig Improvement Co., 163 N.C. App. 318 (2004) in arguing that animal genetics cannot constitute a trade secret. The Court is unpersuaded because this case involved neither the federal nor Florida state statute involved in the present case.

For the foregoing reasons, the Court declines to hold that Primo's broodstock cannot as a matter of law "fall within the statutory definitions of 'trade secret' under state or federal law." (Doc. #252, p. 14.) The Court thus denies Defendants' motion as to Counts IV through VIII.

**D.    The Lanham Act Claim (Count VI)**

Defendants also move for summary judgment on the merits of TB Food's Lanham Act claim in Count VI. Defendants assert they are entitled to summary judgment because "Plaintiffs do not possess the trademark rights to the mark, pu-rui-mo, in China," and Count VI is predicated upon Defendants' alleged misappropriation of the "Primo" tradename. (Doc. #252, p. 17.)

Contrary to Defendants' argument, Count VI is not entirely premised on Defendants' alleged improper use of the "Primo" or "pu rui mo" tradename. Indeed, in relevant part, Count VI alleges that Defendants engaged in unfair competition practices in violation of the Lanham Act by (1) "wrongfully misappropriat[ing] the Primo Method and other trade secrets of Primo"; and (2) making "false and misleading statements of fact . . . concerning [Defendants'] purported rights over significant portions of Primo's broodstock and associated intellectual property rights." (Doc. #20, ¶¶ 154-55.) While Count VI alleges that Defendants' actions caused "confusion regarding the affiliation, connection, or association of Defendants to Primo's proprietary shrimp

broodstock and Primo's tradename," (Doc. #20 ¶ 156), it does not allege that Defendants' use of the name "pu rui mo" in China is the sole – or even primary – basis for such a Lanham Act claim.

Defendants also argue they are entitled to summary judgment on this claim because "Wudi Tenfly owns the Chinese mark [pu rui mo] that underlies Plaintiffs' Lanham Act claim." (Doc. #252, p. 19.) On January 9, 2020, the Court modified its Preliminary Injunction in this case to "exclude the term pu rui mo from its scope" since a Chinese court has determined that Wudi Tenfly owns the rights to the tradename "pu rui mo" in China. (Doc. #281, p. 17.) The Court found that such modification was warranted because the Preliminary Injunction's previous prohibition of Defendants' use of "pu rui mo" in China would be inconsistent with the Chinese court's legal determination under Chinese law.

While it is clear that the tradename "pu rui mo" belongs to Wudi Tenfly in China under Chinese law, that issue is not dispositive as to whether Defendants violated the Lanham act as alleged in Count VI. Indeed, as noted *supra*, the crux of the claim in Count VI is that Defendants allegedly "misappropriated the Primo Method and other trade secrets of Primo" and "made false and misleading statements of fact . . . concerning their purported rights over significant portions of Primo's broodstock and associated intellectual property." (Doc. #20, ¶¶ 154-55.) The Court is aware of no legal basis – and Defendants cite to none –

supporting Defendants' assertion that they are immune from Lanham Act liability for the alleged trade secret misappropriation and false statements regarding Primo's intellectual property rights because Wudi Tenfly owns the "pu rui mo" tradename. Defendants' motion as to Count VI is therefore denied.

Accordingly, it is now

**ORDERED:**

1. Defendants' Motion for Final Summary Judgment (Doc. #252) is **GRANTED IN PART AND DENIED IN PART.**

2. The Motion is **GRANTED** to the extent that PB Legacy, Inc. is **dismissed without prejudice** as a plaintiff as to Counts I through IX.

3. The Motion is otherwise **DENIED.**

**DONE AND ORDERED** at Fort Myers, Florida, this ___10th___ day of April, 2020.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies: Counsel of record