UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PB LEGACY, INC, a Texas
Corporation and TB FOOD USA,
LLC,

      Plaintiffs,

v.                       Case No:  2:17-cv-9-FtM-29NPM

AMERICAN MARICULTURE, INC.,
a Florida corporation,
AMERICAN PENAEID, INC., a
Florida corporation, and
ROBIN PEARL,

      Defendants.
_____

AMERICAN MARICULTURE, INC.,
a Florida corporation,

      Counter-Plaintiff,

v.

PB LEGACY, INC, a Texas
Corporation,        KENNETH
GERVAIS, and RANDALL AUNGST,

      Counter/Third-Party
      Defendants.
_____

## OPINION AND ORDER

This matter comes before the Court on third-party defendant Randall Aungst's Motion for Summary Judgment (Doc. #287), filed on February 3, 2020, to which counter-plaintiff American Mariculture, Inc. filed a Response in Opposition (Doc. #294) on March 5, 2020.

Randall Aungst filed a Reply (Doc. #300) on March 17, 2020, and American Mariculture, Inc. filed a Sur-Reply (Doc. #305) on March 25, 2020.  For the reasons set forth below, the motion is granted.

**I.**

On April 6, 2017, defendant American Mariculture, Inc. (AMI) filed a four-count Counterclaim (Doc. #80) against plaintiff PB Legacy and non-parties Kenneth Gervais (Gervais) and Randall Aungst (Aungst).[1]  In relevant part, the Counterclaim alleges the following:

On or about January 1, 2015, AMI and Primo entered into a "Grow Out Agreement" authorizing Primo to use AMI facilities to grow out shrimp broodstock and to produce saleable shrimp.  (Doc. #80, ¶ 8.)  Over the course of the following year, Primo is alleged to have repeatedly breached the terms of the Grow Out Agreement, including by failing to ship developed broodstock from the AMI facilities, failing to provide shrimp breeders for the hatcheries, failing to implement a breeding program, and failing to make timely payment of amounts due.[2]  (Id. ¶ 9.)  In response, AMI advised

---

[1] Technically, the claims against Mr. Gervais and Mr. Aungst would be set forth in a third-party complaint.  See Fed. R. Civ. P. 14(a)(1).  Nonetheless, the Court will refer to the pleading as a Counterclaim.

[2] While the details and merits are disputed by the parties, it is not disputed that there were significant disagreements between Primo and AMI.

Primo of its intent to harvest and sell Primo's shrimp broodstock, which AMI asserted was its right under the Grow Out Agreement. (Id. ¶ 10.)

On or about January 6, 2016, Robin Pearl, President of AMI (Pearl), met with Gervais and Aungst, on behalf of Primo, in Bokeelia, Florida to discuss the various disagreements and AMI's intent to harvest the shrimp broodstock. (Id. ¶ 11.) During this meeting, Gervais and Aungst told Pearl that Primo had contracted for the sale of 100,000 animals of shrimp broodstock to a Chinese company. (Id. ¶ 12.) This shrimp broodstock was to be shipped from the AMI facility, and pursuant to the terms of the Grow Out Agreement, AMI was to be paid $7.50 for each animal shipped, for a total payment to AMI of $750,000.00. (Id. ¶ 13.) AMI demanded a deposit of $100,000.00 in order to defray its costs of maintaining the animals to be sold, which was orally agreed to by Primo's representatives. (Id. ¶ 14.)

AMI asserts it relied upon the representations of Gervais and Aungst, and maintained Primo's shrimp broodstock at its premises at considerable expense to AMI. (Id. ¶ 15.) When Primo made no deposit, AMI again notified Primo of its intent to harvest the shrimp broodstock in order to mitigate its damages and the ongoing, considerable expense of maintaining Primo's shrimp broodstock. (Id. ¶ 16.)

