```
               UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
                   FORT MYERS DIVISION

TB FOOD USA, LLC, a
Delaware Limited Liability
Company,

         Plaintiff,

v.                              Case No:  2:17-cv-9-FtM-29NPM

AMERICAN MARICULTURE, INC.,
a Florida Corporation,
AMERICAN PENAEID, INC., a
Florida Corporation, and
ROBIN PEARL,

         Defendants.
_____

AMERICAN MARICULTURE, INC.,
a Florida Corporation,

         Counter-Plaintiff,
v.

PB LEGACY, INC., a Texas
Corporation, KENNETH GERVAIS,
and RANDALL AUNGST,

         Counter/Third-Party
         Defendants.
_____
```

## OPINION AND ORDER

This matter comes before the Court on review of the following four motions in limine concerning expert witnesses: (1) defendants American Mariculture, Inc., American Penaeid, Inc., and Robin Pearl's Motion to Limit or Exclude Expert Testimony By Dr. Lian Gan (Doc. #328) filed on October 29, 2020; (2) defendants American

Mariculture, Inc., American Penaeid, Inc., and Robin Pearl's Motion to Limit or Exclude Expert Testimony By Carlos F. Massad (Doc. #329) filed on October 29, 2020; (3) defendant American Mariculture, Inc.'s Motion to Limit or Exclude Expert Testimony of Granvil D. Treece (Doc. #330) filed on October 30, 2020; and (4) plaintiff TB Food USA, LLC's Motion to Partially Exclude The Testimony of Experts Dr. Roger W. Doyle and Dr. James Wyban (Doc. #331) filed on October 30, 2020.  Defendants American Mariculture, Inc., American Penaeid, Inc., and Robin Pearl (collectively, the Defendants) filed a Response In Opposition to Plaintiff's motion (Doc. #341) on December 17, 2020. Plaintiff filed Responses in Opposition to each motion (Doc. #342; Doc. #343; Doc. #344) on December 18, 2020.

## I.

In brief, Primo Broodstock, Inc. (Primo, nka PB Legacy), the original plaintiff in this case, operated a commercial shrimp breeding business and enlisted the assistance of defendant American Mariculture, Inc. (AMI) and its Chief Executive Officer Robin Pearl (Mr. Pearl) to provide a large indoor grow-out facility in Florida. Primo and AMI entered into certain agreements to effectuate this business relationship, and to ensure Primo's breeding techniques were kept confidential. (Doc. #20, ¶¶ 1-3; Doc. #20-2.) Disputes arose between Primo and AMI.  Ultimately,

AMI retained the Primo shrimp, and with the assistance of American Penaeid, Inc. (API), bred and sold the Primo shrimp on the open market. (Doc. #20, ¶¶ 40-42.) In 2017, Primo filed this lawsuit against Defendants asserting breach of contract, misappropriation of trade secrets, and unfair competition claims, among other claims. (Doc. #1; Doc. #20.)

Plaintiff TB Food USA, LLC (Plaintiff[1]) has engaged Dr. Lian Gan, Carlos F. Massad, and Granvil D. Treece to provide expert testimony. Defendants seek to exclude some or all of their testimony on a variety of grounds. Plaintiff in turn seeks to exclude all or portions of the testimony of Defendants' expert witnesses, Dr. Roger W. Doyle and Dr. James Wyban.

**II.**

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. <u>United States v. Perry</u>, No. 16-11358, 2021 WL 4448600, 2021 U.S. App. LEXIS 29333, at *16 (11th Cir. Sep. 29, 2021). Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

[1] While this litigation was pending, plaintiff TB Food USA, LLC (TB Food) purchased substantially all of Primo's assets (Doc. #253-2. As a result, this Court dismissed Primo as a plaintiff, and found TB Food was now the proper party in interest. (Doc. #306, pp. 16-18.)

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 contemplates that the district court serve as gatekeeper for the admission of such testimony in order to ensure that any and all expert testimony is both relevant and reliable. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993); Tampa Bay Water v. HDR Eng'g, Inc., 731 F.3d 1171, 1183 (11th Cir. 2013). "The Supreme Court did not intend, however, that the gatekeeper role supplant the adversary system or the role of the jury: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." McDowell v. Brown, 392 F.3d 1283, 1299 (11th Cir. 2004) (marks and citations omitted).

In determining the admissibility of expert testimony under Rule 702, the Court applies a "rigorous" three-part inquiry. United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en

banc). Expert testimony is admissible if (1) the expert is qualified to testify on the topic at issue, (2) the methodology used by the expert is sufficiently reliable, and (3) the testimony will assist the trier of fact. Perry, 2021 U.S. App. LEXIS 29333, at *16; Moore v. Intuitive Surgical, Inc., 995 F.3d 839, (11th Cir 2021). The burden of laying the proper foundation for the admission of expert testimony "is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010). The admission of expert testimony is a matter within the discretion of the district court, which is accorded considerable leeway in making its determination. Frazier, 387 F.3d at 1258.

The first requirement for the admissibility of expert testimony is that the expert is qualified to testify competently regarding the matters he or she intends to address. Frazier, 387 F.3d at 1269-61). Rule 702 permits a person to qualify as an expert based upon knowledge, skill, experience, training, or education. Frazier, 387 F.3d at 1260-61; Perry, 2021 U.S. App. LEXIS 29333, at *17.

The second inquiry for determining the admissibility of expert testimony is whether the methodology used by the expert is sufficiently reliable. Tampa Bay Water, 731 F.3d at 1183. The

reliability prong is distinct from an expert's qualifications; thus, an expert can be qualified but his opinions unreliable. See Moore, 995 F.3d at 852; see also Frazier, 387 F.3d at 1261. The Supreme Court has provided a non-exhaustive list of factors to guide courts in assessing the reliability of expert opinions: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." Kilpatrick, 613 F.3d at 1335 (citing Daubert, 509 U.S. at 593-94). Although these criteria are more applicable to assessing the reliability of scientific opinions, they "may be used to evaluate the reliability of non-scientific, experience-based testimony." Frazier, 387 F.3d at 1262 (citing Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999)). "Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." Id.

