UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

TB FOOD USA, LLC, a
Delaware Limited Liability
Company,

       Plaintiff,

v.                                    CASE NO. 2:17-cv-9-FtM-29NPM

AMERICAN MARICULTURE, INC.,
a Florida Corporation,
AMERICAN PENAEID, INC., a
Florida Corporation, and
ROBIN PEARL,

       Defendants.

_____

AMERICAN MARICULTURE, INC.,
a Florida Corporation,

       Third-Party Plaintiff,

v.

PB LEGACY, INC. a Texas
Corporation,

       Third-Party Defendant.

_____

**COURT'S INSTRUCTIONS TO THE JURY**

Members of the jury:

It is my duty to instruct you on the rules of law that you must use in deciding this case.

When I have finished you will go to the jury room and begin your discussions, sometimes called deliberations.

**I.**

Your decision must be based only on the evidence presented during the trial.  You must not be influenced in any way by either sympathy for or prejudice against anyone.

You must follow the law as I explain it – even if you do not agree with the law – and you must follow all of my instructions as a whole. You must not single out or disregard any of the instructions on the law.

The fact that a corporation or a limited liability company is involved as a party must not affect your decision in any way. A corporation, a limited liability company, and all other persons stand equal before the law and must be dealt with as equals in a court of justice. When a corporation or limited liability company is involved, of course, it may act only through people as its employees; and, in general, a corporation and limited liability company are responsible under the law for the acts and statements of its employees that are made within the scope of their duties as employees of the company.

As I said before, you must consider only the evidence that I have admitted in the case.  Evidence includes the testimony of witnesses and the exhibits admitted. But anything the lawyers say

is not evidence and is not binding on you.

You should not assume from anything I have said that I have any opinion about any factual issue in this case.  Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters. In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions.  You should not be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact. There is no legal difference in the weight you may give to either direct or circumstantial evidence.

When I say you must consider all the evidence, I do not mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was.  In making that decision you

may believe or disbelieve any witness, in whole or in part.  The number of witnesses testifying concerning a particular point does not necessarily matter.

To decide whether you believe any witness I suggest that you ask yourself a few questions:

- Did the witness impress you as one who was telling the truth?

- Did the witness have any particular reason not to tell the truth?

- Did the witness have a personal interest in the outcome of the case?

- Did the witness seem to have a good memory?

- Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

- Did the witness appear to understand the questions clearly and answer them directly?

- Did the witness's testimony differ from other testimony or other evidence?

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact. And ask whether there was evidence that at some other time a witness said

4

or did something, or did not say or do something, that was different from the testimony the witness gave during this trial.

But keep in mind that a simple mistake does not mean a witness was not telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

When scientific, technical or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter. But that does not mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

**II.**

There are four types of claims involved in this case: Breach of contract, defamation, misappropriation of trade secrets, and unfair competition. Plaintiff TB Food, which is the successor in interest to Primo Broodstock, Inc. and PB Legacy, Inc., asserts that defendant AMI has breached the Nondisclosure Agreement (the

NDA) as well as the Grow-out Agreement (GOA), and that defendants AMI, API, and Robin Pearl have made defamatory statements, misappropriated trade secrets, and engaged in unfair competition. All defendants deny these claims, and have asserted various affirmative defenses.  Additionally, AMI has brought a third-party complaint against PB Legacy, Inc. asserting claims of breach of contract.  PB Legacy, Inc. denies the claims, and asserts certain affirmative defenses.

It is the responsibility of plaintiff TB Food and third-party plaintiff AMI to prove every essential part of their claims by a "preponderance of the evidence."  Similarly, it is the responsibility of defendants AMI, API, and Robin Pearl and third-party defendant PB Legacy, Inc. to prove every essential part of their affirmative defenses by a preponderance of the evidence. This is sometimes called the "burden of proof" or the "burden of persuasion."

A "preponderance of the evidence" simply means an amount of evidence that is enough to persuade you that a claim or defense is more likely true than not true. If the proof fails to establish any essential part of a claim or defense by a preponderance of the evidence, you should find against the party asserting that claim or defense.  When more than one claim or defense is involved, you

should consider each claim or defense separately.

In deciding whether any fact has been proved by a preponderance of the evidence, you may consider the testimony of all of the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them.

### III.

The Court will explain each of the claims and affirmative defenses, beginning with the breach of contract claims by TB Food.

### A.  TB FOOD'S BREACH OF CONTRACT CLAIMS AGAINST AMI

In Count I of the Amended Complaint, TB Food alleges that AMI breached the Non-disclosure Agreement (NDA) and the Grow-Out Agreement (GOA) which AMI had entered with Primo Broodstock, Inc. (Primo), and as a result TB Food, as the successor in interest of Primo, suffered damages.  The parties agree that the NDA and the GOA constitute valid, binding contracts.

As to the NDA, TB Food asserts that AMI breached the NDA by:

(1) failing to preserve Primo's "Confidential Information," as defined in the NDA, by

> (a) transferring both males and females of several highly desirable, disease-resistant

lines of shrimp to AMI's agents and instrumentalities; and

(b) using Dr. Perez to "unlock" Primo's genetic lock by conducting a genetic analysis of the Primo shrimp in AMI's possession without Primo's consent or authorization;

(2) using Primo's "Confidential Information" in one or more ways without Primo's permission;

(3) not ceasing to use Primo's "Confidential Information" when requested by Primo; and

(4) not returning Primo's Confidential Information to Primo when requested by Primo.

As to the Grow-Out Agreement, TB Food alleges that AMI was obligated to kill all shrimp Primo left behind at the AMI facility, and not use, transfer, or sell any live Primo shrimp without Primo's advance written authorization. TB Food alleges that AMI breached these obligations in the Grow-Out Agreement by

(1) failing to kill the Primo shrimp remaining at AMI's facility as of April 30, 2016, and

(2) transferring all right, title, and interest in the live Primo shrimp and the underlying genetics to API, knowing that API would sell the Primo shrimp and utilize the underlying genetics to sell shrimp throughout the world.

