UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

TB FOOD USA, LLC, a Delaware
limited liability company,

Plaintiff,

v.                                                       CASE NO. 2:17-cv-00009-FtM-JES-UAM

AMERICAN MARICULTURE, INC., a
Florida corporation, AMERICAN PENAEID,
INC., a Florida corporation, and ROBIN
PEARL,

Defendants.
_____/

AMERICAN MARICULTURE, INC., a
Florida corporation,

Counter Plaintiff,

v.

PB LEGACY, INC., a Texas
corporation.

Counter and Third-Party Defendant.
_____/

**PLAINTIFF TB FOOD USA, LLC'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR A NEW TRIAL UNDER FRCP 59**

Plaintiff TB Food USA, LLC ("TB" or "Plaintiff") files this response in opposition to Defendants' Motion for a New Trial Pursuant to Rule 59 ("Mot."), and would respectfully show[1] the Court as follows:

---

[1] On November 16, 2021, the Parties submitted to the Court the full set of exhibits. As such, only the referenced trial transcripts shall be filed with this motion.

1

## ARGUMENT

### A. LEGAL STANDARD

"A losing party may also move for a new trial under Rule 59 on the grounds that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair . . . and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (internal citations omitted). "Thus, under Rule 59(a), a district court may, in its discretion, grant a new trial "if in [the court's] opinion, the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Id.* But it is imperative that a reviewing judge not substitute his or her judgment for that of the jury, so "new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great-not merely greater-weight of the evidence."[2] *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (internal quotations and citation omitted). While the Court must protect against manifest injustice in the Jury's verdict, it is not the Court's role to assess credibility where conflicting testimony has been presented during the trial. *See Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1558-1559 (11th Cir. 1984). Instead, the Court must defer to the jury on the weight to be given to each witness's testimony. *Id.*

Indeed, the remedy of a new trial set forth in Rule 59 "is sparingly used." *Andreu v. Waste Pro*, No. 17-60926-CIV-DIMITROULEAS, 2018 U.S. Dist. LEXIS 236125, at *3 (S.D. Fla. 2018) (citing *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 375 (1st Cir. 2004)); *Goodloe v.*

---

[2] "A new trial should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great— not merely the greater—weight of the evidence." *Christmas v. Rodriguez-Colon*, No. 8:17-cv-1183-KKM-SPF, 2021 U.S. Dist. LEXIS 167635, at *45 (M.D. Fla. 2021) (quoting *United States v. Sullivan*, 1 F.3d 1191, 1196 (11th Cir. 1993)).

*Daphne Utilities*, 2015 WL 4523974, at * 4 (S.D. Ala. July 27, 2015). "A district court has broad discretion in determining whether a new trial is warranted in a particular case."[3] *Andreu*, *supra*. Moreover, "[d]eference to the district court is particularly appropriate where a new trial is denied and the jury's verdict is left undisturbed." *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1247-1248 (11th Cir. 2001).

### B. DEFENDANTS ARE NOT ENTITLED TO A NEW TRIAL BASED ON PURPORTEDLY FALSE TESTIMONY

Having deservedly lost at trial, Defendants desperately attempt to get a new trial by their "Hail Mary"[4] argument that Neil and Ken Gervais (hereinafter "Neil" and "Ken," respectively) allegedly gave false testimony regarding the acquisition of Primo's founding shrimp stocks solely based on documents Defendants "fortuitously" received from Henry Uy ("Uy") and Feedmix Specialist Inc. II ("Feedmix") during trial. In support of their meritless argument, Defendants have improperly submitted in their Rule 59 motion, the affidavit of Robin Pearl sworn to December 17, 202,1 and the Declaration of Uy executed on December 16, 2021. For the reasons articulated in Plaintiff's Objections to said "sworn statements" [Doc. # 501], the Court should not consider them.

Before delving into what Defendants' burden of proof is for entitlement to a new trial on this ground and as to how Defendants woefully fail to make such a showing, Defendants' suggestion that Plaintiff, PB Legacy, and Ken wrongly withheld information from them is patently false and wholly frivolous.[5] To begin with, despite their cavils about Plaintiff's purported failure to produce the documents on which Defendants' motion primarily relies upon, it is beyond

---

[3] However, "[t]he trial judge's discretion to set aside a jury verdict based on the great weight of the evidence is very narrow." *Hewitt,* 732 F.2d at 1559.

