IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

TB FOOD USA, LLC, a Delaware
Limited Liability Company,

   Plaintiff,

v.                           CASE NO. 2:17-cv-9-FtM-29 NPM

AMERICAN MARICULTURE,
INC., a Florida Corporation, et al.,

   Defendants.

_____/

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF TB FOOD'S
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

Pursuant to Local Rule 3.01, Defendants AMERICAN MARICULTURE, INC.

("AMI"), AMERICAN PENAEID, INC. ("API") and ROBIN PEARL (together,

"Defendants"), by and through their undersigned counsel, submit this response in

opposition to Plaintiff TB Food USA, LLC's Renewed Motion for Judgment as a

Matter of Law (the "Rule 50(b) Motion"), and in support thereof, state as follows:

**I.**     **Plaintiff Presents No Basis for Overturning the Jury's Verdict Finding
No Liability for Any Claim as to Defendant AMI.**

As a preliminary matter, Plaintiff correctly states that "[b]ecause the Rule

50(b) motion is only a renewal of the preverdict motion, it can be granted only on

grounds advanced in the preverdict motion." Connelly v. Metro Atlanta RTA, 764

F.3d 1358, 1363 (11th Cir. 2014) (citing Fed.R.Civ.P. 50); see also, Austin-Westshore

Const. Co. v. Federated Dep't Stores, Inc., 934 F.2d 1217, 1222 (11th Cir. 1991)

("Parties who fail to raise certain issues in their motion for directed verdict are

precluded from raising such issues in their JNOV motion"). The Rule 50(b) Motion fails to set forth any demonstration that its unstated claim for alter ego was made prior to the jury's verdict, and a review of the trial transcript demonstrates conclusively that no such argument was ever made under Rule 50(a). (Doc. #486 at 3 (citing (Doc. # 480 at 23-30) for the entirety of Plaintiff's preverdict motion). Because Plaintiff failed to advance any argument as to alter ego in its preverdict motion, it is precluded from raising that issue on renewal under Rule 50(b).

Likewise, Rule 50(b) provides that a party may file a renewed motion for judgment as a matter of law, "if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged." Fed.R.Civ.P. 50(b). It is undisputed that the jury's verdict did not address any claim for alter ego liability (or any variation thereof). (Doc. #465). As a result, any "renewed" motion on that issue was due within 28 days of the discharge of the jury on November 19, 2021, making the filing deadline under Rule 50(b) December 17, 2021.  Plaintiff failed to file its Rule 50(b) Motion until December 29, 2021, some twelve days after the deadline under Rule 50(b) had lapsed. Because, with respect to its unstated claim for alter ego liability, Plaintiff failed to file its Rule 50(b) Motion within the deadline established by Rule 50(b), the Court should decline to consider it.

Turning to the substance of Plaintiff's argument, Plaintiff seeks to overturn the clear and unequivocal verdict of the jury that AMI was specifically not liable

for any of its seven claims. (Doc. #465). In so doing, Plaintiff relies on a series of straw men and a concluding *non sequitur* to argue that "the jury could not have found that API and Pearl induced AMI to breach its duty to maintain secrecy without also finding that AMI breached that duty." (Doc. #486 at 4). First, the straw men: Plaintiff states a series of "deductions" regarding AMI that the jury hypothetically made with respect to its finding of liability against API and Mr. Pearl. (Doc. #486 at 3).[1] Not one of the "deductions" stated by Plaintiff is supported by any citation to the record evidence or, more importantly, to the Verdict. Plaintiff then attempts to bootstrap these "deductions" into a conclusion that API and Pearl necessarily induced AMI to breach a duty of confidentiality. (Doc. #486 at 4). It is a *non sequitur* to state that the jury could not have found API and Mr. Pearl liable for Plaintiff's claims without also finding AMI liable. Indeed, if that were true, there would be no need for the jury to specify which, if any, of the Defendants were liable