On or about January 19, 2016, Gervais, on behalf of Primo, sent AMI a copy of the Chinese contract to support his and Aungst's prior representations, along with "a slew" of threats designed to prevent AMI from harvesting Primo's shrimp broodstock. (Id. ¶ 17.) AMI asserts that in reliance upon the representations of Gervais and Aungst, as well as the contract which was provided, it continued to maintain Primo's shrimp broodstock. (Id. ¶ 18.)

On or about January 26, 2016, Primo filed suit against AMI in state court seeking injunctive relief to prevent AMI from harvesting or otherwise disposing of Primo's shrimp broodstock. (Id. ¶ 19.) On or about January 29, 2016, Pearl and Aungst met to discuss their competing claims and a termination of their business relationship and prior agreements. (Id. ¶ 20.) At that meeting, Pearl and Aungst negotiated and signed what AMI refers to as a settlement agreement comprised of approximately 12 handwritten terms (the "Settlement Agreement"). (Id.) AMI alleges that Point six of the Settlement Agreement formally terminated all prior agreements, including the Grow Out Agreement; Point seven of the Settlement Agreement prevented AMI from harvesting the shrimp broodstock; and Point eight of the Settlement Agreement required

Primo to remove all shrimp broodstock from AMI's facilities by April 30, 2016.[3]  (Id. ¶¶ 21-23.)

AMI alleges that, in breach of Primo's obligations under the Settlement Agreement, Primo failed to remove all shrimp broodstock from AMI's facilities by April 30, 2016.  (Id. ¶ 24.)  AMI incurred significant expense in maintaining Primo's shrimp broodstock from the date of the Settlement Agreement forward.  (Id. ¶ 25.)  AMI alleges that, "[i]n fact, Primo never had a valid contract for the sale of shrimp broodstock to China, and all representations to that effect were made specifically to induce AMI into maintaining Primo's shrimp broodstock (at AMI's expense) and executing the Settlement Agreement."  (Id. ¶ 26.)

    Count III of the Counterclaim, the sole claim against Aungst, incorporates these allegations and asserts a claim for fraudulent inducement.  Specifically, Count III alleges that, "[i]n a meeting with Mr. Pearl, on behalf of AMI, on or about January 6, 2016, Mr. Gervais and Mr. Aungst, on behalf of Primo, made false representations of material fact in stating that Primo held a valid contract for the sale of 100,000 animals of shrimp broodstock to China, which would ship from AMI facilities resulting in $750,000.00 in revenues to AMI."  (Id. ¶ 29.)  Count III further

---

[3] While the existence of the "settlement agreement" document is not disputed, its meaning and effect are disputed by the parties.

alleges that Gervais, on behalf of Primo, furthered this misrepresentation by providing a copy of the allegedly valid contract to Pearl, on behalf of AMI, on or about January 19, 2016. (Id. ¶ 30.)  Count III continues that both Gervais and Aungst, acting on behalf of Primo, knew or should have known that their statements were false at the time they were made, and that they intended that their false representations would cause AMI to continue to maintain Primo's shrimp broodstock at AMI's expense and preclude harvesting.  (Id. ¶¶ 31-32.)  AMI alleges that its reliance on the false representations was reasonable and justifiable under the circumstances, and that it suffered damages in excess of $75,000 as a direct result of Gervais' and Aungst's fraudulent and knowing misrepresentations.  (Id. ¶¶ 33-34.)

## II.

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Baby Buddies, Inc. v. Toys "R" Us, Inc., 611 F.3d 1308, 1314 (11th Cir. 2010).  A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A court must decide 'whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004)(quoting Anderson, 477 U.S. at 251).

In ruling on a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party. Scott v. Harris, 550 U.S. 372, 380 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010). However, "if reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999)(quoting Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296-97 (11th Cir. 1983)(finding summary judgment "may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts")). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007).