The third requirement for admissibility is that the expert testimony must assist the trier of fact. "[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. Proffered expert testimony generally

will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63; see also Edwards v. Shanley, 580 F. App'x 816, 823 (11th Cir. 2014).  "This condition goes primarily to relevance." Daubert, 509 U.S. at 591.

### III.

With these standards in mind, the Court will address each of the proposed experts.

**A. Dr. Lian Gan**

Plaintiff has proffered the expert testimony of Dr. Lian Gan (Dr. Gan), who has a "Bachelor of Agriculture, a Master of Agriculture, and . . . [in 2011 received] a Doctorate in Aquatic Biology Aquaculture."[2] (Doc. #328-2, p. 3; Doc. 343-1, pp. 10-11.)[3] Dr. Gan studied nutrition, reproduction, and immunization concerning shrimp, fish, and other life forms. (Doc. #343-1, pp. 15-16.) Since 2015, Dr. Gan has worked as an Associate Professor at Southern China Agriculture University, and he has also been

---

[2] Aquaculture is "the breeding, rearing, and harvesting of animals and plants in all types of water environments." https://www.fisheries.noaa.gov/topic/aquaculture (last visited Oct. 13, 2021).

[3] The page numbers refer to those generated by the Court's computer system upon filing (upper left-hand corner) and do not always correspond with the page number at the bottom of the document.

employed as a consultant for various corporations involved in shrimp reproduction. (Doc. #328-1, p. 32; Doc. #328-2, p. 4; Doc. #343-1, pp. 11-12.) Dr. Gan's doctoral thesis, along with his other publications, focus on dietary issues in aquaculture. (Doc. #328-2, pp. 5-6; Doc. #343-1, p 22.)

There are thirteen topics on which Dr. Gan proposes to offer an opinion, which can fairly be reduced to the following six categories: (1) the distinctiveness, value, and reputation of the Primo name and its shrimp in commerce, including among shrimp farmers and breeders in China; (2) Defendants' and/or their agents Charles Tuan and John Wu's actions in using, marketing, advertising, and associating Defendants shrimp with Primo, and the impact in commerce as to these actions; (3) Defendants' non-use of the Primo name, and Defendants and its agents' bad faith trademark filing of the literal Mandarin translation of "Primo"; (4) the confusion and/or deception caused in commerce, including the Chinese shrimp broodstock market, by Defendants' use, marketing of, and association with the Primo name and Primo shrimp; (5) resulting damages—unjust enrichment obtained by Defendants, as well as the lost profits suffered by Plaintiff, the amount of disgorgement to which Plaintiffs are entitled, and the price erosion in the marketplace of Plaintiff's shrimp due to Defendants' sales and actions; and (6) the cost of corrective advertising to

alleviate any confusion Defendants created in the shrimp market. (Doc. #328-1, p. 3.)

Defendants argue the Court should exclude all of Dr. Gan's opinion testimony because (1) he is unqualified to opine on the designated topics; (2) it is impossible to determine whether his opinions are based upon reliable methodology, and (3) his testimony will not be helpful to a jury. (Doc. #328, pp. 15-16.) The Court agrees with the first argument, and therefore does not reach the next two.

Defendants argue that Dr. Gan lacks both the education and work background regarding business, intellectual property, market surveying, studying market conditions, or determining the value of a trademark in any market. (Doc. #328, pp. 7, 15.) Thus, Defendants assert, Dr. Gan has no scientific, technical, or other specialized knowledge in any of the proposed topics which would allow him to offer expert testimony. (Id., p. 15.) Plaintiff responds that Dr. Gan is qualified because his experience in shrimp and fish nutrition requires "a deep grounding in statistical analysis," and that he has conducted extensive research into "operational issues within the industry," and is familiar with the "economic context" underlying the shrimp industry. (Doc. #343, pp. 3-4.)

The record establishes that Dr. Gan does not have the requisite education or experience to be qualified as an expert on

the designated topics.  It is undisputed that Dr. Gan has extensive scientific background and experience in shrimp reproduction, immunization, and dietary issues, and that he has served as a technical consultant for various corporations involved in shrimp reproduction.  (Doc. #343-1, pp. 12, 20-25.)  However, there is no indication that Dr. Gan's education or work experience meaningfully goes beyond the scientific or technical aspect of these areas.  While "[a]n expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand," see City of S. Miami v. DeSantis, No. 19-cv-22927, 2020 U.S. Dist. LEXIS 226867, 2020 WL 7074644, at *4 (S.D. Fla. Dec. 3, 2020), an expert must "have at least some minimum training, education, experience, knowledge, or skill" pertaining to the particular subject matter of his proposed testimony. See Bouton v. Ocean Beach Props., Ltd., No. 16-cv-80502, 2017 U.S. Dist. LEXIS 174989, 2017 WL 4792488, at *15 (S.D. Fla. Oct. 23, 2017); see also Bowers v Norfolk S. Corp., 537 F. Supp. 2d 1343, 1376 (M.D. Ga. 2007) ("Rule 702 and Daubert still require that the area of the witness's competence match the subject matter of the witness's testimony.").