AMI responds that it did not breach either the NDA or the Grow-Out Agreement, and asserts several affirmative defenses.

**Breach of Contract Elements**

To establish its claim for breach of either the NDA or the Grow-Out Agreement, TB Food, as successor in interest to Primo, must prove by a preponderance of the evidence all of the following:

(1)  Primo and AMI entered into a contract;

(2)  Primo did all, or substantially all, of the essential things which the contract required it to do, or Primo was excused from doing those things;

(3)  All conditions required by the contract for AMI's performance had occurred;

(4)  AMI failed to do something essential which the contract required it to do, or AMI did something which the contract prohibited it from doing and that prohibition was essential to the contract, or both; and

(5)  Primo was damaged by AMI's conduct.

As previously stated, the parties agree that the NDA and the GOA constitute valid, binding contracts, and therefore the first element is satisfied.  You must decide whether the remaining elements are satisfied separately for the Non-Disclosure Agreement and the Grow-Out Agreement, since you are to decide whether AMI breached one, both, or neither contract.

9

Under Florida law, every contract includes the implied covenant of good faith and fair dealing. Good faith means honesty in fact in the conduct of the contractual relations. Thus, every contract includes an implied agreement that the parties will perform their obligations in good faith, even if the contract does not expressly say so.

**Meaning of Terms**

TB Food and AMI dispute the meaning of several terms contained in the Grow-Out Agreement and the handwritten document. In deciding what the terms in the documents mean, you must decide what the parties agreed to at the time the document was created. In order to determine what the parties agreed to, you should normally consider the plain and ordinary meaning of the language used in the document, as well as the circumstances surrounding the making of the document. The agreement of the parties is determined only by what the parties said, wrote, or did. You may not consider the parties' thoughts or unspoken intentions.

You may use the following principles to resolve the disputes over terms in the Grow-Out Agreement and handwritten document.

- You may assume that the parties intended the disputed terms in their document to have their plain and ordinary meaning, unless you decide that the parties intended the disputed terms to have another meaning.

10

- You should consider the whole document, not just isolated parts. You should use each part to help you interpret the others, so that all the parts make sense when taken together.

- You should consider how the parties acted before and after the document was created.

- Disputed terms should be given the meaning used by people in that trade, business, or technical field, unless the parties agreed that the disputed terms should have another meaning.

- You must first attempt to determine the meaning of the disputed terms in the documents from the evidence presented and the previous instructions.  If you cannot do so, you may consider which party drafted the disputed terms in the documents and construe the language against that party.


**Modification of GOA Contract**

AMI asserts that the Grow-Out Agreement was modified by the handwritten document signed by Robin Pearl and Randall Aungst, on behalf of Ken Gervais.  TB Food denies that the relevant terms of the Grow-Out Agreement were modified.

The parties to a contract may agree to modify its terms. A modification merely replaces one or more terms of a valid and existing agreement.  All terms of the original contract not

replaced by a modification remain in effect. All the parties whose rights or responsibilities are affected by a modification must consent to the modification. A party cannot modify a contract unilaterally, and there must be a meeting of the minds on each modification. You must decide whether a reasonable person would conclude from the words or conduct of AMI and Primo that they agreed to modify the Grow-Out Agreement, and if so, what terms were modified.  A written contract may be modified by a written agreement, and unless it is prohibited by the original written contract, may be modified by a subsequent oral agreement between the parties or by the parties' subsequent conduct. AMI has the burden of proving modification by a preponderance of the evidence. TB Food disputes there was a meeting of the minds as to certain terms contained in the handwritten document.

**Damages**

If you find for TB Food on its breach of contract claim as to either or both contracts, you should award TB Food an amount of money that the preponderance of the evidence shows will fairly and adequately compensate TB Food for its damages.  Adequate compensation to TB Food includes damages incurred by Primo, but would not include any damages incurred by TB Food's parent corporation, Haimao.

12

You shall consider the following types of damages:

1. **Compensatory damages:** Compensatory damages is that amount of money which will put TB Food in as good a position as it would have been if AMI had not breached the contract, and which naturally result from the breach.

2. **Special damages:** Special damages is that amount of money which will compensate TB Food for those damages which do not normally result from the breach of contract. To recover special damages, TB Food must prove that when the parties made the contract, AMI knew or reasonably should have known of the special circumstances leading to such damages.

3. **Nominal damages:** If you find for TB Food but find that no damage has been proved, you may award nominal damages. Nominal damages are damages of an inconsequential amount which are awarded to vindicate a right where a wrong is established but no damage is proved, such as $1.00.

Lost profits are one form of special damages. To be entitled to recover lost profits, TB Food must prove both of the following:

(a)  AMI's actions caused TB Food to lose profits; and

(b)  TB Food can establish the amount of its lost profits with reasonable certainty.

13

For TB Food to establish the amount of its lost profits with reasonable certainty, it must prove that a reasonable person would be satisfied that the amount of lost profits which TB Food may be entitled to recover is not simply the result of speculation. Instead, TB Food must prove that there is some standard by which the amount of lost profits may be established. TB Food does not have to be able to prove that the amount of lost profits can be calculated with mathematical precision, but must show there is a reasonable basis for determining the amount of the loss. The standard may be regular market values, or other established data, by which the amount may be satisfactorily established.

**Affirmative Defenses**

If you find that TB Food has established all the elements of its breach of contract claim against AMI as to either or both contracts, you must then consider AMI's affirmative defenses. If AMI establishes an affirmative defense as to a specific contract, AMI is entitled to prevail as to the specific contract even if TB Food has proven its case as to that contract by a preponderance of the evidence. AMI asserts the following affirmative defenses to the breach of the NDA and Grow-Out Agreement claim:

**(1)   Termination of Obligations By Modification**

AMI's first affirmative defense asserts that the obligations under the NDA and the GOA were terminated by a modification contained in the handwritten document.   To establish such a termination, AMI must prove by a preponderance of the evidence that:

> (a)   the   handwritten   document   constitutes   a modification of the NDA and the Grow-Out Agreement; and
>
> (b)   one   of   the   agreed-upon   modifications   was   the termination of the obligations in the NDA and the Grow-Out Agreement upon which TB Food's breach of contract claim is based.