[4] "A Hail Mary pass in American football is a long forward pass **made in desperation at the end of a game**, **with only a small chance of success**." *United States v. George*, 676 F.3d 249, 251 (1st Cir. 2012) (emphasis added).

[5] If anything, it is *Defendants* who wrongfully withheld information in this case, as they previously represented to this Court that they could not provide financial information for API after mid-2019. *See* RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL, [Doc. #s 376, at pp. 7-9, 485-1]. The testimony of Jerry Beck made clear that this representation was false. *See* TRIAL TESTIMONY NOV. 16, at pp. 135-136.

reasonable dispute Defendants never asked for them. The documents at issue date from 2011 and 2012, and therefore were not responsive to their document request, **which expressly limited its scope to documents generated on or after January 1, 2013**. *See* AMI'S FIRST REQUEST FOR PRODUCTION, attached hereto as **Exhibit A**, at Instruction G; *see also* TB FOOD'S RESPONSE TO AMI'S FIRST REQUEST FOR PRODUCTION, attached hereto as **Exhibit B**, at p. 4 (acknowledging instruction calling for production of documents after January 1, 2013, and agreeing to so limit its production); TRIAL EXHIBITS 419, KKK, LLL, MMM, OOO, PPP, QQQ. Moreover, and contrary to Defendants' suggestion, Plaintiff (at the time Primo Broodstock, Inc.) was not obligated to list Uy or Feedmix in its initial disclosures, as it did not use them to support its claims or defenses. *Stamps v. Encore Receivable Management, Inc.*, 232 F.R.D. 419, 421 (N.D. Ga. 2005) ("there is no requirement to disclose anything that the disclosing party will not use, which may include much that is harmful to its case."); *see also* FED. R. CIV. P. 26(a)(1) advisory committee's note (2000) ("A party is no longer obligated to disclose witnesses or documents, whether favorable or unfavorable, that it does not intend to use"). Finally, Feedmix and Uy are not "interested persons" within the context of this case.[6]

Turning to the merits of Defendants' argument, such as they are, it is worth noting that while their motion cites *Davis by Davis v. Jellico Community Hosp. Inc.*, 912 F.2d 129 (6th Cir. 1990) for the proposition that materially false testimony may be grounds for a new trial, **they studiously omit the three-part test *Davis* sets out for when a new trial must be granted**, to

---

[6] The Court's Interested Persons Order, Doc. # 14, asks Plaintiff (at the time, Primo Broodstock, Inc.) to disclose (1) parties with an interest in the outcome; (2) publicly traded companies whose stock price may be substantially affected by the outcome; (3) the name of any entity likely to be an active participant in the proceedings; and (4) the name of each victim of the alleged wrongful conduct. It is beyond reasonable dispute that Uy and Feedmix do not qualify under any of these categories: they have no entitlement to any recovery by Plaintiff in this action, so they have no interest in the action nor would their stock price be affected if they have one (upon information and belief, Feedmix is not publicly traded). They obviously have not been active participants in this litigation and have not been victimized by Defendants' conduct.

wit: (1) the court is reasonably well satisfied that the testimony given by a material witness is false; (2) that the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after trial; and (3) without it, a jury might have reached a different conclusion. *Id.* at 134; *see also Fisk Elec. Co. v. Solo Constr. Corp.,* No. 07-22120-CIV, 2009 U.S. Dist. LEXIS 139308, at *9 (S.D. Fla. 2009). As set forth below, Defendants failed to carry their burden and none of these factors were and can be satisfied.

        *i.     Neither Neil nor Ken Testified Falsely*

Despite Defendants' artful attempt to avoid saying so, their argument is essentially that Ken and Neil perpetuated a fraud on the Court with their alleged false testimony.[7] In short, they accuse Ken and Neil of perjury which is "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Duperval*, 777 F.3d 1324, 1337 (11th Cir. 2015). It is well-settled that proving a fraud on the court requires "clear and convincing evidence of an unconscionable plan designed to improperly influence the court in its decision." *Tarasewicz v. Royal Caribbean Cruises, Ltd.*, No. 14-CIV-60885-BLOOM/VALLE, 2016 U.S. Dist. LEXIS 186120, at *17 (S.D. Fla. 2016) (citing *Johnson v. Law Offices of Marshall C. Watson, PA*, 348 F. App'x 447, 448 (11th Cir. 2009)). As the granting of a new trial is an extreme remedy, it is unsurprising that the party seeking a new trial based on allegedly false testimony (aka perjury) has the burden of proving falsity by clear and convincing evidence. *See Weaver v. Mitchell,* No. 15 C 2950, 2019 U.S. Dist. LEXIS 7363, at *13 (N.D. Ill. 2019); *Kissinger-Campbell v. Harrell*, No. 8:08-cv-568-T-27TBM, 2009 U.S. Dist. LEXIS 137641, at *6 (M.D. Fla. 2009). Thus, Defendants must show by clear and