---

[1] Thus, for example, Plaintiff states, without evidence, that "the jury deduced that API and Pearl used improper means to acquire the trade secret through 'inducement of a breach to maintain secrecy' and/or because they were 'derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.'" (Doc. #486 at 3 (citing Fla. Stat. §688.002). There are at least six separate bases contained within the definition of "misappropriation," contained in Chapter 688.002, Florida Statutes, upon which a jury might conclude that misappropriation by API and Mr. Pearl had occurred. And the Court's Instructions to the Jury provide at least four separate bases of potential liability. (Doc. #456 at 36-38). Plaintiff hypothesizes that the jury must have zeroed in on inducement or derivation, but cannot differentiate between the two. A review of the trial testimony demonstrates that Plaintiff presented no evidence of any alleged inducement of AMI by API or Mr. Pearl, and the fact that API and Mr. Pearl may have known of AMI's alleged usage limitations does not make AMI liable for misappropriation.

for each claim, as was stated in the Verdict, the form of which was approved by Plaintiff's counsel. (Doc. #465); see also, (Doc. # 480 at 22:19-23:10). No objection to an individual determination of liability was raised.

Indeed, the jury was presented with substantial evidence of the division of operations as between AMI and API, including the following testimony from one of AMI's founding shareholders, Mr. Jerry Beck:

> Q. And can you explain why -- did you participate in the decision to create a completely separate company now known as API?
> A. Yes, I would say I did -- I was part of that decision group, yes.
> Q. Okay. And why not just do it under AMI?
> A. They're two different businesses. We started AMI as a production company to grow shrimp to sell dead shrimp to supermarkets and restaurants.
> Q. Uh-huh.
> A. API was a different business. We'd started this Grow-Out Agreement with Primo and then subsequently we -- well, we hoped to do it with other companies and we did do it with other companies. It's a different revenue stream and it was really just an accounting thing. It's just we wanted to separate the two revenues streams. We wanted to have one company pay expenses to the other company. So API would pay grow-out fees to AMI just like Primo would pay grow-out fees to AMI [...].

(Doc. # 479 at 134:7-135:1). The jury was further instructed that it was API, and not AMI, that engaged in the genetic analysis that Plaintiff claims constitutes the disclosure of its alleged trade secrets:

> Q. Did Neil participate in identifying the founding stocks of API?
> A. Yes, he did.
> Q. How did he participate?
> A. He brought in Dr. Franklin Perez from Ecuador and he worked with Dr. Perez for two or three days to, basically, go to every single

4

> tank that we had on the farm and do a – do a -- grab animals and they would take a blood sample from every animal. And I think maybe 100 animals per tank or something like that. And then Dr. Perez would -- took that information, the blood samples, back to Ecuador and he analyzed it.

(Doc. # 472 at 38:3-13). Indeed, Plaintiff admits that it was API (and not AMI) that allegedly engaged in misappropriation where it admits that "Dr. Perez … unlock[ed] the genetics for API." (Doc. #486 at 10).[2] As such, it was perfectly reasonable and consistent with the evidence presented for the jury to find that only API and Mr. Pearl "acquired, disclosed, or used" Plaintiff's alleged trade secret and that AMI did not.[3] See 18 U.S.C. §1839; Fla. Stat. §688.002; (Doc. # 456 at 26-39). Indeed, such a conclusion is far more likely than Plaintiff's series of tortured "deductions" leading to its concluding *non sequitur*.[4] More to the point, Plaintiff's hypothetical divinations of the unexpressed mind of the jury in this case clearly

---

[2] Contrary to Plaintiff's repeated statements that this genetic analysis was nefariously orchestrated by AMI, the Court will remember that it was Neil Gervais, Chief Science Officer for Primo, that presented Dr. Perez to API for the subject analysis and gave his (and Primo's) approval for same. (Doc. # 472 at 38:24-39:18).

[3] Meanwhile, Plaintiff's repeated and insistent argument that AMI breached the NDA and GOA was disposed of by the jury with its unequivocal finding that, in both instances, Primo was at least equally at fault for such breaches. (Doc. # 465 at 3). This issue is discussed in more detail with respect to Defendants' *in pari delicto* defense below.