### III.

"The elements of fraudulent misrepresentation and fraudulent inducement are: (1) a false statement concerning a material fact;

7

(2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." Moriber v. Dreiling, 194 So. 3d 369, 373 (Fla. 3d DCA 2016)(citations omitted); see also Butler v. Yusem, 44 So.3d 102, 105 (Fla. 2010); GEICO Gen. Ins. Co. v. Hoy, 136 So.3d 647, 651 (Fla. 2d DCA 2013). However, "as a matter of law, a plaintiff may not rely on statements made by litigation adversaries to establish fraud claims." Moriber, 194 So. 3d at 373. The Court addresses each of Aungst's arguments in turn.

### A.  Failure to State Claim

Aungst argues that "AMI failed to state a claim for which relief may be granted . . . ." (Doc. #287, p. 2.)  This seems to be a motion to dismiss allegation under Fed. R. Civ. P. 12(b)(6). The Court concludes that Count III is sufficiently pled under Rule 12(b)(6) standards to state a claim upon which relief may be granted.  This portion of the motion is denied.

### B.  Liability of Corporate Officer

Aungst argues that summary judgment must be entered in his favor because, as a corporate officer of Primo, he can have no personal liability for statements he made on behalf of Primo. Aungst points to various paragraphs of the Counterclaim which allege he was acting "on behalf" of Primo, which he argues precludes personal liability.  (Doc. #287, pp. 6-7.)

Aungst concedes that it is possible for a corporate officer to have personal liability for a tortious act committed in the scope of his employment with a corporation. (Id. p. 6.) As the case he cites states:

> A director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character; he is not liable for torts committed by or for the corporation unless he has participated in the wrong. Accordingly, directors not parties to a wrongful act on the part of other directors are not liable therefor. **If, however, a director or officer commits or participates in the commission of a tort, whether or not it is also by or for the corporation, he is liable to third persons injured thereby, and it does not matter what liability attaches to the corporation for the tort.** A contrary rule would enable a director or officer of a corporation to perpetrate flagrant injuries and escape liability behind the shield of his representative character, even though the corporation might be insolvent or irresponsible."

Orlovsky v. Solid Surf, Inc., 405 So.2d 1363 (Fla. 4th DCA 1981) (emphasis added)(citation and quotation omitted). Nothing in the language of the Counterclaim would necessarily preclude personal liability. Indeed, the Counterclaim alleges that Aungst personally participated in the allegedly wrongful conduct. This basis for summary judgment is denied.

### C. Falsity of Statement

The crux of the motion is that the statement was not false or known to be false when made. (Doc. #287, pp. 8-10.) "[A] false

statement of material fact" is one of "[t]he essential elements to establish a claim for fraudulent inducement." Rose v. ADT Sec. Services, Inc., 989 So. 2d 1244, 1247 (Fla. 1st DCA 2008). Additionally, AMI must show that Aungst knew the statement was false when made. Butler v. Yusem, 44 So.3d at 105.

First, some preliminary matters.

The falsity at issue in Count III is not the representation that a contract existed, but the representation that it was a "valid" contract. The record clearly establishes the existence of the Broodstock Sales Agreement to sell 100,000 shrimp in China (Doc. #41-2, pp. 26-29) and that a copy of this contract was given to AMI.

Aungst correctly points out that a promise to do something in the future normally cannot be a false statement of fact, and that Count III does not allege that Aungst knew at the time he made the statement there was no contract to sell 100,000 shrimp to a Chinese purchaser. (Doc. #287, pp. 8-9.) Neither of these is relevant to the claim in Count III, which is not based on future conduct (it is based on the current existence of a valid contract) and does not assert that the contract was non-existent (only that it was not valid).

Additionally, the Court rejects Aungst's argument that AMI must show he forged the Chinese contract. (Doc. #300, p. 3.) Count III contains no suggestion that the contract was a forged

document, only the assertion that it was not a "valid" contract. Similarly, Aungst's position that the fraudulent inducement claim is premised on the failure of the Chinese contract to culminate in an actual transaction, (Doc. #287, pp. 9-10), misstates the nature of the claim.  AMI does not claim fraud because the deal fell through; it claims fraud because (it asserts) the contract was not "valid."