Here, Dr. Gan testified he was not qualified to provide an expert opinion as to trademark registration and whether a trademark was filed in bad faith, and admitted he did not strictly follow

the list of topics on which he was to opine when writing his report. (Doc. #328-2, p. 36.) The record establishes that the proposed testimony concerning determination of the market value, reputation and distinctiveness of a tradename, assessing market conditions, conducting market surveys[4], evaluating validity of trademark filings and bad faith actions, estimating the costs of corrective advertising, and determining damages (i.e., loss profits, unjust enrichment, disgorgement, or price erosion) are all outside the scope of Dr. Gan's expertise. See, e.g., Seatrax, Inc., v. Sonbeck Int'l, Inc., 200 F.3d 358 (5th Cir. 2000) (finding an expert on marine cranes could not testify to the defendant's profits from infringing activity in an infringement action); Ancho v. Pentek Corp., 157 F.3d 512, 519 (7th Cir. 1998) ("Just as a qualified and board certified heart surgeon does not possess sufficient knowledge of orthopedic medicine to render an expert opinion on spine surgery, likewise . . . a mechanical engineer . . . lacks qualifications to give expert testimony about plant

---

[4] In 2014, Dr. Gan also conducted one survey prior to this litigation which sought information about issues confronting "shrimp feeders." (Doc. #343-1, p. 32.) This experience is not sufficient for Dr. Gan to be an expert in market surveys. Cf. Louis Vuitton Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 616 (S.D.N.Y. 2007) (in noting that "[e]xtensive experience can be a sufficient basis for expert testimony on matters such as consumer surveys," the Court found that 40 years of experience in conducting market research and designing surveys was sufficient to qualify as an expert in conducting surveys).

reconfiguration . . ..”); Eagleston v. Guido, 41 F.3d 865 (2d Cir. 1994)(sociologist was qualified to testify about effects of domestic violence, but not about whether a police department provided sufficient training to its officers responding to domestic violence reports); Perry v. Schumacher Grp. of La., No. 2:13-cv-36-FtM-29DNF, 2020 U.S. Dist. LEXIS 227942, at *3, 14 (M.D. Fla. Dec. 4, 2020) (finding that a doctor, who specialized in emergency medicine and pre-hospital care with a two-year professional development degree in human resources and finance was unqualified to determine damages or economic losses).

For these reasons, the Court finds Dr. Gan is not qualified to testify as an expert about the identified topics. Because the Court finds Dr. Gan lacks the proper qualifications to address the identified topics, it does not reach issues pertaining to reliability or helpfulness to the jury.

**B. Carlos F. Massad**

Mr. Massad's education consists of a Master of Science in marine resources management with a focus on business administration and aquaculture, a master's degree in zoology, and a Bachelor of Science. (Doc. #329-5, pp. 2, 4.) Mr. Massad's resume reflects that since 1995 he has worked for various companies in the aquaculture business as a CEO or managing director, overseeing the genetic selection of various fish and shrimp, developing

harvesting processes, and establishing sales channels and markets for such products.  (Id., pp. 2-4.)   Mr. Massad is the current Chief Executive Officer of TB Food. (Doc. #329-1, p. 3.)

Defendants object to Mr. Massad offering any opinions about (1) the development of Primo shrimp and the characteristics which make Primo shrimp unique and desirable in the world market; (2) clarification of industry terms and assertions made by witnesses in proceedings before the Court during consideration of a preliminary injunction against Defendants; (3) how Primo's shrimp were used by AMI and API in creating their broodstock shrimp program; (4) the genetic make-up of Primo shrimp and if it derives economic value from not being readily ascertainable by proper means by other persons who could obtain economic value from their use; (5) whether PB Legacy took reasonable efforts to maintain the confidentiality of Primo's shrimp (including genetic and biological data) by preventing the use of the genetic make-up of Primo shrimp; and (6) the advantage gained by AMI/API using Primo shrimp to found its broodstock program. (Doc. #329, pp. 6-7; Doc. #329-1, p. 3.)

### (1)  Qualifications to Render Opinions

In general, Defendants argue that Mr. Massad is not academically qualified to testify about the matters noted above since he is not a geneticist. Nor does he have a legal education

in intellectual property, and most of his work history relates to running a business rather than performing science operations. (Doc. #329, pp. 4, 14-15.)  The Court finds Mr. Massad is qualified to offer opinions on some but not all of the proposed topics.

There is nothing in the record which would qualify Mr. Massad to offer opinions concerning the factual details of the development of Primo shrimp prior to his arrival at TB Foods.  Such testimony appears to simply be a recitation of what others have told him, which may or may not be admissible, but is not the proper subject of expert testimony. Similarly, there is nothing in the record which would establish his knowledge of how AMI or API used Primo shrimp prior to this arrival at TB Foods.

Mr. Massad has an educational background in science and over 25 years of working in aquaculture, approximately ten of which were spent managing and directing shrimp hatcheries. (Doc. #329-5, pp. 2-4.) When overseeing shrimp hatcheries, including those belonging to TB Food, Mr. Massad implemented "a family based selective breeding program which uses genomic[5] selection to accelerate the genetic gains per generation for desirable characteristics of high resistance to disease and rapid growth."

_____

[5] Genomics is a form of technology that allows a person to see the whole genome of the shrimp which in turn permits more particularized selection of traits in a shrimp. (Doc. #342-1, p. 13.)

(Doc. #329-1, p. 3.)  While Mr. Massad is not a geneticist or a technician, the record establishes a sufficient basis for an understanding of  the underlying genetic traits that are vital to the Primo brand (i.e., rapid growth and disease resistant), how the genetic traits for shrimp are selected, the time it takes to develop shrimp broodstock like that of Primo's, the value and distinctiveness of the Primo broodstock in worldwide markets as one of the only brands to be resistant to "White Spot and Early Mortality Syndrome (EMS)," and why it is vital to protect a genetic selection program, and the challenges of doing so. (Doc. #342-1, pp. 8, 11, 13-14, 16-19, 27-28, 31-34, 36-37.) The Court finds this experience sufficient to meet the "relatively low threshold for qualification" of expert testimony.  StoneEagle Servs., Inc. v. Pay-Plus Sols., Inc., 2015 U.S. Dist. LEXIS 79955, 2015 WL 3824170, *4 (M.D. Fla. June 19, 2015).

Plaintiff asks Mr. Massad to opine on whether the genetic make-up of Primo shrimp derives independent economic value by not being readily ascertainable by proper means by other persons who could obtain economic value from their use.  The Court finds that Mr. Massad's background satisfies the qualification requirement. The Court also finds that Mr. Massad is qualified to discuss industry terminology.