**(2)   Accord and Satisfaction By Modification**

AMI's second affirmative defense asserts that the handwritten document constituted an accord and satisfaction.   To establish an accord and satisfaction, AMI must prove by a preponderance of the evidence that:

> (a)   the handwritten document constitutes a modification of the NDA and the Grow-Out Agreement;

15

(b)  the  parties  mutually  intended  to  effect  a settlement  of  an  existing  dispute  by  entering  into the modification; and

(c)  there  was  substantial  actual  performance  in accordance with the modification.

If  there  is  no  substantial  actual  performance  under  the modification,  then  the  defense  fails.    If  there  is  substantial actual  performance,  such  substantial  actual  performance  of  the modification discharges the prior obligations.

### (3)  Novation By Modification

AMI's  third  affirmative  defense  asserts  that  the  handwritten document constituted a novation.  A novation is a mutual agreement between  the  parties  for  the  discharge  of  a  valid  existing obligation  by  the  substitution  of  a  new  valid  agreement.    To establish its third affirmative defense of novation, AMI must prove by a preponderance of the evidence:

(a)  the existence of a previously valid contract;

(b)  the handwritten document constitutes a modification of the NDA and the Grow-Out Agreement;

(c)  that  the  parties  intended  to  extinguish  the original contractual obligation; and

16

(d)   the validity of the modification.

**(4)   Release By Modification**

AMI's fourth affirmative defense asserts that the handwritten document effected a "release" from all past, present, and future claims arising out of their contractual obligations under the NDA and the GOA.   To establish this release defense, AMI must prove all of the following by a preponderance of the evidence:

(a) the handwritten document constitutes a modification of the NDA and the GOA;

(b) the agreed-upon modification was that Primo would abandon past, present and future claims or relinquish a right that it could have asserted against AMI under the GOA at the time of the modification; and

(c) Primo executed the handwritten agreement voluntarily and knowingly.

**(5)   Waiver By Modification**

AMI's fifth affirmative defense asserts that under the handwritten document, after April 30, 2016, Primo gave up or waived its rights under the NDA and GOA to (a) possess the shrimp and the underlying genetics contained therein at the AMI facility, and (b)

17

control AMI's possession and use of the remaining shrimp and the underlying genetics.   To establish this waiver defense, AMI must prove all of the following by a preponderance of the evidence:

> (a)  Primo had a right to possession and use of the shrimp and the underlying genetics;
>
> (b) Primo knew or should have known it had the right to possession and use of the shrimp and the underlying genetics; and
>
> (c) Primo freely and intentionally gave up its right to possess and use the shrimp and the underlying genetics in AMI's facility after April 30, 2016.

A waiver may be oral or written or may arise from conduct which shows that Primo gave up a right.

### (6)  Equitable Estoppel

AMI's next two affirmative defenses assert the defense of equitable estoppel based on Primo's alleged change of positions. To establish the first of these two affirmative defenses, AMI must prove all of the following by a preponderance of the evidence:

> (a)  Primo initially recognized that the handwritten document terminated both the Non-disclosure Agreement and the Grow-Out Agreement,

18

but later denied that the handwritten document terminated the Non-disclosure Agreement and the Grow-Out Agreement;

(b)  AMI relied in good faith upon Primo's initial position that the handwritten document terminated the NDA and the GOA; and

(c)  AMI's reliance on Primo's initial position caused AMI to change its position for the worse.

AMI's next affirmative defense also asserts the defense of equitable estoppel based on Primo's alleged change of positions. To establish this affirmative defense, AMI must prove all of the following by a preponderance of the evidence:

(a)  Primo initially recognized that the handwritten document gave AMI the right to the shrimp left at the AMI facility after April 30, 2016, but later denied that the handwritten document gave AMI that right;

(b)  AMI relied in good faith upon Primo's initial position; and

(c)  AMI's reliance on Primo's initial position caused AMI to change its position for the worse.

**(7)   In Pari Delicto**

AMI's next affirmative defense is referred to as the *in pari delicto* defense, which means "in equal fault."  AMI asserts that Primo was at least equally at fault in the same wrongdoing, and therefore may not recover damages resulting from that wrongdoing. Specifically, AMI claims that any damages alleged by TB Food result primarily or equally from Primo's wrongdoing, including Primo's prior breaches of the Grow-Out Agreement and the handwritten document modifications.  To establish this defense, AMI must prove the following by a preponderance of the evidence:

(a) Primo participated in the same alleged wrongdoing as AMI; and

(b) Primo bears at least substantially equal responsibility for the damages it claims to have suffered from the alleged breach of contracts.

**(8)   Failure to Mitigate Damages**

AMI's next affirmative defense asserts that TB Food failed to mitigate its damages.  To establish this affirmative defense, AMI must prove by a preponderance of the evidence that damages resulting from a breach of contract could have been avoided with reasonable effort or expenditures.  You should consider the reasonableness of TB Food's efforts in light of the circumstances

20

facing it at the time, including its ability to make the efforts or expenditures without undue risk or burden.

If AMI breached the contract and the breach caused damages, TB Food is not entitled to recover for those damages which AMI proves TB Food could have avoided with reasonable efforts or expenditures. If TB Food made reasonable efforts to avoid the damages caused by the breach, then your award should include reasonable amounts that it spent for this purpose.

**B. TB FOOD'S DEFAMATION CLAIM AGAINST AMI, API, AND ROBIN PEARL**

In Count III of the Amended Complaint, TB Food alleges that AMI, API, and Robin Pearl made false statements in China which constituted defamation of Primo.  Defamation is the unprivileged publication of false statements which naturally and proximately result in injury to another.