---

[7] False testimony also can be considered a form of "fraud" under Rule 60(b)(3), and courts have noted that there is no substantive difference in the standard for assessing a motion for new trial based on introduction of false testimony under Rules 59(a) and 60(b)(3). *Othman v. City of Chi.*, No. 11-cv-5777, 2016 U.S. Dist. LEXIS 18519, at *4-5 (N.D. Ill. 2016).

convincing evidence that the testimony at issue was willfully false, not merely the product of confusion or mistake. *See Brown v. Eppler*, 794 F. Supp. 2d 1238, 1243 (N.D. Okla. 2011). Indeed, mere inconsistencies or differences in recollection are insufficient to merit a new trial. *See Stepanovich v. Bradshaw*, Case No. 14-cv-270-PAM-BAM, 2017 U.S. Dist. LEXIS 222251, at *7 (M.D. Fla. 2017); *United States ex rel. Davis v. U.S. Training Ctr. Inc.*, 498 F. App'x 308, 321-322 (4th Cir. 2012).

Here, Defendants have not and cannot establish that the testimony Ken and Neil gave at trial was willfully false because it was not. To make this clear, it is worth looking precisely at which statements Defendants' claim were false. First, Defendants take issue with Ken's testimony that Primo's founding stocks were purchased via the Gervais family's trust, and that Primo incurred other costs. *See* MOT., at p. 8 *citing* TRIAL TESTIMONY, Nov. 4 at pp. 110-111. However, Ken continued to testify that Primo, through the trust, paid for its own founding stocks even after Defendants had a chance to cross-examine him at trial using the documents Uy provided Defendants. *See* TRIAL TESTIMONY NOV. 15, at pp. 68, 71, 94. Defendants also challenged Ken's statement that Primo paid other costs with respect to Primo's founding stocks. However, Ken continued to testify that they paid these costs in conjunction with Feedmix, which was acquiring its own set of founding stocks at the time. *See* TRIAL TESTIMONY NOV. 15, at pp. 69-70, 76, 97, 99, 107.

As for the alleged false statements Neil made, it should be viewed in the light of Defendants' tactical choice not to attempt to recall him to the stand (or, at a minimum, have him testify by video), despite having been aware of Mr. Uy's accusations at least six days before resting their case. [*See* Doc. # 483-2, at ¶ 5 (Pearl claimed he made counsel aware of statements from

6

Feedmix on November 9th)].⁸ It appears that Defendants made this choice both to maximize tactical surprise, and because Neil might have reminded them of his deposition testimony, in which he clearly stated that Primo acquired its founding stocks in conjunction with a company in the Philippines (presumably Feedmix), but that the Filipino company decided not to proceed with those animals. *See* DEPOSITION TESTIMONY OF N. GERVAIS DEC. 6, 2019, at pp. 67:13-68:21; 70:25-71:15; 117:22-118:21, attached hereto as **Exhibit C**.⁹ If recalled, Neil might also have reminded Defendants that earlier in the trial he testified the shrimp was also intended for Primo's use in the United States, and that they were initially imported as part of a joint program Primo was running with that customer. TRIAL TESTIMONY NOV. 3, at p. 8, 11.¹⁰ While counsel for the Defense strategically omitted any mention of that customer's name at the time, later testimony established that the customer at issue was Feedmix.¹¹ TRIAL TESTIMONY NOV. 15, at p. 98. In short, Neil's testimony was also not false.

Accordingly, at worst, Ken was confused as to whether Defense counsel was asking him about what the family trust contributed to Primo, not whether anyone else paid any of the ancillary costs relating to the Primo animals. TRIAL TESTIMONY NOV. 15, at pp. 78. Thus, this is grossly insufficient as a basis for granting a new trial.