[4] Plaintiff's statement that the evidence shows that Mr. Pearl acted on behalf of AMI alone is an outright misrepresentation. (See Doc. #486 at 5 (citing testimony of Jerry Beck for that assertion that Mr. Pearl "was at all times acting on behalf of AMI, not himself.")). In reality, Mr. Beck testified that Mr. Pearl was "acting on behalf of the companies," meaning AMI or API, and not AMI alone, as Plaintiff falsely claims.

do not provide a basis for overturning the jury's express determinations and entering a contrary judgment as a matter of law.

Admitting the weakness of its principal argument, Plaintiff then changes tack by arguing that AMI should be held liable for the actions of API and Mr. Pearl under a theory of alter ego. As stated repeatedly at trial, Plaintiff failed to plead any claim for alter ego in the underlying proceeding. See Marsar v. Smith & Nephew, Inc., No. 8:13-CV-1244-T-27TGW, 2013 WL 4413722, at *2 (M.D. Fla. Aug. 14, 2013); see also Big Pond Prod., LLC v. Team Marine, U.S.A., LLC, No. 4:11-CV-511-MW/CAS, 2014 WL 12480484, at *2 (N.D. Fla. May 27, 2014). Plaintiff also failed to present any evidence of its unstated claim for alter ego for the jury's consideration.[5] Indeed, a review of the trial transcript reveals that the terms, "alter ego," "corporate veil," and "mere instrumentality," were never uttered by Plaintiff's counsel before the jury. These facts were implicitly recognized by the Court in its denial of Plaintiff's request for a jury instruction on alter ego:

> [THE COURT:] Any other jury instruction issues we need to cover or that you need to put your final objections on the record to?
> MR. O'CONNOR: None from defendants, Your Honor. Thank you.
> MR. GARGANO: Your Honor, the only one I -- and I'm not sure if it's germane, given how the verdict sheet is laid out, but piercing the corporate veil, particularly, as to API. I didn't know if that -- an instruction or a finding needed to be included on that or whether or not, because of the statutory causes of action, it doesn't matter. Because our position would be, if you

---

[5] Issues relating to alter ego and piercing the corporate veil are questions of fact determined by the jury. See, e.g., House of Koscot Dev. Corp. v. Am. Line Cosmetics, Inc., 468 F.2d 64, 65 (5th Cir. 1972); Walton v. Tomax Corp., 632 So. 2d 178 (Fla. 5th DCA 1994).

found against just API, you should also be finding against AMI because it's one in the same.

THE COURT: I guess I'm not clear. On the one hand, you say it may not matter and, on the other hand, you say it may.

MR. GARGANO: Well, I think the concern we have is that if there's a finding of just against API, API closes shop and AMI just rides off into the sunset and we think that AMI needs to be held accountable for API.

THE COURT: Well, that's the way it always is. I mean, that's the benefit and the curse of the corporate form, I guess.

MR. GARGANO: Right. And our position is that we've established that we've pierced that corporate form, especially based on the testimony that Mr. Beck gave yesterday.

THE COURT: Mr. O'Connor?

MR. O'CONNOR: Your Honor, we would disagree with that. There are no allegations relating to piercing the corporate veil in the amended complaint. No discovery was done on piercing the corporate veil. You know, I think this is an eleventh-hour attempt to expand the potential zone of liability. And, as to the evidence, we think it's pretty clear that every act that was taken by Mr. Pearl was done, you know, either for AMI here in the United States or API in the international arena. So we would disagree strongly.

THE COURT: All right. The Court will deny the request for an additional jury instruction. <u>The Court finds that the instructions given sufficiently cover the matter to the extent that it's raised in either the pleadings or in the evidence presented, both instructions and the verdict form, I would find to be sufficient to cover that area.</u>

(Doc. #480 6:14-8:4 (emphasis added)). Because Plaintiff failed to plead or present evidence as to any unstated theory of alter ego, Plaintiff's argument is likewise inappropriate for inclusion in a motion under Rule 50(b) and should be denied.