Finally, the Court rejects Aungst's argument that AMI's lack of standing to challenge the validity of the contract affects its ability to assert the fraud claim.  (Doc. #300, p. 4.)  AMI clearly would have no standing in a breach of contract claim concerning the Chinese contract, but that is not the nature of the claim in Count III.  Rather, AMI says that Aungst lied to it when he said Primo had a "valid" contract with a Chinese customer.  AMI is entitled to litigate the alleged falsity of the representation in the fraud claim.

On the merits, the core of AMI's fraud claim is stated as follows:  "In a meeting with Mr. Pearl, on behalf of AMI, on or about January 6, 2016, Mr. Gervais and Mr. Aungst, on behalf of Primo, made false representations of material fact in stating that Primo held a valid contract for the sale of 100,000 animals of shrimp broodstock to China, which would ship from AMI facilities resulting in $750,000.00 in revenues to AMI."  (Doc. #80, ¶ 29.)

The only portion of this representation which is alleged to have been knowingly false is that the contract was "valid."

The Court has previously granted summary judgment in favor of the other two defendants in Count III because there was no evidence that Aungst's representation was false. (Doc. #285, p. 16.)  AMI asserts that since then, Aungst provided a deposition in which he "testified on two separate occasions that the contract presented to Mr. Pearl in order to convince him not to harvest Primo's animals was not a valid and enforceable contract." (Doc. #294, p. 7.)

AMI first asserts that the Broodstock Sales Agreement was "de facto unenforceable" because "according to Mr. Aungst's testimony, the material terms of the Chinese contract could be changed by the buyer at any time." (Id.)  At deposition, the following exchange ensued between Aungst and AMI's counsel:

> [Counsel]: Is this the contract that you were describing earlier where Primo agrees to supply 100,000 shrimp to a Chinese customer?
>
> [Aungst]: What it is, it's an initial agreement, supply contract that China would like to have 100,000 broodstock provided by Primo.
>
> [Counsel]: Right.
>
> [Aungst]: That's what it is.
>
> [Counsel]: And there's a delivery date on here, right?
>
> [Aungst]: The delivery dates are always there, but they always can be changed. I mean, they change them all the time. There's no specific date.  Anyway, go ahead.

[Counsel]: So you're saying this -- the delivery date here, even though it's part of a contract, is not an enforceable provision or –

[Aungst]: What I'm saying is, if this date expires, they can always renew it. But this is the date you have to provide the $100,000 -- or 100,000. But as you see here, the quantity per shipment, right, well, at any time the buyer can say, well, I don't need this many anymore or I have problems in my hatchery so we have to reduce the number animals. So there's no fix really. I mean, even though you have a contract, until you get paid for it, until you deliver, until what they really want, they can change their mind, too. And then you go by it. So it's not a -- even though it's there, things happen. You're dealing with live animals. Okay? So when you have these animals in your facility and you say, oh, my facility's not working, I can't take no more, what are you going to do?

. . .

[Counsel]: So even though it says sales agreement and it looks like a contract, this isn't really an enforceable contract between the parties, it might change at any point?

[Aungst]: It could change with both parties agreeing to it.

[Counsel]: And what if one party didn't agree to it?

[Aungst]: Well, I never had that happen, so obviously I don't know what would happen I'm not a lawyer or any -- I don't know what would happen, to be honest with you.

(Doc. #294-2, p. 35.)[4]

Contrary to AMI's characterization, Aungst did not state the contract was subject to modification solely at the buyer's

---

[4] When citing to the transcript of Aungst's deposition, the Court refers to the page number placed at the top of the document by the Clerk's Office.

discretion.   Instead,  Aungst  testified  "[i]t  could  change  with
both parties agreeing to it."  (Doc. #294-2, p. 35.)  The ability
of  the  parties  to  modify  a  contract  by  their  consent  does  not
render the contract invalid or unenforceable.