Plaintiff also asks Mr. Massad to opine whether PB Legacy took reasonable efforts to maintain the confidentiality of Primo's shrimp.  Mr. Massad considered such efforts, which are necessary in determining the existence of a trade secret pursuant to § 688.002(4), Fla. Stat., and concluded that Primo's shrimp genetic code is a trade secret. (Doc. #329-1, pp. 10-11; Doc. #342-1, p. 32.)

While the adoption of Rule 704 of the Federal Rules of Evidence abolished the "ultimate issue rule" which proscribed opinion testimony that ostensibly invaded the province of the jury, the Eleventh Circuit has noted that the distinction between an admissible factual opinion or an inadmissible legal conclusion is not always easy to perceive.  Hanson v. Waller, 888 F.2d 806, 811 (11th Cir. 1989).  Thus, while "[a]n expert may testify as to his opinion on an ultimate issue of fact[,] [a]n expert may not, however, merely tell the jury what result to reach . . . . A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law." Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990)(quotations omitted).  The distinction may turn on the phrasing of the question.  Owen v. Kerr-McGee Corp., 698 F.2d 236, 240 (5th Cir. 1983).

Mr. Massad is qualified to testify as to whether Primo shrimp derived economic value, the efforts PB Legacy took to maintain confidentiality, and his view as to the reasonableness of the efforts. Mr. Massad may not, however, testify that the Primo shrimp genetics constitute a "trade secret."

Finally, Mr. Massad's opinion about the advantages gained by AMI/API in utilizing Primo shrimp to found its broodstock program is not admissible because Mr. Massad is neither qualified nor, as discussed below, is his opinion reliable on this topic.

**(2)  Reliability of Testimony**

Defendants argue that Mr. Massad's opinions on the topics at issue are inadmissible because they are based on assumptions of fact, and provide no data, calculations, or sufficient facts to be found reliable. (Doc. #239, pp. 7-12, 14-15, 17.) Mr. Massad's methodology used to reach his opinions is described in his report as being:

> [B]ased upon [his] knowledge, observations, experience, education, training, review of the Aquaculture literature, review of the broodstock market data, review of Primo's and TB Food's internal records, review of relevant testimony in this matter, and review of information obtained throughout the discovery process.

(Doc. #329-1, p. 4.)  With one exception, Mr. Massad's opinions appear sufficiently reliable to be admissible.

- 17 -

With respect to the sixth topic, Mr. Massad was asked to provide an opinion about the advantage gained by AMI/API using Primo shrimp to establish its broodstock program.  (Doc. #329, pp. 6-7; Doc. #329-1, p. 3.) Mr. Massad estimated that the cost each year for research and development of shrimp broodstock is $1,500,000.00, which demonstrated that Defendants gained an advantage of approximately $22,500,000.00 ($1.5 million times 15 years) for the 15 required years of research and development, plus any profits since its founding. (Doc. #329-1, p. 13.) When asked how he determined this amount, Mr. Massad admitted that he did not know how much Primo had spent in the years prior to his employment, but in general he estimated it cost that much to run a well-managed genetic program based on his seven years of experience running the shrimp hatchery for Blue Genetics. (Doc. #342-1, pp. 33-34.) Mr. Massad did not provide any data or computations to show how he reached this estimation. See Gardner v. Ford Motor Co., 2015 U.S. Dist. LEXIS 194098, 2015 WL 12841011, *4 (M.D. Fla. June 3, 2015) ("Opinions that are formulated in accordance with an unknown methodology cannot be tested or evaluated and cannot be deemed reliable.").  Accordingly, Mr. Massad's opinion on this topic is not reliable and will not be admissible at trial.

**(3)  Assistance to the Jury**

Defendants further argue that none of Mr. Massad's opinions will assist the jury and, therefore, are not admissible. (Doc. #329, pp. 16-17.)  The Court disagrees.

Mr. Massad's admissible opinions provide background information about customs and practice in the aquaculture shrimp business, what makes Primo shrimp distinct and valuable in the global shrimp market, the breeding practices of other worldwide shrimp broodstock competitors, and whether or to what extent Defendants incorporated Primo genetics into its shrimp broodstock. Such opinions go directly to the breach of contract and trade secret and unfair competition claims, and are based on knowledge and experience unlikely to be held by the average citizen. See Frazier, 387 F.3d at 1262. The Court therefore concludes that Plaintiff has satisfied the third criteria as to the opinions which have satisfied the first two requirements.

**C. Granvil D. Treece**

Mr. Treece's education consists of a Bachelor of Arts and a Master of Science in marine biology. (Doc. #330-1, p. 1; Doc. #330-3, p. 2.) Mr. Treece's resume reflects that he has taught aquaculture classes as an adjunct professor at Texas A&M University for 14 years, and served as one of the universities' aquaculture specialist for 30 years.  (Doc. #330-3, p. 2.) Mr. Treece also has

considerable experience working as a global consultant in the mariculture and aquaculture industries since 1978 for shrimp farming and hatchery, has managed a shrimp hatchery three years, and has produced several publications concerning Biofloc Systems for Marine Shrimp and on various topics relating to aquaculture and shrimp. (Id., pp. 2-27.)

Defendants seek to exclude Mr. Treece from providing opinions about the following: (1) what was permitted or forbidden under the Grow-Out Agreement between Primo and AMI/API, and its purpose; (2) that it would have taken AMI 18 years to develop their own lines of shrimp for it to be similar to that of Primo; and (3) that some of Defendants' activities in China may have been harmful to Primo's sales in China. (Doc. #330, pp. 5-9.) Defendants assert that such opinions do not meet either the qualifications or reliability factors for admissibility under Rule 702. (Id.)

**(1)  Qualifications to Render Opinions**

Defendants argue that Mr. Treece is not qualified to offer "legal opinions" concerning the first two opinions identified above because Mr. Treece has no legal education or background, nor is he a lawyer. (Doc. #330, pp. 6-7.) Plaintiff responds that Defendants' argument lacks merit because many of the legal opinions Mr. Treece offered relating to the parties' legal agreements were solicited by Defendants during Mr. Treece's deposition, and due to

Mr. Treece's substantial experience in aquaculture he is well-familiar with contractual agreements and industry practices to provide an opinion as to grow-out and non-disclosure agreements. (Doc. #344, p. 4.)