TB Food asserts that publication of the following three statements each constituted defamation:

(1)  The breeder shrimp that Primo was offering for sale, including through its exclusive distributor in China (i.e., Haimao), are "fake" and not the "real Primo" shrimp;

(2)  Primo had abandoned all intellectual property rights in the shrimp it left behind with AMI on April 30, 2016; and

(3)  Primo had given the full bank of all its genetic lines to AMI under the Grow-Out Agreement, while retaining none of the lines for itself at its headquarters in Brookshire, Texas.

The first issues for your determination about each statement are whether TB Food has shown by a preponderance of the evidence that:

(1)  a defendant made, published, or broadcasted any of these statements; and, if so,

22

(2) the statements were in some significant respect a false statement of fact and tended to injure Primo's, or its successor in-interest TB Food's, business interests or reputation.

"Publication" of defamatory matter is communication of the statement to a third person.

A statement is "in some significant respect" false if its substance or gist conveys a materially different meaning than the truth would have conveyed. In making this determination, you should consider the context in which the statement is made and disregard any minor inaccuracies that do not affect the substance of the statement.

If you find that each of these elements of TB Food's defamation claim has been satisfied as to any of the statements, you must next determine whether TB Food has shown a third element of the claim by clear and convincing evidence:

(3) That at the time the statement was made, a defendant knew the statement was false or had serious doubts as to its truth.

"Clear and convincing evidence" differs from the "preponderance of the evidence" in that it is more compelling and persuasive.  Clear

and convincing evidence is evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter at issue.

You must make separate determinations of all these issues for each of the three defendants and each of the allegedly defamatory statements.

**Damages**

If you find for TB Food on its claim for defamation, you should award it an amount of money that the preponderance of the evidence shows will fairly and adequately compensate it for damages caused by the statement(s). A statement is a cause of damages if it directly and in natural and continuous sequence produces or contributes substantially to producing such damage.

If you find for TB Food, you should consider the following components of damage: Any injury to business or reputation in the past or to be experienced in the future.

There is no exact standard for fixing the compensation to be awarded on account of such element of damage. Any award should be fair and just in the light of the evidence.

**Affirmative Defenses**

If you find that TB Food has established all the elements of its defamation claim against any of the defendants, you must then consider their affirmative defense to TB Food's defamation claim.

**Release:** Defendants' affirmative defense asserts that the handwritten document effected a "release" from all past, present, and future claims arising out of their contractual obligations under the NDA and the GOA. To establish this release defense, defendants must prove all of the following by a preponderance of the evidence:

> (a) the handwritten document constitutes a modification of the NDA and the GOA;
>
> (b) the agreed-upon modification was that Primo would abandon past, present and future claims or relinquish a right that it could have asserted against defendants under the GOA at the time of the modification; and,
>
> (c) Primo executed the handwritten document voluntarily and knowingly.

### C. TB FOOD'S FEDERAL TRADE SECRET MISAPPROPRIATION CLAIM AGAINST AMI, API AND ROBIN PEARL

In Count IV of the Amended Complaint, TB Food claims that defendants AMI, API and Robin Pearl misappropriated one or more of TB Food's trade secrets in violation of a federal statute. To prove its claim, TB Food must prove the following facts by a preponderance of the evidence:

(1)  TB Food, as successor in interest to Primo, was the owner of a trade secret;

(2)  the trade secret relates to a product or service used in, or intended for use in, interstate or foreign commerce; and

(3)  defendants misappropriated that trade secret.

**Owner**

Federal law defines the term "owner" as the person or entity which has rightful legal or equitable title to, or license in, the trade secret.

**Trade Secret**

A trade secret is defined as all forms and types of financial, business, scientific, technical, economic, or engineering information, if

26

(1)  the owner thereof has taken reasonable measures to
     keep such information secret; and

(2)  the information derives independent economic value,
     actual or potential, from not being generally known
     to, and not being readily ascertainable through proper
     means, by another person who can obtain economic value
     from the disclosure or use of the information.

A trade secret may include patterns, plans, compilations, program
devices, formulas, designs, prototypes, methods, techniques,
processes, procedures, programs, or codes. A trade secret may be
tangible or intangible. A trade secret does not have to be stored,
compiled, or memorialized. But if it is, it does not have to be
stored, compiled, or memorialized in any particular manner, such
as physically, electronically, graphically, photographically, or
in writing.

     To establish that any of their asserted matters constitute a
trade secret, TB Food must prove the following by a preponderance
of the evidence:

(1)  The matter is not generally known to another person who
     can obtain economic value from the disclosure or use of
     the information;

(2)  Another person cannot readily discover the matter
     through proper means;

27

(3)   The matter derives independent economic value, actual or potential, from not being known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information; and

(4)   Primo had taken reasonable steps to keep the matter secret.

Whether another person or company has also come up with the alleged trade secret is not relevant to the trade secret analysis here, unless someone who rightly possessed the secret has disclosed the idea into the public domain, thereby destroying its status as a trade secret. This is why two companies may simultaneously hold a valid trade secret in the same information.

**Interstate or Foreign Commerce**

Use or intended use of the product or service in interstate commerce means that the product or service involves travel, trade, transportation, or communication between a place in one state and a place in another state. Use of the product or service in foreign commerce means that the product or service involves travel, trade, transportation, or communication between a place in the United States and a place outside of the United States.