Finally, even were the Court to consider Uy's Declaration, which it should not, it adds nothing to this analysis., In addition to being rank hearsay, Uy's Declaration does not prove that

---

⁸ Pearl's affidavit also establishes that he violated the Court's order by discussing the case with Mr. Uy and another Feedmix employee while on the witness stand.
⁹ Defendants' failure to follow up on Neil's deposition testimony and propound written discovery requests on Neil, or take further depositions is fatal to Defendants' disingenuous claim that "critical" discovery was withheld from them.
¹⁰ Notably, Ken testified to this in response to Defendants' counsel asking "Is it not true that those stocks were actually designed to be sold to a customer in the Philippines?" which belies Defendants' contention that the information from Uy took them by surprise. TRIAL TESTIMONY NOV. 3, at p. 8.
¹¹ There is no doubt that counsel for the Defense knew that Feedmix was the company he described as "large Filipino operation that, as of today, I don't know if anybody has talked about or mentioned." TRIAL TESTIMONY NOV. 3, at p. 11.

Neil's and Ken's testimony was false, as at best Uy's "testimony" merely makes mostly unsupported assertions that contradict their testimony.[12] Indeed, new trials cannot be granted on the basis of such weak support. *United States v. Shaw*, No. 8:09-CR-251-T-30MAP, 2011 U.S. Dist. LEXIS 116604, at *4-11 (M.D. Fla. 2011).

   ii. *Defendants were not Taken by Surprise and had a Full and Fair Opportunity to Rebut Ken and Neil's Testimony at Trial.*

Turning to the second prong of the *Davis* test, for a new trial to be granted on the basis of false testimony, that testimony must be a surprise. *See Lopez v. Aramark Unif. Career Apparel, Inc.*, 426 F. Supp. 2d 914, 974-976 (N.D. Iowa 2006); *Massi v. Walgreen Co.*, No. 3:05-cv-425 (GUYTON), 2008 U.S. Dist. LEXIS 38845, at *10-11 (E.D. Tenn. 2008); *Matthews v. Summers*, No. CV-14-00062-PHX-JAT, 2016 U.S. Dist. LEXIS 21768, at *5 (D. Ariz. 2016). In short, granting a new trial is only appropriate if the evidence was not discovered until after trial or the aggrieved party was unable to meet it at trial. *See Grassi v. Grassi,* No. 1:18-CV-02619, 2020 U.S. Dist. LEXIS 82164, at *17-18 (N.D. Ohio 2020). A new trial, therefore, is not appropriate in cases where "the jury had ample opportunity to hear the testimony of the witnesses, be apprised of the alleged inconsistencies in their testimony, and judge the truth or falsity of the evidence offered." *Franklin v. Thompson*, 981 F.2d 1168, 1171 (10th Cir. 1992). Accordingly, a new trial is inappropriate where the aggrieved party had a chance to cross-examine the witnesses at trial about the alleged false testimony. *See, e.g., Stepanovich*, 2017 U.S. Dist. LEXIS 222251; *Nosewicz v. Janosko,* Civil Action No. 16-cv-00447-PAB-KLM, 2020 U.S. Dist. LEXIS 126157 (D. Colo. 2020); *Othman*, 2016 U.S. Dist. LEXIS 18519; *Gilreath v. Cumberland Cty. Bd. of Educ.*, 304

---

[12] Defendants' use of Uy's affidavit is questionable at best, considering that they could have sought to have him testify at trial (at least by video), but made the choice not to do so.

F.R.D. 481, 485-486 (E.D.N.C. 2015); *Wolde-Giorgis v. Christiansen*, 438 F. Supp. 2d 1076 (D. Ariz. 2006).

Here, Defendants were able to meet the allegedly false testimony and introduce evidence at trial that they believed contradicted it.

It is beyond dispute that Defendants had the opportunity to introduce the emails received from Mr. Uy into evidence, were able to cross-examine Ken about them, and attempted to impeach him with his own alleged prior inconsistent statements. *See* TRIAL EXHIBITS KKK, LLL, MMM, OOO, PPP, QQQ; TRIAL TESTIMONY NOV. 15, at pp. 67-96, 103-107. Having both attempted at trial to impeach Ken with this allegedly false testimony and the opportunity to argue that Ken testified falsely at trial, a new trial is clearly not an appropriate remedy. Instead, all Defendants could do (and what they did do) is argue that these supposed revelations undermined Ken's credibility. However, since determinations of witness credibility are the exclusive province of the jury, they were entitled to find Ken's testimony credible and enter a verdict for the Plaintiff. *See U.S. v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997) (determinations of witness credibility fall within the exclusive province of the fact-finder and may not be revisited unless the testimony is incredible as a matter of law); *see also Alston v. Swarbrick*, 954 F.3d 1312, 1320 (11th Cir. 2020) (civil case applying incredibility standard).