Moreover, Plaintiff misrepresents the record evidence to suit its argument. Thus, for example, Plaintiff cites extensively to Trial Exhibit 397 as evidence that "AMI and Pearl schemed up three ways to obtain and use Primo's trade secrets and confidential information …" (Doc. #486 at 8). Even a cursory review of that document reveals that it originated with API, which was formed

7

contemporaneously with the development of the document in December 2015, as a proposal to form a joint venture with Neil Gervais utilizing animals that belonged to Neil Gervais, who both publicly and privately claimed exclusive ownership thereof. (Doc. # 472 at 31:15-25). Plaintiff's attempt to attribute this document to AMI in order to bolster its eleventh-hour argument on alter ego in order to overturn the express determinations of the jury is nothing short of an egregious and self-serving misrepresentation of the evidence.

In summary, contrary to the requirements of Rule 50(b), Plaintiff's arguments on alter ego were not raised at the close of evidence. Plaintiff further failed to submit such argument within 28 days of the jury's discharge, as likewise required. Plaintiff failed to plead any alter ego argument, and it failed to present any evidence or argument relating to an alter ego argument to the jury. Substantively, Plaintiff has presented no evidence to support its fallacious reasoning that AMI is necessarily liable for all claims such that the jury's verdict should be overturned. Thus, Plaintiff's alter ego argument should be denied.

## II.     Plaintiff Presents No Basis for Overturning the Jury's Verdict on Defendants' Defense of *In Pari Delicto*.

The balance of Plaintiff's Rule 50(b) Motion relies upon an argument that, contrary to the jury's findings, Primo engaged in no substantial wrongdoing with respect to the NDA, so that AMI's *in pari delicto* defense fails, and the Court should overrule the Verdict to hold AMI liable for both breach of contract and unfair

competition. (Doc. #486 at 11-19). Contrary to Plaintiff's argument, the jury was presented with substantial evidence of Primo's malfeasance, including (1) the authorization, facilitation, and participation of its Principal Shareholder and Chief Science Officer in the alleged misappropriation; (2) the theft of broodstock that became Primo's founding stocks from its rightful owner, Feedmix; and (3) Primo's fraudulent agreement to release AMI from its obligations under the NDA and the GOA by virtue of the handwritten agreement. Any one of these proven facts is sufficient to support a finding of *in pari delicto*. Taken together, such conduct— particularly the theft of broodstock intentionally concealed by Plaintiff through, *inter alia*, discovery violations and outright perjury—cries out for redress as requested in Defendants' Renewed Motion for Judgment as a Matter of Law (Doc. # 484), Defendants' Motion for a New Trial (Doc. # 483), and Defendants' Renewed Motion for Sanctions (Doc. # 487).

In this case, the jury was ably instructed by the Court on AMI's defense of *in pari delicto* as follows:

> AMI's next affirmative defense is referred to as the *in pari* delicto defense, which means "in equal fault." AMI asserts that Primo was at least equally at fault in the same wrongdoing, and therefore may not recover damages resulting from that wrongdoing. Specifically, AMI claims that any damages alleged by TB Food result primarily or equally from Primo's wrongdoing, including Primo's prior breaches of the Grow-Out Agreement and the handwritten document modifications. To establish this defense, AMI must prove the following by a preponderance of the evidence:
> 
> (a) Primo participated in the same alleged wrongdoing as AMI; and

> (b) Primo bears at least substantially equal responsibility for the damages it claims to have suffered from the alleged breach of contracts.

(Doc. #456 at 20). The jury returned its Verdict finding, in pertinent part, that "AMI has proven by a preponderance of the evidence that the breach of contract claim is barred by the *in pari delicto* defense." (Doc. #465 at 4). Thus, the jury determined as a factual matter that "Primo participated in the same alleged wrongdoing as AMI," and "Primo bears at least substantially equal responsibility for the damages it claims for have suffered from the alleged breach of contracts."