> [A] modification merely replaces some terms of
> a valid and existing agreement while keeping
> those  not  abrogated  by  the  modification  in
> effect.  See  Franz  Tractor  Co.  v.  J.I.  Case
> Co., 566 So.2d 524, 526 (Fla. 2d DCA 1990).
> "It is well established that the parties to a
> contract can discharge or modify the contract,
> however  made  or  evidenced,  through  a
> subsequent  agreement."  St.  Joe  Corp.  v.
> McIver, 875 So.2d 375, 381-82 (Fla. 2004).

Bornstein v. Marcus, 275 So. 3d 636, 639 (Fla. 4th DCA 2019). It
appears that this is no different than Chinese law, which provides
that parties may subsequently modify the terms of a contract.  See
Contract  Law  of  the  People's  Republic  of  China,  Art.  77
(promulgated by Nat'l People's Cong., Mar. 15, 1999)[5] ("A contract
may be amended if the parties have so agreed.").

AMI's   second   assertion   is   that   deposition   testimony
demonstrates  Aungst  knew  the  Chinese  contract  was  "not  valid
because  it  had  not  been  'stamped'  by  the  Chinese  government."
(Doc.  #294,  p.  7.)   AMI  relies  on  the  following  deposition
testimony:

> [Counsel]: If we turn back to the broodstock agreement
> that  you  have  here,  do  you  see  any  witnesses  on  the
> signature page?

---

[5] Available at https://www.wipo.int/edocs/lexdocs/laws/en/
cn/cn137en.pdf.

[Aungst]: Huh? This document would be stamped and sent to the China government. It has binded.

[Counsel]: And what, otherwise to you it's not a valid agreement?

[Aungst]: Huh? Do you see -- I mean, I can't see because it's all whited out, but this is a binded document to China.

[Counsel]: But are there witnesses?

[Aungst]: No, but there is -- there are -- there are stamps, there are company stamps, you know, registration stamp numbers and all that stuff. It's not just a handwritten agreement. This is not a handwritten agreement. It's -- it's -- well, it's handwritten, but, I mean, it's -- it's binded.

[Counsel]: So until this receives the stamps that you're talking about, you're saying this is not a valid agreement?

[Aungst]: For it to be bounded, I think it has to have a stamp by the Chinese government. It goes to China and they get stamped. Right? They get approval. See, they can't just simply -- is that correct? I don't know.

[Counsel]: No, you can't ask questions.

[Aungst]: Yeah, I understand. But, yeah, I always thought that these were stamped.

[Counsel]: So even though you represented to Mr. Pearl that this was a valid agreement, you're saying until it's stamped --

[Aungst]: At this time this -- well –

[Counsel]: -- it's not a valid agreement?

[Aungst]: From my understanding, there is a stamp that goes with it.

[Counsel]: And until that stamp is on there, it's not a valid agreement?

[Aungst]: To my understanding.

(Doc. #294-2, p. 37.)

The Court finds that Aungst's lay opinion regarding Chinese contract law is insufficient to raise a genuine issue of material fact as to whether Aungst falsely represented that the Broodstock Sales Agreement was a "valid contract." As Aungst testified at deposition, he is "not a lawyer" and has limited understanding of the legal principles relevant to this analysis. (Doc. #294-2, p. 35.) Circuitously, AMI relies on Aungst's understanding of contract law for its assertion that the Broodstock Sales Agreement was "not valid" because it lacked a stamp issued by the Chinese government. While AMI cites to Aungst as a legal authority, the Court is unpersuaded by Aungst's lay opinion as to this purely legal issue, which cannot form a basis for a false representation claim. Chino Elec., Inc. v. U.S. Fid. & Guar. Co., 578 So. 2d 320, 323 (Fla. 3d DCA 1991)("It is, of course, well settled in Florida that in order to be actionable a fraudulent misrepresentation must be of a material fact, rather than a mere opinion or a misrepresentation of law.").