The Court is unconvinced that Mr. Treece has the requisite experience to opine on legal implications of the contractual agreements between Primo and Defendants. It is undisputed that Mr. Treece is not an expert in the legal area of contacts. Indeed, Mr. Treece admitted he did not have legal training and was not qualified to interpret contractual provisions. (Doc. #330-4, pp. 8-9.) While Mr. Treece may have some practical experience involving contractual agreements and industry practices in the field of aquaculture, such experience is simply insufficient to constitute expertise under Daubert as to the agreement in this case. Moreover, "questions of law are not subject to expert testimony." Commodores Enter. Corp. v. McClary, 879 F.3d 1114, 1128-29 (11th Cir. 2018); see also Montgomery, 898 F.2d at 1541 ("A witness . . . may not testify to the legal implications of conduct; the court must be the jury's only source of law."). Therefore, the Court finds Mr. Treece is not qualified to render expert testimony as to terms or purpose of the Grow-Out Agreement.

**(2)  Reliability of Testimony**

As to the remaining two opinions, Defendants argue Mr. Treece's opinions are unreliable. (Doc. #330, pp. 7-9.) First, Defendants appear to take issue with Mr. Treece's opinion that "it would have taken AMI at least 18 years to develop an SPF and SPR line, similar to Primo, if at all possible." (Doc.  #330-1,  p. 18.) The Court finds Mr. Treece's opinion regarding the time it could take AMI to develop the disease resistant shrimp is sufficiently reliable.

The record indicates that in formulating this opinion, Mr. Treece relied upon various studies, publications, and his own experience.  In his report, Mr. Treece recalls the various shrimp genetic programs and the difficulties they faced in breeding disease free shrimp. (Doc. #330-1, pp. 2-10.)  Mr. Treece notes that it generally takes at least 7 to 9 years to develop minimal level shrimp genetic programs, but that disease resistant shrimp may only be developed after 15 to 18 years. Mr. (Id., p. 3.) To further buttress his opinion, Mr. Treece identifies the Oceanic Institute in Hawaii, which took 18 years to develop fast growing and disease resistant shrimp. (Id., p. 5.) The Court finds this foundation sufficient under Daubert. See Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1338 (11th Cir. 2009) (quoting Kumho Tire Co., 526 U.S. at 150) ("A district court may

decide that nonscientific testimony is reliable based 'upon personal knowledge or experience.'"); Goines v. Lee Mem'l Health Sys., 2019 U.S. Dist. LEXIS 37549, 2019 WL 1101878, *6 (M.D. Fla. Mar. 8, 2019) (finding expert's opinion sufficiently reliable when it was based on examination of record evidence, including depositions, and applied against expert's knowledge and experience).

Finally, regarding the third opinion, Defendants state that Mr. Treece testified as to some "possible activities by the Defendants in China" that Mr. Treece believes harmed Primo's sales in China. Defendants argue this is not expert testimony, but instead is argumentative and regurgitation of speculation since Mr. Treece admitted he has no evidence of Primo or API's results in China. (Doc. #330, pp. 8-9; Doc. #330-2, p. 3.) Mr. Treece's deposition testimony shows he testified about whether Primo's lack of success in the Chinese broodstock market was due to confusion between the Primo and AMI/API brands because there was "bad publicity." (Doc. #330-4, pp. 19-20.) Mr. Treece stated he heard that the same person who was helping Primo sell its brand in China was also contracted by API and was essentially "wearing two caps." (Id.) Mr. Treece admitted he did not know the whole story, but heard bad things were going on in China. (Id.)

Rule 702 requires judges to act as the gatekeeper to ensure that expert testimony "is not only relevant, but reliable." Daubert, 509 U.S. at 589.  For expert testimony to be reliable, it requires that the testimony be "more than subjective belief or unsupported speculation." Silcox v. Hunter, 2018 U.S. Dist. LEXIS 127442, 2018 WL 3633251, * 29 (Fla. M.D. July 31, 2018).  Here, Mr. Treece admitted that he did not know all the facts and his opinion was based on hearsay and speculation.  Accordingly, this portion of Mr. Treece's opinion is unreliable and inadmissible.

**(3) Assistance to the Jury**

The Court finds that Mr. Treece's admissible opinion would assist the trier of fact.  Mr. Treece's report and testimony provide sufficient evidence that his overall knowledge and history of aquaculture and the detailed processes involved in breeding shrimp are not only relevant to this case, but would assist the jury in understanding these matters that are beyond that of the average lay person. McDowell, 392 F.3d 1283, 1299 (11th Cir. 2004); Frazier, 387 F.3d at 1262.

**D. Dr. Roger W. Doyle**

Defendants' have proffered the expert testimony of Dr Doyle. (Doc. #331-2, p. 1.) Dr. Doyle's education consists of a Bachelor of Science in biology and physical chemistry, a master's degree in oceanography, and a doctorate in biology. (Doc. #331-1, p. 1.) Dr.

Doyle served as an associate professor of biology at Duke University for four years, as well as Dalhousie University where he retired as a full professor of biology and was the founding director of the Marine Gene Probe Laboratory. (Id.) Dr. Doyle also served as the president of the International Association for Aquaculture Genetics, the coordinator of the Aquaculture Genetics Network in Asia, and as a mentor in genetics and biodiversity for the Network of Aquaculture Centers in Asia-Pacific. (Id.)