**Misappropriation**

"Misappropriation" of a trade secret occurs when someone acquires, discloses, or uses a trade secret without the right to do so. For TB Food to prove that defendants misappropriated a trade secret belonging to Primo, and then to TB Food as Primo's successor in interest, TB Food must prove the following by a preponderance of the evidence:

1. Defendants acquired, disclosed, or used a trade secret belonging to Primo, and then belonging to TB Food as Primo's successor in interest, without Primo's or TB Food's express or implied consent; and

2. Defendants knew or should have known that the trade secret:

   (a) was derived from or through a third person who used improper means to acquire the trade secret; or

   (b) was acquired under circumstances giving rise to a duty to maintain the secrecy of one or more of its stated trade secrets or limit the use of one or more of its stated trade secrets, or

   (c) was derived from or through a third person who was under a duty to maintain the

29

secrecy of or limit the use of one or more

of its stated trade secrets.

Each act of acquiring, disclosing, or using a trade secret belonging to Primo, or to TB Food as successor in interest, may constitute a separate act of misappropriation.


"Improper means" may include theft, bribery, misrepresentation, and breach or inducement of a breach of duty to maintain secrecy. "Improper means" does not, however, include reverse engineering. Reverse engineering is the process of starting with the known product and working backward to determine the process which aided in its development, and may include dissecting the product or having it dissected.

"Express consent" is consent that is clearly and unmistakably stated.

"Implied consent" is consent that is inferred from one's conduct rather than from one's direct expression.

There are no technical limitations on the nature of the conduct that constitutes "use" of a trade secret. As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use." For example, marketing goods that embody the trade secret, employing the trade secret in manufacturing or

30

production, or relying on the trade secret to assist or accelerate research or development all constitute "use."

The unauthorized use need not extend to every aspect or feature of the trade secret; use of any substantial portion of the secret is sufficient to subject the actor to liability. Similarly, the actor need not use the trade secret in its original form. Thus, an actor is liable for using a trade secret with independently created improvements or modifications if the result is substantially derived from the trade secret. However, if the contribution made by the trade secret is so slight that the actor's product or process can be said to derive from other sources of information or from independent creation, the trade secret has not been "used" for purposes of imposing liability for alleged misappropriation of a trade secret.

Any conduct by the actor that enables another to learn the trade secret is "disclosure" of the secret.

**Damages**

If TB Food has proved its claim for misappropriation of trade secrets under federal law, you must decide the issue of damages.

**(1)   Compensatory Damages**

If your verdict is for TB Food on its claims for misappropriation of trade secrets under the federal statute, you should award TB Food an amount of money that a preponderance of the evidence shows will fairly and adequately compensate TB Food for the damage legally caused by defendants' misappropriation of the trade secrets. Adequate compensation to TB Food includes damages incurred by Primo, but would not include any damages incurred by TB Food's parent corporation, Haimao.

To the extent that it is not duplicative (that is, double counting), you may award either:

    (a) the amount

       i.  of TB Food's actual damages suffered as a result of defendants' misappropriation of Primo's trade secrets; and

      ii.  of defendants AMI, API, or Pearl's unjust enrichment that is a result of their misappropriation of Primo's trade secrets, even if that amount is more than the actual damages suffered by TB Food.

    OR

    (b)  the amount of a reasonable royalty payable to TB Food for defendants' unauthorized disclosure or use of Primo's or TB Food's trade secrets.

Damages for actual loss include but are not limited to TB Food's lost revenue, lost profits, lost sales, lost customers, or lost market share. These are just some examples.

Damages for unjust enrichment include the recovery of the full total of defendants' profits, or the amount corresponding to the actual contribution Plaintiff's trade secret made to defendants' commercial success caused by the misappropriation, or both.

In determining the amount of unjust enrichment, you may compare the costs to defendants of achieving the same result with and without the improper use of the trade secret and award the difference to TB Food.  This is called the "head start" measurement of damages.

Additionally, in determining the amount of unjust enrichment, you may, but are not required to, limit any damages for unjust enrichment to the period of time it would have taken defendants to independently develop the product without the benefit of Primo's or TB Food's trade secrets. This is called the "head start" time period.

Damages in the amount of a reasonable royalty is the price that would be agreed upon by a willing buyer and a willing seller for the use made of the trade secret by one or more of the Defendants.  The method is not limited to a percentage of

defendants' sales or profits and may instead rely on any appropriate measure of the fair market value of defendants' use.

**(2)   Exemplary Damages**

If you find that defendants have engaged in willful and malicious misappropriation of the trade secret, you may award "exemplary" damages, that is, damages meant to make an example of defendants.

Exemplary damages may be awarded in an amount not more than two (2) times the amount awarded for compensatory damages (i.e. the amount awarded for either actual damages plus unjust enrichment or for a reasonable royalty).

**Affirmative Defenses**

If you find that TB Food has established all the elements of its federal trade secret misappropriation claim against any of the defendants, you must then consider their affirmative defenses to this claim.

**Release By Modification, Waiver By Modification, Novation by Modification, Equitable Estoppel, In Pari Delicto, Failure to Mitigate Damages**

Defendants asserts that TB Food does not have a right to assert a claim for federal trade secret misappropriation because

the handwritten document effected a release by modification, a waiver by modification, and a novation by modification, and because equitable estoppel applied, the parties were in pari delicto, and there was a failure to mitigate damages. I have previously instructed you regarding the elements of these affirmative defenses. These prior instructions apply equally to these affirmative defenses as asserted in connection with the federal trade secrets claim.

### D. TB FOOD'S FLORIDA MISAPPROPRIATION OF TRADE SECRETS AGAINST AMI, API AND ROBIN PEARL

In Count V of the Amended Complaint, TB Food alleges that defendants AMI, API and Robin Pearl misappropriated Primo's, and TB Food's as successor in interest, trade secrets in violation of the Florida Uniform Trade Secrets Act, which I will refer to as simply the Florida trade secret statute. To prove a claim under the Florida trade secret statute, TB Food must prove by a preponderance of the evidence that (1) it possessed a trade secret, and (2) the trade secret was misappropriated.