Similarly, this factor of the *Davis* test also prevents granting a new trial based on Neil's testimony.  First, as discussed above, Neil testified to Primo's early involvement with Feedmix both in his deposition and at trial. *See* Exhibit "C" at pp. 67:13-68:21, 70:25-71:15, 117:22-118:21; TRIAL TESTIMONY NOV. 3, at p. 8, 11. As such, Defendants clearly could have asked him about this issue when cross-examining him.[13] Moreover, Defendants' case for a new trial is fatally

---

[13] Defendants' failure to follow up on Neil's deposition testimony and propound written discovery requests on Neil, or take further depositions makes clear that, to the extent, Defendants were actually surprised about the association

9

undermined by the fact that they made no effort to recall Neil to the stand, despite having been in touch with Mr. Uy and Feedmix at least five days before resting their case. In the age of video testimony, it is likely that Neil could have been compelled to testify despite no longer being in the courtroom. At a minimum, it was incumbent on Defendants to request a continuance so Neil could be recalled. *See, e.g., U.S. Fid. Guar. v. Baker Material*, 62 F.3d 24, 29 (1st Cir. 1995); *Hancock v. Wash. Hosp. Ctr.*, 13 F. Supp. 3d 1, 9 (D.D.C. 2014); *Lipsett v. University of Puerto Rico*, 759 F. Supp. 40, 47 (D.P.R. 1991). Having chosen not to do so, Defendants have waived their right to seek a new trial on this ground.

       *iii.*    *The Testimony Complained of Would not Have Changed the Result*

Even if, *arguendo* the testimony at issue here was both false and a "surprise", and it was neither, under the *Davis* test a new trial may only be warranted if the falsehood was material. *See Gibson v. Total Car Franchising Corp.*, 223 F.R.D. 265, 279-82 (M.D.N.C. 2004); *Gilreath,* 304 F.R.D. at 485-486. The test for this factor is whether it probably would have changed the result. *Xiong v. Knight Transporation, Inc.*, 77 F. Supp. 3d 1016, 1024 (D. Colo. 2014). Here it would have made no difference.

First, as discussed above, Defendants were aware of this material during trial and used it to impeach Ken and to impugn Neil's credibility during their closing argument. TRIAL TESTIMONY NOV. 15, at pp. 215-216. As such, there can be no argument that the allegedly false testimony **would have changed** the jury's mind for reasons of credibility since Defendants presented and argued the alleged false testimony to the jury which found for Plaintiff anyway (whether the jury deemed it irrelevant or found Ken and Neil credible or both).

---

between Ken, Neil, the Filipino Company, and Primo's obtainment of shrimp from Ecuador for creating Primo's founding stocks, it was the product of their own lack of diligence.

Second, the testimony made no material substantive difference to the outcome. Even if, *arguendo,* the jury were to believe that Feedmix, not Primo, owned the animals, the result is the same.[14] After all, even if the Court were to agree with Defendants that the evidence did not support a finding that Primo owned its founding stocks, it still would not change the result. Under the Uniform Trade Secret Act, upon which the Florida Uniform Trade Secrets Act ("FUTSA") FLA. STAT. 688.001-688.009 is modeled, courts from around the country have concluded that the relevant inquiry is whether a party seeking relief for misappropriation of a trade secret possessed a trade secret, not whether it owned it. *See, e.g., Advanced Fluid Sys., Inc. v. Huber*, 958 F.3d 168, 177-178 (3d Cir. 2020); *DTM Research, L.L.C. v. AT & T Corp.*, 245 F.3d 327, 331-332 (4th Cir. 2001); *BladeRoom Grp. Ltd. v. Facebook, Inc.*, 219 F. Supp. 3d 984, 990 (N.D. Cal. 2017); *Candy Craft Creations, LLC v. Gartner*, CV 212-091, 2015 WL 1541507 (S.D. Ga. Mar. 31, 2015); *Metso Minerals Industries, Inc. v. FLSmidth-Excel LLC*, 733 F. Supp. 2d 969, 976 (E.D. Wis. 2010); *Fast Capital Marketing, LLC v. Fast Capital LLC*, CIVIL ACTION No. H-08-2142, 2008 WL 5381309 (S.D. Tex. Dec. 24, 2008). Here, it is beyond dispute that Primo was in possession of its trade secrets, and as such, has the right to recover its damages for Defendants' misappropriation of them.