It is not unusual for the defense of *in pari delicto* to be left to the determination of the jury, particularly where, as here, such requires factual determinations regarding the Plaintiff's participation in the alleged wrongdoing. See, e.g., City of St. Petersburg, Florida v. Wells Fargo Bank, N.A., 8:10-CV-693-T-TBM, 2012 WL 12904222, at *2 (M.D. Fla. Aug. 9, 2012) (finding that "the court properly instructed the jury on the matter of mitigation, damages, and the *in pari delicto* defense"). Indeed, a jury determination is particularly appropriate in this case, where one of Plaintiff's principal shareholders was directly involved in the alleged wrongdoing. The "*in pari delicto* doctrine bars recovery by a corporation whose sole shareholder is engaged in wrongdoing …." Liquidation Com'n of Banco Intercontinental, S.A. v. Renta, 530 F.3d 1339, 1355 (11th Cir. 2008) (citing

10

<u>Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards</u>, 437 F.3d 1145, 1149 (11th Cir. 2006)). The Eleventh Circuit explained that

> [t]he defense is not available *because* of the wrongdoer's ownership of a plaintiff corporation, but because of his agency relationship with it. Indeed, <u>wrongdoing by a mere employee might be a sufficient basis for the defense in some cases</u>. [C]orporations act only through their agents, and an agent's guilty conduct and knowledge is typically imputed to his principal.

<u>Renta</u>, 530 F.3d at 1355 (italics in original; underline added for emphasis). <u>Renta</u> is further clear that the question of whether such conduct precludes recovery under *in pari delicto* "typically presents a jury question." <u>Renta</u>, 530 F.3d at 1355 (citing <u>Bank of China, New York Branch v. NBM LLC</u>, 359 F.3d 171, 179 (2d Cir. 2004)).

The jury was presented with testimony to demonstrate that Neil Gervais promoted, facilitated, and participated in the very act of genetic testing, which Primo alleged to constitute breach of both the NDA and the GOA. Specifically, Neil Gervais testified to his participation as follows:

> Q. Right. That's when you --
> A. Okay?
> Q. That's when you recommended Dr. Franklin Perez for the –
> A. Yes.
> Q. -- PCR testing?
> A. Correct.

(Doc. # 468 at 34:22-35:3).

> Q. All right. So you, as Primo, you were the one that suggested this PCR testing and Dr. Franklin Perez; correct?
> A. Yes, I suggested.

(Doc. # 468 at 35:22-24). These statements were corroborated by the testimony of Mr. Pearl, who further detailed Neil Gervais' authorization, facilitation, and knowing participation in the alleged breaches.

> Q. Who was it that put together the -- let me back up. The idea of genetic testing, where did that originate?
> A. Mr. Neil Gervais.
> […]
> Q. Okay. At that point, was Neil Gervais an owner of Primo?
> A. Yes, he was.
> Q. Okay. Was he the Chief Science Officer of Primo?
> A. Yes, he was.
> Q. Did you understand he was giving you permission to genetically test those stocks?
> A. Yes, he did.
> Q. Who was it that put together the personnel that were -- that was required in order to do this genetic testing?
> A. Neil Gervais.
> ***
> Q. Okay. In fact, Neil participated in all stages of the development of API; is that right?
> A. Yes, he did.
> Q. And did he give you permission to make plans based on his animals?
> A. Yes, he did.
> Q. Including to use them as the founding stocks for API?
> A. Yes, he did.

(Doc. # 472 at 38:23-39:18), (Doc. # 472 at 46:9-16).

Mr. Pearl testified that AMI looked to Neil Gervais (and not Ken Gervais) as the driving force and decision maker behind Primo. (Doc. # 471 at 162:12-164:8). And Ken Gervais testified that Neil Gervais both held an equal interest in Primo and that Primo had no shareholder agreement to define who had the right to take

decisions for the corporation. (Doc. # 469 at 113:11-114:4). Thus, the evidence showed that Neil Gervais, acting as Principal Shareholder and Chief Science Officer for Primo, authorized, facilitated, and actively participated in the wrongdoing alleged by Primo to constitute breaches of both the NDA and the GOA. This evidence both demonstrates that the *in pari delicto* defense was properly presented for jury determination and provides the factual and legal basis for the jury's Verdict, which properly denied Primo from recovering for a breach in which it was directly involved. See Renta, 530 F.3d at 1355.