AMI's reliance on Zhongshan Hengfu Furniture Co., Ltd. v. Home Accents All., Inc., No. EDCV1400038VAPDTBX, 2014 WL 12561625, at *3 (C.D. Cal. Oct. 20, 2014), is misplaced. Besides being a non-binding decision, Zhongshan provides no such support for AMI's

position.  In that case, the court noted that a Chinese *company's*
stamp "is a substitute for a signature, [so] due care must be
exercised to ensure that the [stamps] are maintained in a safe
location and are not subject to misuse by persons without
authority."   Id., at *3 n.3 (citation and quotation omitted).
Zhongshan does not support the assertion that the Broodstock Sales
Agreement was "not valid" for lacking a stamp issued by the Chinese
government.

In addition, AMI also appears to rely on an affidavit executed
by Pearl as evidence that Aungst falsely represented that the
Broodstock Sales Agreement was a "valid contract."  In that
affidavit, Pearl averred that Neil Gervais told Pearl that Ken
Gervais had testified in another lawsuit "that this contract for
100,000 animals was not a 'real' contract."  (Doc. #41, ¶ 75.)

Aungst asserts this statement constitutes inadmissible
hearsay, while AMI argues it is admissible hearsay under Rule
804(b)(3).  Assuming its admissibility, the Court finds such
hearsay insufficient to raise an issue of fact as to whether Aungst
falsely represented that the Broodstock Sales Agreement was a
"valid contract."  As noted earlier, neither the Court nor AMI may
rely on the opinions of lay persons to determine the validity or
enforceability of a contract - a purely legal opinion.

The Court continues to find that AMI has produced no evidence
supporting the claim in Count III that counter-defendants made a

material false statement of fact when they represented they had a valid contract for the sale of 100,000 shrimp broodstock to a Chinese customer.  Therefore, this portion of the motion is granted.

### D.   No Inducement

Aungst also argues that there is no evidence that the statement about the Chinese contract induced AMI to maintain the live shrimp at its facility.  This is so, Aungst argues, because AMI was already bound by the Grow Out Agreement to keep the shrimp alive, and there was a pending state case in which AMI could have been ordered to maintain the status quo.  Thus, Aungst argues, there can be no fraudulent inducement to do something it was "already unequivocally required to do."  (Doc. #287, p. 10.)

It may be that a person cannot be fraudulently induced to do something which is already unequivocally required, but the record in this case contains material factual disputes as to AMI's prior obligation to maintain the live shrimp during certain time periods. Therefore, this cannot form a basis for summary judgment.

### E.   Subsequent Written Contract

Aungst argues that there can be no tort of fraudulent inducement where the alleged fraud contradicts a subsequent written contract because, in such a situation, reliance on fraudulent representations is unreasonable as a matter of law. The subsequent contract is what Aungst refers to as the "Term

Sheet" and AMI refers to as the "Settlement Agreement".   (Doc. #287, pp. 10-11.)

The only binding authority cited by Aungst is <u>Englezios v. Batmasian</u>, 593 So. 2d 1077, 1078 (Fla. 4th DCA 1992), which related to an alleged oral representation made during the negotiation of a written contract.  In that context, the court stated, "[a] party may not recover in fraud for an alleged oral misrepresentation which is adequately dealt with in a later written contract."  <u>Id.</u> This is not the context of the current case, and the binding effect of the "Settlement Agreement"/"Term Sheet" is disputed by the parties.  As such, this argument does not support summary judgment.

For the foregoing reasons, the Court finds AMI has failed to set forth evidence demonstrating that Aungst made a false statement of material fact regarding the validity of the Broodstock Sales Agreement.  Aungst is thus entitled to summary judgment on Count III.

Accordingly, it is now

**ORDERED**:

Defendant's Motion for Summary Judgment (Doc. #287) is **GRANTED**. The Court will withhold entry of judgment until the completion of the case.

**DONE AND ORDERED** at Fort Myers, Florida, this ___5th___ day of May, 2020.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies: Counsel of record