Dr. Doyle also has extensive experience in aquaculture research, development and commercial experience in the Americas, Middle East, Africa, and Asia. (Id.) He also assisted in establishing a tilapia broodstock development in the Philippines, oversaw students involved in breeding various species, and consulted with broodstock development companies. (Doc. #331-4, p. 34.) Presently, Dr. Doyle is the president of the Genetic Computation Ltd., a Canadian consulting company that specializes in aquaculture and conservation genetics. (Doc. #331-1, p. 1.) Dr. Doyle has published numerous works about aquaculture, the latest of which considered "Domestication and genetic improvement: balancing improved production against increased disease risks from inbreeding." (Id.)

Plaintiff objects to Dr. Doyle offering opinions about thirteen topics which relate to Primo and AMI/API shrimp

broodstock, including the gene pools, the origins of the broodstock, breeding methods, the performance of each respective broodstock, and the reason for an increase/decrease of Primo and AMI/API's market shares in China. Plaintiff seeks to exclude Dr. Doyle's opinions on these matters based on a lack of qualifications and reliability. (Doc. #331, pp. 2-4.)

**(1)   Qualifications to Render Opinions**

Plaintiff argues that Dr. Doyle's professional background and training are almost entirely as a geneticist, with little to no experience in marketing, administration, legal interpretation, or working in the Chinese market. (Doc. #331, p. 3.) Plaintiff therefore asserts that Dr. Doyle's opinions linking Primo's market share to farm management procedures, commentary on what constitutes a trade secret and customer confusion in the Chinese market, and why Chinese farmers choose AMI/API broodstock over that of Primo's, must be excluded. (Id., p. 10.) The Court disagrees with the majority of Plaintiff's arguments.

Dr. Doyle references farm management procedures not from a business perspective, but rather how the respective parties have managed their shrimp broodstock and the breeding procedures utilized. (Doc. #331-1, p. 5.) Dr. Doyle acknowledges that there are remarkable differences in management — like the procedures utilized by each party to protect their intellectual property, the

creation and retention of genetic diversity, and minimization of inbreeding in the Primo and AMI broodstock in the United States. (Id.) Overall, his opinions are based on the different generation process of genetics in the broodstock and inbreeding.  In other words, they are science-based, and are well within Dr. Doyle's extensive knowledge regarding aquaculture and genetics, and are admissible.

Likewise, the Court does not find that Dr. Doyle's opinion exceeded his qualifications.  Dr. Doyle readily admitted he has no legal training or education, but he opined that from a geneticist's (scientific) perspective he does not perceive any way in which AMI/API received protected information concerning the creation or maintenance of the shrimp broodstock it inherited from Primo. (Doc. #331-1, pp. 16-17.) The Court does not find that Dr. Doyle's anticipated testimony provides any legal opinion or conclusion, and he is qualified to address this matter from a genetics point of view. See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1112-13 n.8 (11th Cir. 2005) (Rule 704(a) provides that an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact).

Finally, with respect to customer confusion in the Chinese market and the Chinese farmers preference for AMI/API shrimp

- 27 -

broodstock, the Court finds that although Dr. Doyle has the unique personal experience of working within the Asian aquaculture markets for over 35 years, he is not an expert in marketing or conducting market surveys. Dr. Doyle confirmed this in his testimony, stating that has no experience working in the Chinese market or administering market surveys.[6]  (Doc. #331-4, pp. 45-46.) See Lebron v. Sec'y of the Fla. Dep't of Child. & Families, 772 F.3d 1352, 1368 (11th Cir. 2014)("Expertise in one field does not qualify a witness to testify about others."); see also Dura Auto. Sys. of Ind., Inc. v. CTS Corp., 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty."). Thus, Dr. Doyle's testimony on these topics is inadmissible.

**(2)  Reliability of Testimony**

Plaintiff argues that Dr. Doyle's testimony and report are inherently unreliable because they are based on an insufficient factual basis or self-serving testimony.  (Doc. #331, pp. 11-14.)

---

[6] Dr. Doyle was interviewed and published in a Chinese trade magazine for the sole purpose of discussing the problem of misrepresentation and mislabeling in Chinese aquaculture and what should be done about it.  (Doc. #331-1, p. 18.) Dr. Doyle, however, clarified that it was not confusion about brands such as Primo and AMI/API, but instead farmers were confused about what the quality of what they were buying—was it Brand A or a knockoff of Brand A. (Doc. #331-4, pp. 129-30.)

As such, Plaintiff argues that "garbage in, garbage out" cannot serve as the foundation for an admissible expert report. (Id., p. 13.)

The record indicates that in formulating his opinions, Dr. Doyle reviewed affidavits, AMI's Supplemental Memorandum in Opposition to Plaintiff's Alternative Motion for Preliminary Injunction, Dr. Gan, Mr. Massad and Mr. Treece's expert reports, University of Arizona documents, and various Primo documents (including Primo Challenge Testing). (Doc. #331-4, pp. 29-31.) His expert report also refers to approximately 40 scientific publications regarding shrimp reproduction, inbreeding, disease reduction in aquaculture, survival rates of shrimp, and DNA fingerprinting, all of which were utilized in supporting his findings or conclusions. (Doc. #331-1, pp. 19-22.)

The Court finds Dr. Doyle's opinions are sufficiently reliable to be admissible.[7] The Court disagrees with Plaintiff's argument that Dr. Doyle's opinions do not have the requisite factual predicates because he failed to review the deposition transcripts or certain emails of fact witness in this case, or, on

---

[7] Because the Court determined Dr. Doyle was not qualified to render opinions about customer confusion in the Chinese market and the Chinese farmers' preferences for Primo or AMI/API shrimp broodstock, the Court does not reach issues as to whether Dr. Doyle employed reliable methodology in reaching such conclusions or whether his opinion would be helpful to the jury.

the other hand, considered Mr. Robin Pearls' sworn affidavits. "These are considerations that may affect the weight a fact finder accords [Dr. Doyle's] testimony, but they do not operate to preclude his testimony." Kleiman v. Wright, No. 18-cv-80176-BLOOM/Reinhart, 2020 U.S. Dist. LEXIS 213482, at *27 (S.D. Fla. Nov. 16, 2020). "So long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversarial process." Lawes v. CSA Architects & Eng'rs LLP, 963 F.3d 72, 98 (1st Cir. 2020) (quoting Daubert, 509 U.S. at 590). "If [Plaintiff] believes that the basis for [Dr. Doyle's] opinions is insufficient, [it] can explore that with [him] on cross examination and argument for the benefit of the trier of fact.". In re Disposable Contact Lens Antitrust, 329 F.R.D. 336, 372 (M.D. Fla. 2018).  Thus, the Court finds that Defendants have met their burden of proving Dr. Doyle meets the reliability requirements for admissibility.