**Trade Secret**

Florida law defines a trade secret as

information ... that: (a) [d]erives independent economic value ... from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

A trade secret may include information such as a formula, pattern, compilation, program, device, method, technique, or process.  To prove that Primo and/or TB Food had a trade secret, TB Food must prove by a preponderance of the evidence that:

(1)  Information belonging to Primo:

(a)  derived actual or potential independent economic value from not being generally known to other persons who could obtain value from its disclosure or use; and

(b)  was not readily ascertainable by proper means by other persons; and

(2)  Primo took reasonable steps, under the circumstances, to maintain the secrecy of any of its trade secrets.

**Misappropriation**

"Misappropriation" of a trade secret occurs when someone acquires, discloses, or uses a trade secret without the right to do so.  To establish misappropriation of a trade secret belonging

36

to Primo and/or TB Food, TB Food must prove the following by a preponderance of the evidence:

(1)    Defendants acquired, disclosed, or used a trade secret belonging to Primo without Primo's express or implied consent; and

(2)    Defendants knew or should have known that the trade secret:

      (a)  was acquired through improper means; or

      (b)  was disclosed or used after being acquired by Defendants using improper means; or

      (c)  was disclosed or used when Defendants knew or should have known that the knowledge of the trade secret came from or through a person who had used improper means to acquire the trade secret; or

      (d)  was disclosed or used when Defendants knew or should have known that the knowledge of the trade secret was acquired by Defendants under circumstances where they had a duty to maintain its secrecy or limit its use; or

37

> > (e)   was  disclosed  or  used  when  Defendants
> > knew or should have known that the knowledge
> > of the trade secret came from or through a
> > person  who  had  a  duty  to  Plaintiff  to
> > maintain its secrecy or limit its use.

Each  act  of  acquiring,  disclosing,  or  using  that  used  a  trade secret  belonging  to  Primo  may  constitute  a  separate  act  of misappropriation. You must unanimously agree as to which acts, if any, constitute misappropriation of a trade secret.

The Court  has  previously  instructed  you  on  the  meanings  of the terms "improper means," "express consent," "implied consent," "use," and "disclosure."   These  same  instructions  apply  to  this claim.

**Damages**

If TB Food has proved its claim for misappropriation of trade secrets  under  the  Florida  statute,  you  must  decide  the  issue  of damages.

If  your  verdict  is  for  TB  Food  on  its  claims  for misappropriation  of  trade  secrets,  you  should  award  TB  Food  an amount of money that a preponderance of the evidence shows will fairly  and  adequately  compensate  TB  Food  for  the  damage  legally caused by defendants' misappropriation of TB Food's trade secrets.

38

This may include both compensatory and exemplary damages.   The instructions I gave you concerning the federal trade secret claim regarding these damages also govern damages under the Florida trade secret statute.

**Affirmative Defenses**

If you find that TB Food has established all the elements of its federal trade secret misappropriation claim against any of the defendants, you must then consider their affirmative defenses to this claim.   Defendants raise the same affirmative defenses to the Florida trade secret claim as they do with the federal trade secret claim - release by modification, waiver by modification, novation by modification, equitable estoppel, in pari delicto, and failure to mitigate damages.   I have previously instructed you regarding the elements of these affirmative defenses.   These prior instructions apply equally to these affirmative defenses as asserted in connection with the Florida trade secrets claim.

**INTRODUCTION TO UNFAIR COMPETITION CLAIMS**

The last three claims brought by TB Food allege unfair competition against all three defendants under different but similar legal causes of action. Count VI alleges that all three defendants engaged in unfair competition by making false statements in advertising in violation of a federal statute referred to as the Lanham Act. Count VII alleges that all three defendants engaged in unfair competition under the Florida common law. Count VIII alleges that all three defendants engaged in unfair competition in violation of a statute referred to as the Florida Unfair and Deceptive Trade Practices Act.

## E. TB FOOD'S FEDERAL CLAIM FOR FALSE ADVERTIZING UNDER LANHAM ACT AGAINST ALL DEFENDANTS

In Count VI of the Amended Complaint, TB Food alleges that AMI, API and Robin Pearl engaged in false advertising in violation of federal law by making false or misleading statements to a number of commercial enterprises about defendants' rights over a significant portion of Primo's shrimp and intellectual property, which tended to confuse consumers.

### Elements

To establish its claim of false advertising in violation of federal law, TB Food must prove by a preponderance of the evidence all of the following:

(1)     Defendants made false or misleading statements of fact in a commercial advertisement or promotion about their own or another's product or services;

(2)     These statements either deceived or had the capacity to deceive consumers;

(3)     The deception was material, in that it was likely to influence a consumer's purchasing decision;

(4)     Defendants caused the false or misleading statement to enter interstate or foreign commerce.

(5)     TB Food has been or is likely to be injured as a result of the false or misleading statement either by direct diversion of sales from themselves to Defendants, or by lessening of the goodwill and reputation associated with TB Food's products.

41

**Damages**

To recover damages for violation of the Lanham Act, TB Food must prove two things by a preponderance of the evidence:

(1)   Defendants' acts of false advertising caused TB Food injury;

(2)   TB Food was actually damaged.

If you find that TB Food has proved these by a preponderance of the evidence, then you must consider what amount of money to fairly and reasonably award to TB Food as damages. Damages consist of the amount of money required to compensate TB Food for the injury caused by defendants' acts of false advertising, but would not include any damages incurred by TB Food's parent corporation, Haimao. You may consider the following types of damages:

(1) **TB Food's Lost Profits On Lost Sales.** This consists of the revenue TB Food would have earned but for a defendant's false advertising, less the expenses TB Food would have sustained in earning those revenues.

(2) **Loss Of Goodwill.** Goodwill is consumer recognition or drawing power of a brand or product. In determining loss of goodwill, you should compare the value of TB Food's goodwill before

42

the acts of false advertising with the value of TB Food's goodwill after the acts of false advertising.