Similarly, under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, there can be no question of ownership since Feedmix sat on its rights for ten years, long past the expiration of the statute of limitations to challenge Primo's alleged conversion. *See, e.g.*, FLA. STAT. § 95.11(3)(h) (Florida has a four-year statute of limitations for "taking, detaining or injuring personal property"); TEX. CIV. PRAC. & REM. CODE §16.003(a) (Texas has a two-year statute of limitations for conversion of physical property). Accordingly, at bottom, Primo and TB have legal

---

[14] As discussed in PLAINTIFF'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW [Doc. # 489] Ken and Neil testified extensively that Primo owned their founding stocks and the jury was entitled to find that testimony credible.

or, at least, equitable title to the shrimp and the genetic information therein, which is more than sufficient for DTSA purposes.[15] *See* 18 U.S.C. § 1839(4) (defining owner as "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed.").[16]

### C. THE JURY'S DAMAGE AWARDS ON COUNTS IV AND V ARE REASONABLE

Defendants next complain about the jury's award of $9.9 million on Plaintiff's DTSA and FUTSA claims. At a threshold matter, the jury clearly intended this to be an award of $9.9. million not, as Defendants suggest, duplicate awards of $4.95 million. TRIAL TESTIMONY, Nov. 19 at p. 29.

Turning to the merits of Defendants' motion, the first inquiry is what law applies to this question. Florida law governs the jury's verdict under FUTSA. *See Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1529 (11th Cir. 1997). The DTSA claim, however, is governed by Federal law. Fortunately, the result is the same for both claims, as under Federal law, "a jury verdict may be vacated as excessive **only if it is so large as to shock the conscience**." Sykes v. McDowell, 786 F.2d 1098, 1105 (11th Cir. 1986) (emphasis added). Similarly, under Florida law, a court "should never declare a verdict excessive merely because it is above the amount which the court itself considers the jury should have allowed." *Odom v. R.J. Reynolds Tobacco Co.*, 254 So. 3d 268, 277 (Fla. 2018) (internal citations omitted). Instead, "the verdict must be so excessive or so

---

[15] The DTSA defines "owner" of a trade secret as "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed." 18 U.S.C. § 1839(4). Further, "trade secrets can be jointly owned and, in fact, a joint owner can bring a claim for trade secret misappropriation against the other owner." *Genesis 1 Oil Servs. LLC v. Wismann Grp., LLC*, No. 8:20-cv-02114-JLS-ADS, 2021 U.S. Dist. LEXIS 54940, at *15-16 (C.D. Cal. 2021)

[16] Finally, Defendants devote a footnote to the proposition that the emails received from Feedmix and Mr. Uy's affidavit constitute newly discovered evidence meriting the granting of a new trial. However, it is well-established that evidence that could have been presented prior to the entry of judgment cannot constitute "newly discovered evidence" under Rule 59. *See, e.g., Michael Linet, Inc. v. Village of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005). Rather, where a party moves for a new trial based on newly discovered evidence, their motion "must not be based on evidence or incidents of which Defendants had knowledge prior to return of the jury verdict." *Edwards v. Hyundai Motor Mfg. Alabama*, 701 F. Supp. 2d 1226, 1233 (M.D. Ala. 2010) (quoting *United States v. Calderon*, 127 F.3d 1314, 1351 (11th Cir. 1997)).Here, as the parties' extensive discussions of the impact this evidence had at trial indicate, they clearly could have been (and, in fact, were) presented prior to the jury's returning its verdict.

inadequate so as at least to imply an inference that the verdict evinces or carries an implication of passion or prejudice, corruption, partiality, improper influences, or the like." *Id.* In determining whether a jury verdict is excessive, Florida law dictates that the Court should consider:

> (a) whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact; (b) whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable; (c) whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture; (d) whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and (e) whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

FLA. STAT. §768.74(5).

Here, all of these factors are met, as the Jury calculated a reasonable damages award below what could have been justified by the evidence at trial.[17] Specifically, given the evidence presented at trial, the Jury could have reached its damages number through either an unjust enrichment or a reasonable royalty calculation, both of which are permissible under the DTSA and FUTSA. *See* 18 U.S.C. § 1836(b)(3)(B); FLA. STAT. §688.004.