Furthermore, the jury was presented with extensive evidence to demonstrate that Primo had previously stolen the shrimp broodstock (and underlying genetics) upon which its claim of breach was based. The evidence presented to the jury demonstrates that a Philippines corporation, Feedmix, was the owner of the stock acquired by Neil Gervais in Ecuador, that Ken Gervais falsely represented to Feedmix that it had received all such animals, and that Ken Gervais proceeded to convert the Feedmix animals to the use of Primo without the knowledge or permission of Feedmix. (Doc. #479 at 67:9-16, 74:19-75:20, 77:4-24, 78:16-18, 80:23-81:6, 81:22-85:17, 90:3-91:14, 94:20-95:10); Defendants' Trial Exhibit JJJ, KKK, LLL, MMM, NNN, OOO, PPP, QQQ. As a result, Primo did not own the shrimp broodstock that constituted its founding stocks, and Primo's representations that it owned such stocks was proven entirely false, thereby

precluding any claim for breach of the NDA and GOA.  Indeed, it was further established that Plaintiff's witnesses, Ken Gervais and Neil Gervais, had both perjured themselves by falsely claiming that Plaintiff (and not Feedmix) had paid for the acquisition of such stocks in Ecuador. (<u>Compare</u> Doc. #467 157:10-14, 167:18-20, 182:19-183:1 and Doc. #469 110:10-111:11 <u>with</u> Doc. #479 67:9-68:6, 74:19-75:20, 80:23-81:6, 90:3-91:14). Primo's claim for breach under both the NDA and the GOA alleged that AMI stole that shrimp broodstock (and the underlying genetics); where AMI presented the jury with evidence to show that such broodstock and genetics was first stolen by Primo, that evidence likewise supports the jury's finding of *in pari delicto*.

Finally, the jury was presented with extensive evidence of Primo's duplicity in negotiating the terms of the handwritten agreement. Specifically, Mr. Pearl testified that the parties involved understood and intended the handwritten agreement to be binding and enforceable as written. (Doc. #471 at 264:8-24). Ken Gervais testified that he authorized Randall Aungst to sign the handwritten agreement on behalf of Primo. (Doc. #469 at 52:11-13). Two separate counsels representing Primo further confirmed the binding nature and enforceability of the handwritten agreement as executed. (Doc. #471 at 267:17-268:1). This consistent testimony stands in stark contrast to Ken Gervais' claim that the termination of the NDA and the GOA, as stated in the handwritten agreement, was not a binding

obligation. (Doc. #469 at 95:19-99:8). Ken Gervais thus testified that Primo agreed to the termination of the NDA and the GOA, without any intent of ever recognizing the binding nature of that provision. In so doing, Ken Gervais and Primo induced AMI to act in alleged breach of the NDA and GOA. This evidence, as well, provides a basis for the jury's determination of Primo's conduct *in pari delicto*, where Primo actively induced the breach of which it complained.

The foregoing provides three separate evidentiary bases upon which the jury's determination of *in pari delicto* may be grounded. Any one of which is sufficient to overcome Plaintiff's substantive argument with respect to AMI's defense of *in pari delicto*. Because failure of the *in pari delicto* defense is necessary to support Plaintiff's additional arguments that the Court should prevail as a matter of law on its claim of breach of the NDA and its unfair competition claims, such arguments also fail as a matter of course.

### III.    Plaintiff Presents No Basis for Overturning the Jury's Verdict on Unfair Competition.

If, despite the foregoing bases supporting the jury's determination of Primo's conduct *in pari delicto*, the Court is inclined to further consider Plaintiff's argument on unfair competition, it should be noted that, once again, no such argument can be found in Plaintiff's preverdict motion under Rule 50(a). (Doc. #480 at 23-30). Furthermore, to the extent that Plaintiff's argument that a determination under the Lanham Act requires the same determination under state

unfair competition claims was not considered by the jury, that argument is out of time under the requirements of Rule 50(b). Fed.R.Civ.P. 50(b). For both these reasons, Plaintiff's arguments on unfair competition should be summarily denied.