**E. Dr. James Wyban**

Dr. Wyban received his Bachelor of Science in biology, and a master's degree and PhD in zoology. (Doc. #331-5, p. 1.) Dr. Wyban was founder/chairman of the High Health Aquaculture (HHA), which was the world's first Specific Pathogen Free (SPF) shrimp breeding company. (Id.) In 1994, upon forming HHA, Dr. Wyban developed SPF technology and bred and exported over 350,000 SPF shrimp broodstock

to over 26 countries worldwide, including China. (Id.) Dr. Wyban earned the title of "The Father of SPF Shrimp" because he developed "the core technology, the original SPF shrimp stocks and the first SPF breeding company." (Id.) Currently, Dr. Wyban is the Director of Marine Genetics, LLC, where he provides consulting services in shrimp breeding and hatchery systems. (Id.)

Plaintiff objects to Dr. Wyban's opinions concerning (1) whether Primo allegedly obtained its founding stock from Ecuador by means of illegal exporting; (2) whether Primo possessed protectable trade secrets or intellectual property; (3) ownership of Primo and AMI/API broodstock and germplasm; (4) Primo's breeding and selection methods; (5) Chinese farmers inability to duplicate SPF broodstock; (6) Primo's allegedly poor reputation in the aquaculture industry; (7) Dr. Wyban's disagreement as to the terminology "locked pairs"; and (8) Dr. Wyban's assessment of Mr. Massad's slot machine metaphor. (Doc. #331, pp. 14-17). Plaintiff argues Dr. Wyban's opinions are inadmissible under at least one of the three various prongs of Daubert. (Id.)

### (1)   Qualifications to Render Opinions

Plaintiff argues that Dr. Wyban's qualifications prevent him from providing admissible testimony about opinions one, two, and three. (Doc. #331, pp. 15-17.) Plaintiff argues that Dr. Wyban is not a lawyer or an expert on Ecuadorian law regarding the

illegality of exporting shrimp from Ecuador, nor does he have the legal training to opine as to whether Primo sufficiently protected its shrimp broodstock in the global market via its Non-Disclosure and Growout Agreements, or Term Sheet, i.e., protected its ownership or had a protectable trade secret. (Id., pp. 15-16.)

With respect to Dr. Wyban's opinion regarding the legality of exporting live shrimp from Ecuador, he expressed in his report that "Primo shrimp founding stock were acquired from Ecuador under a questionable process.  It is illegal to export live shrimp from Ecuador." (Doc. #331-5, p. 5.)  The Court agrees that to the extent Dr. Wyban is concluding or inferring that Primo obtained their shrimp illegally from Ecuador, this is outside his expertise and is not admissible. See, e.g., Commodores Enter. Corp., 879 F.3d at 1128-29 ("questions of law are not subject to expert testimony."); see Montgomery, 898 F.2d at 1541 ("A witness . . . may not testify to the legal implications of conduct; the court must be the jury's only source of law."). Claussen v. PowerSecure, Inc., No. 3:18-CV-607, 2019 U.S. Dist. LEXIS 173429, 2019 WL 4941109, at *8 (M.D. Ala. Oct. 7, 2019) (A non-lawyer expert therefore "cannot testify . . . about whether someone violated a law.")

Turning to his second and third opinions, Plaintiff argues that Dr. Wyban's opinion as to the ownership of Primo broodstock and whether Plaintiff sufficiently protected it through legal

documents such as the NDA and Growout Agreement is improper based on Dr. Wyban's lack of legal training. (Doc. #331, p. 15.) Specifically, Dr. Wyban stated that "[b]ased on my experience selling broodstock shrimp into the global industry, I don't think Primo's rudimentary documents (NDA, Growout Agreement, and Term Sheet) are sufficient to protect their ownership of their stock if they freely chose to sell their shrimp to buyers (including API)." (Doc. #331-5, p. 3.) Plaintiff also objects to Dr. Wyban's opinion that Primo's "trade secret" is only that Primo acquired shrimp stocks from Ecuador and brought the stocks to the United States, and that there is no "Primo method."  (Doc. #331, p. 16.)

It does not appear that Dr. Wyban's testimony exceeds his expertise. Dr. Wyban does not opine whether there were valid and enforceable legal agreements between Primo and AMI/API, only that in his view they were insufficient to protect Primo's ownership of its broodstock.  Dr. Wyban appears to concede Primo possessed a protectable trade secret, but disagrees that there is such a thing as a "Primo method."

**(2)  Reliability of Testimony**

Defendants argue that Dr. Wyban's testimony about "Primo's breeding and selection methods must also be excluded since he was not provided with anything more than limited, self-serving information from Defendants and not given Primo's records or the

testimony of fact witnesses." (Doc. #331, p. 16.)

As with Dr. Doyle, the Court finds that Plaintiff's arguments about the materials Dr. Wyban considered in reaching his conclusions go to the weight a fact finder should accord to Dr. Wyban's opinion, rather than its admissibility. See Kleiman, 2020 U.S. Dist. LEXIS 213482, at *27. Furthermore, Dr. Wyban provided his opinions about Primo's breeding and selection methods upon consideration of and rebuttal of conclusions reached in the expert report of Mr. Massad, including genomic selection of shrimp and what can and cannot be used for a proper breeding program. (Doc. #331-5, pp. 5-7.) In this situation, where the experts disagree, it is "precisely the type of dispute that should be decided within the crucible of cross examination, rather than by a judge at the Daubert stage." Moore v. Intuitive Surgical, Inc., 995 F.3d 839, 857 (11th Cir. 2021).