(3) **Defendants' Profits.** In addition to TB Food's damages, TB Food may recover the profits defendants gained from the acts of false advertising. You may not, however, include in any award of profits any amount that you considered in determining actual damages. Profit is determined by deducting expenses from gross revenue. Gross revenue is all of the money a Defendant received due to its acts of false advertising. TB Food is required only to prove a Defendant's gross revenue. A Defendant is required to prove any expenses that it argues should be deducted in determining its profits. TB Food is entitled to recover a Defendant's total profits from its acts of false advertising unless a Defendant proves that a portion of the profit is due to factors other than acts of false advertising.

If you find that defendants engaged in false advertising under the Lanham Act, you must also determine whether TB Food has proven that, at the time defendants engaged in the false advertising, a Defendant acted willfully.

A Defendant acts willfully if it knew that a Defendant had engaged in false or deceptive advertising or if a Defendant acted with indifference to Plaintiff's rights. The Lanham Act permits

tripling of an award of damages in a case in which a Defendant acted willfully.

**Affirmative Defenses**

If you find that TB Food has established all the elements of its federal false advertising claim, you must then consider defendants' affirmative defenses to this claim.

Defendants asserts four affirmative defenses against TB Food's false advertising claim – release by modification, waiver by modification, in pari delicto, and abandonment by modification. I have previously instructed you regarding the elements of the first three of these affirmative defenses. These prior instructions apply equally to these affirmative defenses as asserted in connection with the Lanham Act claim.

As to the fourth affirmative defense, defendants assert that Primo abandoned the shrimp at AMI's facilities by failing to take delivery of them by the April 30, 2016 date set forth in the handwritten document. To establish this affirmative defense, the defendants must prove all of the following by a preponderance of the evidence:

(a)    The handwritten document required Primo to remove its shrimp from the AMI facility by April 30, 2016;

(b)    Primo failed to remove its shrimp from the AMI facility by April 30, 2016; and

(c)    Primo's failure to remove the shrimp constituted the intent to abandon the shrimp.

**F. TB FOOD'S FLORIDA CLAIMS FOR UNFAIR COMPETITION AGAINST ALL DEFENDANTS**

In Counts VII and VIII of the Amended Complaint, TB Food has alleged unfair competition claims against all defendants under both the Florida common law and the Florida Deceptive and Unfair Trade Practices. The legal standards applied to these state law claims are the same.

Unfair competition covers a wide range of unlawful, unfair, deceptive or fraudulent acts, including false advertising, trade libel, misappropriation of trade secrets and infringement of the right of publicity.

TB Food claims the following business conduct by Defendants were acts of unfair competition which were contrary to honest practice in commercial matters, or were deceptive acts or unfair practices:

(1) Defendants used Primo's confidential information that Defendants gained under the NDA without Primo's consent to displace and take Primo's place in the broodstock market in Asia by taking and using Primo's confidential information to create API's founding and subsequent broodstock stocks; and

(2) Defendants engaged in deceptive or fraudulent conduct by making false statements that tended to deceive consumers and/or interfere with Primo's sales or potential sales in China.

46

For TB Food's claim that Defendants used Primo's confidential information that Defendants gained under the NDA without Primo's consent, TB Food has the burden of proving the following by a preponderance of evidence:

(1)  Defendants are a competitor of the TB Food;

(2)  Defendants had a duty under the Non-Disclosure Agreement not to use or disclose Primo's confidential information without Primo's permission;

(3)  Defendants breached this duty; and

(4)  TB Food has suffered damages.

For TB Food's claim that Defendants engaged in deceptive or fraudulent conduct by making false statements that tended to deceive consumers and/or interfere with Primo's sales or potential sales in China, TB Food has the burden of proving each of the following elements by a preponderance of the evidence:

(1)  Defendants are a competitor of the TB Food;

(2)  Defendants engaged in deceptive or dishonest conduct;

(3)  The conduct caused a likelihood of consumer confusion:

   (a) between Primo and AMI/API's broodstock shrimp; and/or

   (b) as to the origin of API's broodstock shrimp, meaning who had the real Primo;

47

(4)   TB Food has been damaged as a result.

Any damages incurred by TB Food includes damages incurred by Primo, but would not include any damages incurred by TB Food's parent corporation, Haimao.

**Damages**

To recover damages for a violation, TB Food must prove two things by a preponderance of the evidence:

(1)   Defendants' acts of unfair competition caused TB Food injury;

(2)   TB Food was actually damaged.

If you find that TB Food has proved these by a preponderance of the evidence, then you must consider what amount of money to fairly and reasonably award to TB Food as damages. Damages consist of the amount of money required to compensate TB Food for the injury caused by defendants' acts of unfair competition, but would not include any damages incurred by TB Food's parent corporation, Haimao. You may consider the following types of damages: TB Food's lost profits on lost sales; the loss of goodwill; and defendants' profits.  My previous instructions as to the meanings of these terms apply equally to the unfair competition claims.

48

**Affirmative Defenses**

If you find that TB Food has established all the elements of its unfair competition claims, you must then consider defendants' affirmative defenses to these claims.

Defendants asserts the following affirmative defenses against TB Food's unfair competition claims – release by modification, waiver by modification, abandonment by modification, novation by modification, in pari delicto, and failure to mitigate damages. I have previously instructed you regarding the elements of these affirmative defenses.  These prior instructions apply equally to these affirmative defenses as asserted in connection with the unfair competition claims.

## IV.

**AMI'S BREACH OF CONTRACT CLAIM AGAINST PB LEGACY, INC.**

AMI has brought what is referred to as a third-party complaint against third-party defendant PB Legacy, Inc. (PB Legacy).  This third-party complaint alleges a breach of contract claim by AMI against PB Legacy.

AMI asserts that PB Legacy breached the GOA as originally entered or as modified by the handwritten document.  PB Legacy, the successor in interest to Primo Broodstock, Inc., denies that it breached the contract, either as originally entered or as modified, and raises certain affirmative defenses.