In pursuing unjust enrichment damages, "[a] plaintiff's burden of proof . . . is 'liberal' and is satisfied by showing the misappropriation, the subsequent commercial use, and . . . evidence by which the jury can value the rights the defendant has obtained." *Advantor Sys. Corp. v. DRS Technical Servs., Inc.*, 678 F. App'x 839, 853 (11th Cir. 2017); P*remier Lab Supply, Inc. v. Chemplex Indus., Inc.*, 94 So. 3d 640, 644 (Fla. Dist. Ct. App. 2012). All a claimant needs to prove in terms of damages for DTSA or FUTSA case is that there is proof of a reasonable basis from which the amount can be inferred or approximated. *Premier*, 94 So. 3d at 644.

---

[17] If anything, the damages aware was too *low*. *See* PLAINTIFF'S MOTION FOR ENHANCED/EXEMPLARY DAMAGES, PRE AND POST JUDGEMENT INTEREST, AND DISGORGEMENt [Doc. # 488].

Here, two non-duplicative reasonable bases for inferring the amount by which Defendants have been unjustly enriched were adduced at trial in the form of (1) financial statements that include Defendants' profits from broodstock sales and (2) expert testimony as to the value of the "head start" Defendants received. Since Defendants changed their bookkeeping practices in 2019, the analysis of what profits constitute unjust enrichment changes slightly but is equally straightforward.

First, the amount by which Defendants were unjustly enriched between 2016 and mid-2019 is readily discerned from their broken-out financial statements. Specifically, for the period between 2016 and 2019, API's revenues were derived from breeder sales that either came from Primo genetics or were derived from Primo genetics. *See* TRIAL EXHIBITS 236, 237, 238, 239; TRIAL TRANSCRIPT NOV. 8, at pp. 85, 87-88, 94-95, 101-102, 107-108. Moreover, it is beyond reasonable dispute that API was paying "AMI" for ill-defined "broodstock grow-out services." *See* TRIAL TRANSCRIPT NOV. 8, at pp. 86, 98-99, 102-103, 110. Thus, Defendants were unjustly enriched in an amount equal to API's gross profits during this time, plus the amount of internal transfers between API and AMI for grow-out services. These amounts come to $10,853,609.43, which breaks down as follows:

| Year | API Gross Income | API Growout Services Payments | Annual Total |
|---|---|---|---|
| 2016 | $346,977.85 | 421,784.00 | $768,761.85 |
| 2017 | $64,643.42 | 1,087,511.00 | $1,152,154.42 |
| 2018 | $2,287,655.79 | 3,399,297.39 | $5,686,953.18 |
| 1H2019 | $1,599,515.52 | 1,646,224.46 | $3,245,739.98 |
| **Total** | **$4,298,792.58** | **$6,554,816.85** | **$10,853,609.43** |

TRIAL EXHIBITS 236, 237, 238, 239.

In June 2019, however, Defendants stopped creating separated financials for API. *See* TRIAL EXHIBITS 235, 239, 414-416; TRIAL TRANSCRIPT NOV. 8, at pp. 105, 107-108, 110-113, 126-127; TRIAL TRANSCRIPT NOV. 15, at pp. 135-136. Nonetheless, Defendants continued to profit

unjustly off their misconduct after June 2019. *See id.* As Pearl admitted under oath, a majority of AMI's consolidated profits during this time were due to API breeder sales in which an overwhelming majority was due to sales of Primo-descended API High-Vigor shrimp. *See* TRIAL TRANSCRIPT NOV. 8, at pp. 112-119, 120-122. Accordingly, since AMI/API had profits of $1,668,891.09 in 2019/20 and $836,755.80 in 2020/21, it follows that at least half of this amount, i.e. $1,252,823.45, represented profits by which they were unjustly enriched. *See* TRIAL EXHIBITS 415, 416. Accordingly, all told, it would have been reasonable for the jury to conclude that Defendants were unjustly enriched by at least $12,106,432.88 in profits.