Turning to Plaintiff's substantive argument, the jury's Verdict unequivocally found that Plaintiff had failed to prove by a preponderance of the evidence its unfair competition claims against AMI, API, and Mr. Pearl. (Doc. #465 at 16). As with its argument on alter ego, Plaintiff continues to press its unsupported "deductions" of the jury's reasoning, in this case to support its claim that "the only possible basis for the jury to have not found for Plaintiff on its Florida unfair competition claims was that it erroneously found that Defendants are not a competitor of TB." (Doc. #486 at 17). As before, there is no basis for such a deduction in the Verdict; indeed, an examination of the Court's Instructions to the Jury reveals that the jury properly considered Plaintiff's Lanham Act for false advertising as distinct from its claims for unfair competition under Florida law.

In the Court's Instructions to the Jury, the Court went to some effort to differentiate among these various claims as follows:

> Count VI alleges that all three defendants engaged in unfair competition by making false statements in advertising in violation of a federal statute referred to as the Lanham Act. Count VII alleges that all three defendants engaged in unfair competition under the Florida common law. Count VIII alleges that all three defendants engaged in unfair competition in violation of a statute referred to as the Florida Unfair and Deceptive Trade Practices Act.

(Doc. #456 at 40). Plaintiff, who approved the jury instructions, made no objection to this statement. Likewise, the elements that Plaintiff was required to prove for each claim, as approved by Plaintiff, are separate and distinct. Plaintiff's Lanham Act claim required evidence of (1) a false statement of commercial promotion, (2) deception of consumers, (3) an effect on purchasing, (4) a relation to foreign commerce, and (5) Plaintiff's injury by lost sales or loss of goodwill. (Doc. #456 at 41). In contrast, Plaintiff's NDA-based unfair competition claims required evidence (a) that Defendants competed with TB Food; (b) that the NDA precluded Defendants from disclosing confidential information; (c) that Defendants breached this duty; and (d) that Plaintiff suffered damages. (Doc. #456 at 47). And Plaintiff's false statement-based unfair competition claims required evidence (i) that Defendants competed with TB Food; (ii) that Defendants engaged in deceptive or dishonest conduct; (iii) that such conduct caused confusion among consumers; and (d) that Plaintiff suffered damages. (Doc. #456 at 47-48).

In finding for Plaintiff and against API and Mr. Pearl on Plaintiff's Lanham Act claim, the Verdict provides no factual findings that may be interpreted or otherwise transported into an analysis of Plaintiff's unfair competition claims. Indeed, the Verdict states simply that "Plaintiff has proven by a preponderance of the evidence its federal false advertising claim against API [and Robin Pearl]." (Doc. #456 at 13). Likewise, the Verdict fails to provide any factual finding that

17

could be used to interpret the jury's determination that Plaintiff failed to prove by a preponderance of the evidence its unfair competition claims against any of the Defendants. (Doc. #456 at 16). Plaintiff now (for the first time) takes the position that the jury's determination under its breach of contract and Lanham Act claims necessarily requires the same determination under its state unfair competition claims. But Plaintiff presents no factual findings by the jury to back up such claims, relying instead on its fallacious "deductions" of the jury's reasoning.[7]

It is perfectly possible (and, indeed, probable) that the jury's determination that Plaintiff failed to prove up its unfair competition claims rested upon one or more of the following: (1) a failure to demonstrate that Defendants compete with Plaintiff; (2) the discharge of any obligations under the NDA due to Plaintiff's conduct *in pari delicto*; (3) the failure to demonstrate any actionable breach of the NDA; (4) the failure to demonstrate any deceptive or dishonest conduct on the part of Defendants; (5) the failure to demonstrate confusion among customers; (6) the failure to demonstrate a causal connection between deceptive or dishonest conduct and confusion among customers; or (4) the failure to demonstrate any damages actually accruing to Plaintiff. Absent an examination of the jury itself, no

---

[7] Indeed, to the extent that such claims are inconsistent, Defendants' position is that the jury mistakenly found liability under the Lanham Act, where its determination of Plaintiff's unfair competition claims demonstrates conclusively that Defendants did not engage in deceptive conduct.

amount of self-serving divination or creative porting of claim elements on the part of Plaintiff can serve to narrow the list of possibilities sufficient to warrant overturning the jury's Verdict.