Plaintiff also argues that Dr. Wyban's opinion about why Chinese farmers have been unable to replicate or create SPF broodstock is not reliable based upon Dr. Wyban's admission that he has not worked in the Chinese market since 2012. (Doc. #331, p. 16.) Dr. Wyban's opinion on this matter has extensive experience developing SPF technology, and was the first person to successfully breed SPF shrimp broodstock which was sold in the global market and included China. See Adams v. Lab. Corp. of Am.,

760 F.3d 1322, 1330 (11th Cir. 2014) (quoting Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1336 (11th Cir. 2010) ("[T]here are instances in which a district court may determine the reliability prong under Daubert based primarily upon an expert's experience and general knowledge in the field."). The Court finds that Dr. Wyban's experience would provide a reliable foundation as to why SPF shrimp were not successfully bred in China. Plaintiff's argument goes to the weight to be accorded to Dr. Wyban's opinion, not its admissibility. See Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir. 2011) ("Quite the contrary, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'").

The Court, on the other hand, agrees that Dr. Wyban's opinion concerning who is responsible for advertising AMI/API shrimp broodstock in China is pure speculation since Dr. Wyban has provided no factual foundation for his conclusion, nor is he qualified as an expert in advertising in China. In re Abilify (Aripiprazole) Prods. Liab. Litig., 299 F. Supp. 3d 1291, 1336 (N.D. Fla. 2018)("the expert must know[] of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation.")(quotations omitted).

**(3)   Assistance to the Jury**

Finally, Plaintiff argues that several of Dr. Wyban's opinions would only serve to confuse the jury and would not assist the tier of fact, therefore they are not admissible under the third Daubert factor. (Doc. #331, pp. 14-17.)   Plaintiff asserts that while Dr. Wyban disagrees strongly with the "locked pairs" terminology, he actually agrees with the "sum and substance of the concept." (Doc. #331, p. 14.)

Mr. Wyban explains how the name "locked pairs" is "highly inaccurate" because there is nothing locked in any way, and he discusses this issue with respect to Mr. Massad's expert opinion in stating that the "locked pair concept that single family cannot be used to establish a breeding program is a gross misunderstanding of basic genetics."  (Doc. #331-5, pp. 5-7.) The Court finds Dr. Wyban's testimony would be helpful to the jury in explaining this concept since it is discussed frequently, and it can provide perspective on how shrimp breeders may protect germplasm. See McDowell, 392 F.3d at 1298-99 (citing Daubert, 509 U.S. at 591) ("the expert testimony must be 'relevant to the task at hand,' . . . i.e., that it logically advances a material aspect of the case.") (quotations omitted).

Next, Plaintiff seeks to exclude Dr. Wyban's discussion of Mr. Massad's "slot machine metaphor" because Dr. Wyban's testimony

agrees with Mr. Massad in sum and substance on this issue and it would not be helpful to the jurors, or could cause confusion. (Doc. #331, p. 15.) Defendants respond that Dr. Wyban's testimony and report on this matter was not merely an issue of semantics, as Dr. Wyban substantively criticized Mr. Massad's knowledge of breeding and the metaphor because it incorrectly suggests that genetics is completely up to chance and luck. (Doc. #331-5, p. 6; Doc. #341, p. 16.) The Court agrees with Defendants, and finds that Dr. Wyman's opinion would be helpful to the jury in that it concerns matters that are beyond the understanding of the average lay person. See Frazier, 387 F.3d at 1262-63.

Lastly, Plaintiff seeks to exclude Dr. Wyban's testimony about Primo's alleged poor reputation in the broodstock industry because it is unsubstantiated, unsourced industry gossip, which would not be helpful since it is well within the capacity of a juror to understand. (Doc. #331, p. 17.) The Court agrees.

Dr. Wyban copied and pasted a posting from an "online shrimp list" that sets forth certain opinions about Primo, from which Dr. Wyban concluded that Primo has a very negative image in the shrimp industry. (Doc. #331-5, p. 8.)  This posting, however, does not require expert testimony as a jury would be capable of reading the post and analyzing it without any expert analysis, nor does it appear to be relevant to the issues of this case. See In re 3M

Combat Arms, 2021 U.S. Dist. LEXIS 47275, at *33 (finding that expert's recitation of events and internal documents is not helpful to the trier of fact because they are devoid of any expert analysis); see also McDowell, 392 F.3d at 1298-99 (citing Daubert, 509 U.S. at 591) ("the expert testimony must be 'relevant to the task at hand,' … i.e., that it logically advances a material aspect of the case."). Therefore, "[s]uch evidence is properly presented through fact witnesses and documentary evidence, not expert testimony." In re 3M Combat Arms, 2021 U.S. Dist. LEXIS 47275, at *33. The Court therefore finds this portion of Dr. Wyban's expert opinion is not admissible.

Accordingly, it is hereby

**ORDERED:**

1. Defendants American Mariculture, Inc., American Penaeid, Inc., and Robin Pearl's Motion to Limit or Exclude Expert Testimony By Dr. Lian Gan (Doc. #328) is **GRANTED.**

2. Defendants American Mariculture, Inc., American Penaeid, Inc., and Robin Pearl's Motion to Limit or Exclude Expert Testimony By Carlos F. Massad (Doc. #329) is **GRANTED in part and DENIED in part.**

3. Defendant American Mariculture, Inc.'s Motion to Limit or Exclude Expert Testimony of Granvil D. Treece (Doc. #330) is **GRANTED in part and DENIED in part.**

    4. Plaintiff TB Food USA, LLC's Motion to Partially Exclude The Testimony of Experts Dr. Roger W. Doyle and Dr. James Wyban (Doc. #331) is **GRANTED in part and DENIED in part**.

    **DONE AND ORDERED** at Fort Myers, Florida, this   26th   day of October, 2021.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Parties of record

- 39 -