To establish its claim for breach of contract, AMI must prove by a preponderance of the evidence all of the following:

(1) Primo and AMI entered into a contract known as the GOA;

(2) AMI did all, or substantially all, of the essential things which the contract required it to do, or AMI was excused from doing those things;

(3) All conditions required by the contract for PB Legacy's performance had occurred;

(4) PB Legacy failed to do something essential which the contract required it to do, or PB Legacy did something which the contract prohibited it from doing and that prohibition was essential to the contract, or both; and

(5) AMI was damaged by PB Legacy's conduct.

Under Florida law, every contract includes the implied covenant of good faith and fair dealing.  Good faith means honesty in fact in the conduct of the contractual relations.  Thus, every contract includes an implied agreement that the parties will perform their obligations in good faith, even if the contract does not expressly say so.

**Damages**

If you find for AMI on its breach of contract claim as to the original Grow-Out Agreement or the Grow-Out Agreement as modified by the handwritten document, you should award AMI an amount of money that the preponderance of the evidence shows will fairly and adequately compensate AMI for its damages.

You shall consider the following types of damages:

1.  **Compensatory damages:** Compensatory damages is that amount of money which will put AMI in as good a position as it would have been if PB Legacy had not breached the contract, and which naturally result from the breach.

2. **Nominal damages**: If you find for AMI but find that no damage has been proved, you may award nominal damages. Nominal damages are damages of an inconsequential amount which are awarded to vindicate a right where a wrong is established but no damage is proved, such as $1.00.

**Affirmative Defenses**

PB Legacy asserts several affirmative defenses regarding AMI's breach of contract claim.

**(1) Waiver**

In its first affirmative defense, PB Legacy asserts that AMI does not have a right to claim breach of contract for the Grow-Out Agreement because AMI gave up or waived its right to require PB Legacy to perform under the Grow-Out Agreement.

To establish this waiver defense, PB Legacy must prove by a preponderance of the evidence all of the following:

(a) AMI had a right to require Primo to ship shrimp from the AMI facility;

(b) AMI had a right to require Primo to provide PL's for the hatchery;

(c) AMI had a right to require Primo to implement a breeding program as described in the GOA;

(d) AMI had a right to require Primo to make payment;

(e)   AMI freely and intentionally gave up its right to require Primo to perform.

**(2)   Estoppel**

In its next affirmative defense, PB Legacy asserts equitable estoppel against AMI. To establish this defense, PB Legacy must prove by a preponderance of the evidence all of the following:

(a) AMI took action indicating Primo did not have to:

   i.   ship shrimp to or from AMI's facility as described by the Grow-Out Agreement;

   ii.   implement a breeding program at the AMI facility as described in the GOA; or

   iii.   make certain payments of amounts that were due under the Grow-Out Agreement;

(b)   PB Legacy relied in good faith upon AMI's action; and

(c)   PB Legacy's reliance on AMI's action caused PB Legacy to change its position for the worse.


**(3)   Ratification**

Next, PB Legacy asserts the affirmative defense of ratification against AMI.  When a party materially breaches the contract but does not indicate any intention to renounce or repudiate the remainder of the contract, the non-breaching party

53

can elect to either continue to perform or cease to perform. If the nonbreaching party elects to perform, the non-breaching party is deprived of an excuse for ceasing performance as the non-breaching party has ratified the remainder of the contract as being valid and waived the right to rescind the contract.

To establish this defense, PB Legacy must prove by a preponderance of the evidence all of the following:

(a) Primo performed one or more acts which breached the Grow-Out Agreement, specifically: (i) to ship developed broodstock from the AMI facilities, (ii) provide shrimp breeders for the hatcheries, (iii) implement a breeding program as described in the Grow Out Agreement, and (iv) make payment of amounts that were due under the Grow-Out Agreement;

(b) AMI knew of these acts or omissions;

(c) AMI knew that it could rescind the Grow-Out Agreement because of these acts; and

(d) AMI accepted the acts or omissions and/or expressed through words or conduct that it accepted these acts or omissions and chose to continue to perform under the Grow-Out Agreement.

**(4)  Estoppel**

In its last affirmative defense, PB Legacy asserts equitable

estoppel against AMI. To establish this defense, PB Legacy must prove by a preponderance of the evidence all of the following:

(a) AMI represented to Primo that Primo did not have to remove all Primo animals from the AMI facility by April 30, 2016.

(b) PB Legacy relied in good faith upon AMI's representations; and

(c) PB Legacy's reliance on AMI's representations caused PB Legacy to change its position for the worse.


**V.**

Your verdict must be unanimous – in other words, you must all agree. Your deliberations are secret, and you will never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors. So you must discuss the case with one another and try to reach an agreement. While you are discussing the case, do not hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong. But do not give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you are judges – judges of the facts. Your only interest is to seek the truth from the evidence in the case.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device with access to the internet, or any social media such as Facebook or Twitter to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations. I expect you will inform me as soon as you become aware of another juror's violation of these instructions.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in this courtroom. Information on the internet or available through social media might be wrong, incomplete, or inaccurate. You are only permitted to discuss the case with your fellow jurors during deliberations because they have seen and heard the same evidence you have. In our judicial system, it is important that you are not influenced

by anything or anyone outside of this courtroom. Otherwise, your decision may be based on information known only by you and not your fellow jurors or the parties in the case. This would unfairly and adversely impact the judicial process.

When you get to the jury room, choose one of your members to act as foreperson. The foreperson will direct your deliberations and speak for you in court.

A verdict form has been prepared for your convenience.

[Explain verdict]

Take the verdict form with you to the jury room. When you have all agreed on the verdict, your foreperson must fill in the form, sign it and date it. Then you will return it to the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the court security officer. The court security officer will bring it to me and I will respond as promptly as possible – either in writing or by talking to you in the courtroom. Please understand that I may have to talk to the lawyers and the parties before I respond to your question or message, so you should be patient as you await my response. But I caution you not to tell me how many jurors have voted one way or the other at that time. That type of information should remain in the jury room and not be shared with anyone, including me, in your

57

note or question.