In addition, Defendants also unjustly profited from the head start they obtained through misappropriating Plaintiff's trade secrets. As numerous witnesses testified, Defendants obtained a head start via their misappropriation of Primo/TB's trade secrets which saved Defendants significant development time and millions of dollars in investment costs to develop high-disease resistant shrimp equivalent to Primo/TB's shrimp as well as maintaining and improving said resistance. *See* TRIAL EXHIBITS 41, 219, 265; TRIAL TRANSCRIPT NOV. 2, at pp. 20-23, 194-195, 203; TRIAL TRANSCRIPT NOV. 3, at pp. 12, 153; TRIAL TRANSCRIPT NOV. 8, at pp. 29, 45-49, 53-54; TRIAL TRANSCRIPT NOV. 10, at pp. 111-112, 117, 125-126, 131-134, 139, 143-144, 165; TRIAL TRANSCRIPT NOV. 12, at pp. 14-16, 21, 27-29, 33-39, 41-42, 44-49, 51, 64-65, 80, 83, 87-89, 92, 116, 127-128, 177, 211-213, 215-216, 218-219. As the aforementioned cited to trial exhibits and testimony demonstrate, Neil Gervais, Carlos Massad, Granvil Treece, and Dr. Wyban all agreed that since 2016 Ecuador banned exportation of nauplii and breeders, and as such, just getting viable shrimp from Ecuador for starting a genetic program and creating high disease-resistant shrimp similar to Primo/TB is extremely difficult and cost-prohibitive.

Indeed, Neil Gervais, Mr. Massad, Mr. Treece, and Dr. Wyban all agreed that even if one was able to obtain Ecuadorian shrimp, it would take at least two to three years to clean them to make them SPF to import. *See id.* Additionally, all four witnesses agreed that it takes millions of dollars in investment and cost to selectively breed. *Id.* Mr. Treece testified based upon his education, years of experience in the field of aquaculture, first-hand knowledge, review of the relevant literature, review of the file materials including various exhibits, deposition and trial testimony, that the head start Defendants obtained saved them approximately 15 to 18 years on the low end of independent development time which would include approximately an annual cost of $1.5 million plus and an additional $200K to $300K for genetic testing based upon a comparison to similar genetic programs. *See* TRIAL TRANSCRIPT NOV. 12, at pp. 41-46, 89. Thus, based upon Mr. Treece's expert opinions, Defendants realized a benefit of $22 to $27 million from their head start.

Turning to the issue of a reasonable royalty, evidence was adduced at trial that gave the jury a clear indication of what a reasonable royalty would be. Specifically, API itself licensed the use of the shrimp genetics it derived from Primo's trade secrets, granting a one-year license to Shandong North Gulf Alliance Co, Ltd. to use its shrimp for $1.5 million. *See* TRIAL EXHIBIT 78; TRIAL TRANSCRIPT NOV. 8, at pp. 69-71. Applying the rate API used to license Primo's shrimp genetics to others would be more than reasonable. In addition, such a license would need to go back retroactively to the date of Defendants' misappropriation, May 1, 2016, and would need to last for the 15-18 years that Mr. Treece testified it would take for API to develop Primo shrimp on its own. *See* TRIAL TRANSCRIPT NOV. 12, at pp. 41-46, 89. Accordingly, under a reasonable royalty

analysis, the jury could have defensibly entered a verdict awarding Plaintiff a total of $22.5 to $27 million, let alone the $9.9 million it actually awarded Plaintiff.

Accordingly, Defendants' Motion for a New Trial should be denied on this ground as well.

## CONCLUSION

For the reasons set forth above, Plaintiff hereby requests that Defendants American Penaeid, Inc's and Robin Pearl's Renewed Motion for a New Trial Pursuant to Rule 59 be denied in its entirety and that the Court grant Plaintiff such other relief as is just and proper.

Dated: January 7, 2022

Respectfully submitted,

By: /s/ *Brian M. Gargano*
Brian M. Gargano (admitted *pro hac vice*)
BOGC LEGAL PLLC
3040 Post Oak Blvd.
Suite 1800-150
Houston, TX 77056
Phone: 713-970-1066
Brian.Gargano@bogclegal.com

and

Chené M. Thompson / FB# 541540
PAVESE LAW FIRM
Post Office Box 1507
Fort Myers, Florida 33902-1507
Telephone No.: (239) 334-2195
Primary: CheneThompson@paveselaw.com
Secondary: KellyGermanis@paveselaw.com

*Counsel for Plaintiff TB Food USA, LLC*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that in accordance with the Federal and Local rules the foregoing document is being filed on this 7th day of January 2022 via the Court's CM/ECF filing system, which will serve a copy electronically on all counsel of record.

                                                    */s/ Brian M. Gargano*
                                                    Brian M. Gargano