Plaintiff's argument here is as legally infirm as it is factually infirm. Plaintiff argues, without any direct legal authority, that the zone of interests analysis required to establish Constitutional standing for a Lanham Act claim somehow eliminates the requirement of actual competition for unfair competition claims under Florida law. (Doc. #486 at 16-17). Plaintiff relies primarily on Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014). But neither Lexmark, nor any of the cases cited by Plaintiff, stands for that ridiculous proposition. Lexmark itself undercuts Plaintiff's argument, where it states that tangential or indirect damage is insufficient to confer standing for, much less to prove up the elements of, a Lanham Act claim:

> We thus hold that a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff. That showing is generally not made when the deception produces injuries to a fellow commercial actor that in turn affect the plaintiff. For example, while a competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses, the same is not true of the competitor's landlord, its electric company, and other commercial parties who suffer merely as a result of the competitor's "inability to meet [its] financial obligations."

Lexmark, 572 U.S. at 133 (internal citation omitted) (emphasis added). Plaintiff's argument that damages to Haimao should impute to TB Food states "injuries to a

fellow commercial actor that in turn affect the plaintiff," for which standing is precluded by <u>Lexmark</u>. Furthermore, it is crystal clear that unfair competition claims under Florida law do, in fact, require a showing of competition. <u>M.G.B. Homes, Inc. v. Ameron Homes, Inc.</u>, 903 F.2d 1486, 1493, 1494 (11th Cir. 1990) (to prevail on unfair competition claim under Florida law, party must show deceptive or fraudulent conduct by a competitor and the likelihood of customer confusion); <u>Donald Frederick Evans and Assoc. v. Continental Homes, Inc.</u>, 785 F.2d 897, 914 (11th Cir. 1986) (Florida law requires that a plaintiff establish deceptive or fraudulent conduct of a competitor and likelihood of consumer confusion for claim of unfair competition)[8]; <u>see also</u> <u>Prac. Mgmt. Assocs., Inc. v. Old Dominion Ins. Co.</u>, 601 So. 2d 587, 588 (Fla. 1st DCA 1992) ("Even giving the phrase 'unfair competition' its broadest ordinary meaning, the offense must include at least two elements, 'unfairness' and 'competition.'").

## CONCLUSION

Wherefore, for the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's Rule 50(b) Motion and provide such other and further relief as it deems just and necessary.

---

[8] It should be noted that the elements requiring a demonstration that the parties are competitors was proposed in proposed jury instructions by Plaintiff, which cited these two Eleventh Circuit cases for the principles noted.

Respectfully submitted this 12th day of January 2022.

/s/Patrick J. O'Connor
Patrick J. O'Connor
Florida Bar No. 0715778
**O'CONNOR HERNANDEZ**
**& ASSOCIATES, P.A.**
999 Brickell Avenue, Suite 740
Miami, Florida 33131
Telephone: 786.628.7541
poconnor@oconnorhernandez.com

/s/Melville G. Brinson
Melville G. Brinson Ill
Florida Bar No. 494003
**MELVILLE G. BRINSON Ill, P.A.**
8359 Stringfellow Road
St. James City, Florida 33956
Telephone: 239.282.0551
brinson@afblaw.com

*Counsel for AMI, API, and Robin Pearl*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that in accordance with the federal and local rules the foregoing document is being filed on this 12th day of January 2022, via the Court's CM/ECF filing system, which will serve a copy electronically on all counsel of record.

/s/Patrick J. O'Connor